**Caleb Crahan** (OSB No. 226470)
ccrahan@thompsoncoburn.com
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, Missouri 63101
Telephone: (314) 552-6477

**Ollie A. Cleveland, III** (*pro hac vice* forthcoming)
tcleveland@thompsoncoburn.com
**Brandt P. Hill** (*pro hac vice* forthcoming)
bhill@thompsoncoburn.com
**Lorrie L. Hargrove** (*pro hac vice* forthcoming)
lhargrove@thompsoncoburn.com
THOMPSON COBURN LLP
2311 Highland Avenue, Suite 330
Birmingham, Alabama 35205
Telephone: (205) 769-4303

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| ASSOCIATION OF ACCREDITED NATUROPATHIC MEDICAL COLLEGES; AMERICAN ASSOCIATION OF NATUROPATHIC PHYSICIANS; and NATUROPATHIC MEDICAL STUDENT ASSOCIATION,<br><br>*Plaintiffs*,<br><br>v.<br><br>LINDA MCMAHON, in her official capacity as U.S. Secretary of Education; and U.S. DEPARTMENT OF EDUCATION,<br><br>*Defendants*. | Case No.: 3:26-cv-01599<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF** |

Plaintiffs the Association of Accredited Naturopathic Medical Colleges ("**AANMC**"), the American Association of Naturopathic Physicians ("**AANP**"), and the Naturopathic Medical Student Association ("**NMSA**") (AANMC, AANP, and NMSA collectively, "**Plaintiffs**") bring this Complaint against Defendants the U.S. Department of Education and the Secretary of Education[1] to challenge a new Department rule that became effective July 1, 2026, and the application of that rule. *See* 91 Fed. Reg. 4254 (Jan. 30, 2026) ("**2026 NPRM**"); 91 Fed. Reg. 23768 (May 1, 2026) ("**Final Rule**").

At its core, this case is about federal loans that students need to pursue a Doctor of Naturopathic Medicine degree. The Department's Final Rule stems from the July 4, 2025 Working Families Tax Cuts Act—better known as the "One Big Beautiful Bill Act" or "OBBB." In OBBB, Congress established new limits on the amount of federal loans that "graduate students" and "professional students" can borrow to pay for a program of study at the post-bachelor's degree level. Historically, "graduate" and "professional" students were treated equally for loan limit purposes. But now they are treated differently. Under OBBB, "professional students" can borrow significantly more than "graduate students." The line drawn between these two definitions is now critically important for students, and also for their schools and the professions they seek to enter. Effective July 1, 2026, "graduate students" are limited to borrowing $100,000 less than "professional students."

Whether a student is a "graduate" or a "professional" student depends on whether their program awards a "graduate degree" or a "professional degree." In OBBB, Congress said this question would be based on a three-part test found in an existing regulation. This three-part test—

[1] The Department and the Secretary are collectively referred to as the "**Department**" or "**ED**" unless specified otherwise.

located at 34 C.F.R. § 668.2 on July 4, 2025—asks the following: whether (1) the degree signifies "completion of the academic requirements to begin practice in a given profession"; (2) the degree signifies "a level of professional skill beyond that normally required for a bachelor's degree"; and (3) the profession that degree holders enter "generally requires professional licensure."

The dispute here is whether a Doctor of Naturopathic Medicine degree ("**N.D.**")[2] meets that three-part test and thus is a "professional degree." The answer is yes. First, students that graduate from a four-year, accredited naturopathic medicine program[3] and earn an N.D. have completed the academic requirements necessary to begin practice. Second, this degree is at a doctoral level, signifying that graduates possess a level of skill beyond that required for a bachelor's degree. Third, to practice as a naturopathic medical doctor, one must be licensed. An N.D. thus meets each part of the three-part test. Indeed, the Department for decades has classified an N.D. as a "professional" degree.

Plaintiffs are here today because the Final Rule did not stick to the three-part test. The Department instead overlayed the test with various criteria not appearing in 34 C.F.R. § 668.2—and thus criteria not codified by Congress into OBBB. Only by inventing and then applying these extra-statutory requirements to an N.D. was the Department able to conclude it is not a "professional degree."

---

[2] The N.D. degree is sometimes referred to as an "N.M.D." The difference is primarily regional: Arizona, Idaho, and New Mexico use the title N.M.D. Most other states, including Oregon, use the title N.D. Both represent the same level of education, training, and professional scope. This Complaint refers to an N.D. for simplicity purposes.

[3] Historically, programs leading to an N.D., like M.D. and D.O. programs, have been four-year programs. Similar to accelerated M.D. programs, and in an effort to trim the total cost of attendance, some schools have condensed their ND programs to an accelerated three or three-and-a-half years. These accelerated programs contain all requisite components of the four year program condensed into three and maintain the same academic and clinical hour requirements as the four-year programs, but eliminate summer and other breaks. For ease of reference, this Complaint will refer to all programs as four-year programs.

The Department purported to exclude an N.D. primarily on the basis that the "professional licensure is not generally required" element was not met because "less than half of states license naturopathic physicians." But that is not a consideration under this element's plain language. This element asks whether, for a particular degree, "professional licensure is generally required." 26 United States jurisdictions, including 23 states, Washington D.C., and two U.S. territories, license the profession, providing more than 50% of the U.S. population with access to naturopathic medical treatment and care. In order to use the education, training, and skills that an N.D. acquires in school, in any of these 26 U.S. jurisdictions, one *must* be licensed. In these regulated jurisdictions, a non-licensed individual cannot provide medical treatment and care that only licensed naturopathic doctors can provide. They are likewise prohibited from using the titles "naturopathic doctor," "naturopathic medical doctor," or "naturopathic physician." To the extent the number of licensing jurisdictions is pertinent, the Department could not faithfully exclude an N.D. given that it classified other degrees as "professional" despite *fewer states* licensing their professions. For example, while 22 states license certified anesthesiologist assistants, the Department concluded that "professional licensure *is* generally required" for them. Its exclusion of an N.D. on the basis that "less than half of states license naturopathic physicians" is indefensible.

The Final Rule is illegal several times over. One court has already held the Final Rule likely violated the Administrative Procedure Act ("APA"). Last month, a federal district court in Washington D.C. held that the Final Rule's extra-statutory "professional degree" requirements—those beyond the three-part test—were likely unlawful. The court explained that "Congress provided three, and only three, criteria for a program to qualify as a professional degree," such that the Department "lacked the authority" to fashion "more stringent requirements." The Final Rule is

facing other challenges, and a federal district court in Massachusetts has already expressed its agreement with the D.C. court.

The D.C. court preliminarily stayed and set aside the extra-statutory requirements, but directed the Department "in the first instance" to reassess "which degrees satisfy the statutory definition." The Department has since done that for *some* degrees, concluding they meet the three-part test. For these degrees, the Department is treating them as "professional" while the stay remains in place.

But for other degrees, like an N.D., the Department has done nothing in response to the D.C. court's decision. Despite AANMC and AANP's recent outreach urging the Department to assess anew an N.D. *only* under the three-part test, as the court required, the Department has not responded. This silence signals the Department's decision to rest on its flawed determination in the Final Rule's preamble that an N.D. is not a "professional degree." That determination purportedly applied the "three-part test." But in reality, the Department relied on the same type of unlawful extra-statutory requirements the D.C. district court set aside. Because the Final Rule is equally unlawful as to an N.D. it must be set aside.

Plaintiffs are three naturopathic medicine associations. They collectively represent six institutions of higher education that offer accredited, four-year, doctoral-level naturopathic medicine degree programs ("**ND programs**"),[4] students and prospective students in ND programs, and licensed naturopathic medicine doctors.

The unlawful Final Rule has serious and immediate consequences for Plaintiffs and their members. Beginning July 1, 2026, new students enrolling in ND programs are restricted to

[4] This Complaint refers to the credential awarded by these programs as an "**N.D.**" and to the programs awarding the credential as "**ND programs**."

substantially lower annual and aggregate loan limits than students in "professional degree" programs. Some current students who had enrolled before July 1, 2026 are also suffering because they are not "grandfathered" in to the pre-OBBB framework, and thus also are restricted to substantially lower loan limits. These students, who are members of Plaintiffs NMSA and AANP, and attend schools that are members of Plaintiff AANMC, have already finished one, two, or three years of their ND programs and need access to the higher limits for "professional students" to afford to finish their educations.

Restricting students to lower "graduate student" loan limits will cause major shortfalls. Most students cannot make up for the reduction in borrowing capacity with their own funds. And private student loans are not a viable option for most students. As the D.C. court recognized, private student loans are far less favorable compared to federal student loans in a number of respects. Relying heavily on private loans will burden students and naturally deter them from enrolling. Indeed, this is already happening. Some prospective students who planned to matriculate have elected to forego enrollment and their career aspirations. Even current students are planning to withdraw, if they have not already, leaving them in the worst possible scenario: debt and no degree. As a result, NMSA and AANP are losing both current and prospective members, AANMC institutions' ND programs are losing enrollment and thus substantial tuition revenue, and the naturopathic medical profession at large is losing an influx of new, licensed naturopathic medicine doctors.

Because the graduate degree loan limits are in place now, time is of the essence. Students, ND programs, and the naturopathic medicine profession at large are suffering irreparable harm. Plaintiffs are therefore separately moving for a preliminary injunction. As that motion will detail, the Court should preliminarily enjoin the Department by directing it to treat the N.D. degree as of

July 1, 2026, as a "professional degree"—at least on an "interim basis" as the Department has done for other degrees following the D.C. district court's ruling—and prohibit the Department from enforcing the lower loan limits against ND program students pending a final judgment on the merits.

## JURISDICTION AND VENUE

1. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States. This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1346(a)(2) because the Department is an agency and Secretary McMahon is an official of the United States.

2. The Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202, 5 U.S.C. §§ 705–706, and the Court's inherent authority to enjoin federal officials.

3. Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(C) because defendants are "an agency of the United States," an "officer" of the agency, and "no real property is involved in the action." Plaintiff NMSA's principal place of business is in Portland, Oregon, and thus NMSA "resides" in this district. *See MadKudu v. U.S. Citizenship & Immigr. Servs.*, No. 20-cv-0653, 2020 WL 5628968, at *8 (N.D. Cal. Sept. 14, 2020) ("For purposes of § 1391(e)(1)(C), the clear weight of federal authority holds that venue is proper in a multi-plaintiff case if any plaintiff resides in the District.").

## PARTIES

4. Defendant Linda McMahon is sued in her official capacity as the Secretary of the U.S. Department of Education.

5. Defendant the U.S. Department of Education is an executive agency of the United States federal government, headquartered in Washington, D.C.

6. Plaintiff the Association of Accredited Naturopathic Medical Colleges (AANMC) is a national, nonprofit membership association incorporated in Delaware and headquartered in Washington D.C. AANMC was established in 2001 to advance the naturopathic medical profession by actively supporting the academic efforts of accredited schools of naturopathic medicine. AANMC is composed of member institutions of higher education that offer accredited doctoral-level ND programs.[5] AANMC's purpose is to support its member institutions and their development. All AANMC members' ND programs offer a comprehensive curriculum in naturopathic medicine that leads to an N.D., prepare graduates to take a national licensing examination, and to, upon passing the examination, apply for licensure as naturopathic medicine doctors in 26 U.S. jurisdictions. AANMC provides guidance, information, and various other benefits for its members, their faculty, applicants to ND programs, ND students, and other stakeholders. AANMC's activities are primarily funded by membership dues.

7. Plaintiff the American Association of Naturopathic Physicians (AANP) is a national, nonprofit professional association headquartered in Washington D.C. and incorporated in Oregon. Founded in 1985, AANP represents over 8,000 licensed naturopathic doctors, ND students, and the licensed naturopathic profession. AANP works to ensure the professional growth and personal excellence of all naturopathic medicine doctors, and it advocates on behalf of the profession and the millions of patients that naturopathic medicine doctors serve. AANP also provides continuing medical education programming to members, which is required for naturopathic medicine doctors to maintain licensure and to advance their knowledge, skills, and

[5] AANMC's member institutions are National University of Natural Medicine (Portland, OR); National University of Health Sciences (Chicago, IL); Sonoran University of Health Sciences (Phoenix, AZ); Bastyr University (main campus in Kenmore, WA; additional campus in San Diego, CA); Canadian College of Naturopathic Medicine (campuses in Vancouver, BC and Toronto, ON); and the Universidad Ana G. Méndez (Gurabo, Puerto Rico).

abilities for the entirety of their careers. A major portion of AANP's activities and services are funded by membership dues.

8. Plaintiff the Naturopathic Medical Student Association (NMSA) is a nonprofit organization headquartered in Portland, Oregon. NMSA is a unified, sustainable, ethical and professional voice for naturopathic medical students across North America. NMSA has individual chapters located at AANMC member institutions, and is currently comprised of over 2,000 members who are students in ND programs and are aspiring to become licensed naturopathic medical professionals. Naturopathic medical students play a pivotal role in advocating for the rights of the naturopathic profession, as well as for future patients who have the right to safe and effective natural therapies and access to licensed naturopathic doctors. NMSA supports naturopathic physicians-in-training, and inspires educational and community-building initiatives that prepare naturopathic medical students with tools, experiences and connections necessary to become successful physicians. Most NMSA activities and services are paid for by membership dues as well.

## **BACKGROUND**

### I. The naturopathic medicine profession

9. Naturopathic medicine is a distinct health care profession that is over 100 years old. The practice blends elements of modern conventional medicine and scientific knowledge with traditional and natural forms of medicine. At its core, its philosophy is focused on addressing the root causes of patient illness and diseases rather than treating symptoms. Naturopathic medicine promotes a patient-centered treatment approach that is tailored to the mental, physical, and emotional needs of each patient.

10. Naturopathic doctors are trained as primary care providers. They diagnose, treat

and manage patients with acute and chronic conditions, while addressing disease and dysfunction holistically. They use familiar, conventional diagnostic techniques and treat illness using traditional therapies. Treatments incorporate elements of modern conventional medicine that advance knowledge of the mechanisms of natural healing and therapeutics, especially in the fields of diagnosis, immunology, clinical nutrition and botanical medicine. Naturopathic doctors are well positioned to help their patients address health concerns that require conventional approaches or can be managed by combining both natural/botanical and conventional techniques.

11. Naturopathic doctors practice in a wide variety of settings, including private practices, integrative health clinics, multidisciplinary medical centers, hospitals, community health centers, and academic institutions.

12. Over time the field of naturopathic medicine has gained acceptance and backing as a creative solution to physician shortages.

13. The naturopathic medicine profession continues to grow today. A health-conscious public has turned to using natural therapies as an alternative, or complement, to conventional medicine. Patients increasingly are seeking naturopathic care for a wide range of conditions, including chronic diseases (diabetes, cardiovascular disease, autoimmune conditions), digestive disorders, hormonal imbalances, allergies, musculoskeletal pain, mental health concerns (anxiety, depression), and general wellness and disease prevention. Many patients are drawn to naturopathic medicine because they prefer a holistic, individualized approach or seek alternatives or complements to conventional treatment.

14. Millions of patients depend on naturopathic primary care today. National survey data show that 0.2% of U.S. adults used naturopathy for pain in 2002, growing nearly sevenfold

to 1.3% in 2022.[6]

**A. Pathway to licensure as a naturopathic medical doctor**

15. In step with patient demand, the number of U.S. jurisdictions that regulate and license naturopathic medicine doctors has steadily increased. In 2000, 11 U.S. jurisdictions maintained licensing (or registration) laws for naturopathic doctors. That number has since grown to 26 jurisdictions, including 23 states, the District of Columbia, and the U.S. territories of Puerto Rico and the U.S. Virgin Islands. Some states, like Oregon, Washington, and Connecticut, have regulated the profession for a century or more. The aggregate population of the 26 regulated U.S. jurisdictions composes more than 50% of the United States population. Several other U.S. states are currently considering legislation, further demonstrating sustained patient demand.

16. The licensed naturopathic profession has more than tripled from 2000 to 2026. Today, there are approximately 8,000 licensed naturopathic medicine doctors.

17. In all 26 U.S. jurisdictions where naturopathic medicine is regulated, licensure is required to practice as a naturopathic medicine doctor. Not a single U.S. jurisdiction allows a non-licensed individual to provide naturopathic medical treatment and care to patients. Said differently, licensure is mandatory for anyone to provide patient care as a naturopathic medicine doctor.

18. Applicants for licensure must satisfy several core requirements in each U.S. jurisdiction. While their laws and regulations differ in some respects, all 26 U.S. jurisdictions require the following three steps.

19. First, applicants must complete a four-year doctoral naturopathic medicine program that is accredited by the Council on Naturopathic Medicine ("**CNME**"). CNME is a programmatic

[6] *Naturopathy*, NIH National Center for Complementary and Integrative Health, https://www.nccih.nih.gov/health/naturopathy (last updated April 2025).

accrediting agency for naturopathic medicine programs that is recognized by the Department.[7] Today, the only CNME-accredited naturopathic medicine programs in the United States are AANMC's member institutions.[8] Thus, completing AANMC members' ND programs and earning an N.D. is currently a prerequisite to pursue licensure as a naturopathic medicine doctor in the United States.

20. The curriculum at AANMC members' ND programs is rigorous. Students must complete a minimum of 4,100 hours of didactic instruction, including no fewer than 1,200 hours of supervised clinical training. The foundation courses typically focus on biomedical sciences—anatomy, physiology, biochemistry, microbiology, pathology, and pharmacology—comparable in many respects to the preclinical curriculum at conventional medical schools. The latter curriculum emphasizes clinical training, including supervised patient care, as well as advanced coursework in naturopathic therapeutics. This comprehensive medical education includes advanced diagnostic skills—such as physical examination, laboratory interpretation, and differential diagnosis—clinical decision-making and case management, pharmacological knowledge and prescriptive authority, minor surgical procedures, and comprehensive primary care management.

21. Second, applicants must sit for and pass the Naturopathic Physicians Licensing Examinations ("**NPLEX**"). The NPLEX is a comprehensive two-part, entry-to-practice national licensing examination.[9] Part 1 of the NPLEX tests an applicant's knowledge of the foundational medical sciences, including anatomy, physiology, biochemistry, pathology and pharmacology, and is similar to those used by conventional medical schools. Part 2 of the NPLEX assesses an

---

[7] *See* CNME Naturopathic Program Accreditation, https://cnme.org/naturopathic-accreditation/.

[8] *See* CNME Accredited Naturopathic Schools, https://cnme.org/accredited-programs/ - schools.

[9] N. Am. Bd. of Naturopathic Examiners, NPLEX Exam Overview, https://nabne.org/exam-overview/.

applicant's grasp of standard clinical sciences, such as diagnosis, responding to medical emergencies, and pharmacotherapy. Applicants are also tested on the unique modalities of naturopathic medicine: for example, clinical nutrition, botanical medicine and physical medicine.

22. Third, applicants for licensure must also complete any jurisdiction-specific examinations and satisfy various other administrative requirements.

23. Upon becoming licensed, naturopathic doctors in all 26 U.S. jurisdictions must fulfill state-mandated continuing medical education and reporting requirements, among other things. *See, e.g.*, Or. Admin. R. 850-040-0210 (requiring 32 hours per year of continuing education).

### B. Scope of practice

#### 1. Licensing Jurisdictions

24. Licensed naturopathic doctors in all 26 U.S. jurisdictions are authorized to perform and offer various types of medical treatment and services. Each jurisdiction maintains a specific "scope of practice" under its laws and regulations, which vary. But all licensed jurisdictions grant licensed naturopathic doctors the authority to diagnose patient illness and diseases, independently treat and manage patients, and perform physical examinations and procedures. Most states authorize licensed naturopathic doctors to order and interpret laboratory tests (e.g., blood, urine, stool, swabs and biopsies) and diagnostic imaging (e.g., X-rays, ultrasounds, MRIs and CT scans). And many states also permit licensed naturopathic doctors to prescribe pharmaceutical drugs, engage in the intravenous and intramuscular administration of medications, and perform minor surgeries.[10]

---

[10] In Oregon, for example, licensed NDs are authorized to prescribe nearly all of the same drug formularies available to allopathic doctors. The naturopathic pharmaceutical formulary includes

25. In all 26 jurisdictions, non-licensed individuals are not allowed to perform or offer these medical services. Non-licensed naturopaths may not provide any medical care or treatment that only licensed naturopathic doctors can. Pursuant to scope of practice laws that govern use of title, they also may not hold themselves out as naturopathic doctors.[11]

**2. Non-Licensing Jurisdictions**

26. In U.S. jurisdictions that do not regulate the practice of naturopathic medicine, non-licensed naturopaths and naturopathic medicine doctors who are licensed in other jurisdictions may practice as wellness consultants, but they cannot perform medical treatment or services that licensees can perform in the 26 licensed jurisdictions. Thus, graduates of accredited ND programs who choose to live and work in these non-licensed jurisdictions are not practicing within a licensed naturopathic scope of practice, nor are they operating under the legal accountability framework that defines the naturopathic profession or the practice of medicine in regulated states.

27. Three states prohibit the practice of naturopathic medicine altogether.[12] These bans are relics from the 1940s and 1950s, and pre-date the modern professionalization of naturopathic medicine by decades. These laws were enacted long before the establishment of current

---

all pharmaceuticals used in a primary care practice, including controlled substances, vaccines, antibiotics and contraceptives. *See* Or. Admin. R. ch. 850, div. 60.

[11] *See* Alaska Stat. § 08.45.080; Ariz. Rev. Stat. Ann. § 32-1555(A)(1)–(2); Cal. Bus. & Prof. Code §§ 3660, 3664, 2052; Colo. Rev. Stat. § 12-250-114; Conn. Gen. Stat. §§ 20-37, 20-42; D.C. Code §§ 3-1205.013–1210.01; Haw. Rev. Stat. § 455-9; Idaho Code § 54-5117; Kan. Stat. Ann. § 65-7211(b); Me. Rev. Stat. tit. 32, § 12521; Md. Code Ann., Health Occ. §§ 14-5F-29 to 14-5F-30; Mass. Gen. Laws ch. 112, § 273; Minn. Stat. § 147E.10; Mont. Code Ann. § 37-26-401; N.H. Rev. Stat. Ann. §§ 328-E:3, 328-E:14; N.M. Stat. Ann. § 61-12G-10; N.D. Cent. Code §§ 43-58-03, 43-58-12; Or. Rev. Stat. § 685.020; 63 Pa. Cons. Stat. §§ 272.201, 272.206; P.R. Laws Ann. tit. 20, § 2465–2466; R.I. Gen. Laws § 5-36.1-4; Utah Code Ann. § 58-71-301, 58-1-501(1)(a); V.I. Code Ann. tit. 27, § 192; Vt. Stat. Ann. tit. 26, § 4122(a)(1)–(2); Wash. Rev. Code § 18.36A.030; Wis. Stat. §§ 466.02(1)(a)-(b), 466.09.

[12] *See* Fla. Stat. § 462.17; S.C. Code Ann. § 40-31-10; Tenn. Code Ann. § 63-6-205.

programmatic accreditation standards, the national licensing examinations (NPLEX), and the rigorous four-year doctoral medical curricula currently recognized by the Department. These archaic statutes target an entirely different historical iteration of the profession, not the modern "Doctor of Naturopathic Medicine" degree program, and there are ongoing efforts to remove these bans. *See Florida Lawmakers Move to License an Alternative Medicine Abolished Decades Ago*, WUSF NPR (May 3, 2026).[13]

## II. The Higher Education Act and the Department's historical treatment of an N.D. and ND programs

### A. Federal Direct Loan Program

28. Congress enacted the Higher Education Act of 1965 ("**HEA**") "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." Pub. L. No. 89-329, 79 Stat. at 1219; *see Biden v. Nebraska*, 600 U.S. 477, 483–84 (2023) ("The [HEA] was enacted to increase educational opportunities and assist in making available the benefits of postsecondary education") (internal quotation omitted).

29. Title IV of the HEA authorizes student financial aid programs, including loan and grant programs. *See* 20 U.S.C. § 1070 *et seq.*

30. Part D of Title IV establishes the "William D. Ford Federal Direct Loan Program" ("**Direct Loan Program**"). 20 U.S.C. § 1087a–j.

31. The Direct Loan Program enables students to borrow Direct Loans to "pursue their courses of study" at eligible institutions of higher education. 20 U.S.C. § 1087a(a).

32. Federal Direct Loans "offer several advantages" over private, nonfederal student

[13] https://www.wusf.org/politics-issues/2026-05-03/florida-lawmakers-move-license-alternative-medicine-abolished-decades-ago.

loans issued by lenders, such as a bank or credit union.[14] Federal loans have fixed interest rates that are typically lower than private loans, there are several options for repayment plans that provide flexibility, and loan forgiveness options are available.[15] Many private loans also require a co-signer and sufficient credit, which many students simply do not have.

33. The Direct Loan Program consists of different types of Direct Loans. *See* 20 U.S.C. § 1087e.

34. Relevant here are Direct Unsubsidized Loans ("**Unsubsidized Loans**") and to a lesser extent, Direct PLUS Loans, better known as Grad PLUS Loans.[16]

35. Prior to July 1, 2026, "graduate" and "professional students" generally could borrow the same amount of Unsubsidized Loans, up to $20,500 annually and up to $138,500 in the aggregate. *See* 34 C.F.R. § 685.203 (2025); *see also* CONGRESSIONAL RESEARCH SERVICE, *The Department of Education's Proposed Rule to Define 'Professional Student': FAQ*, at p. 8 (Dec. 17, 2025)[17] ("[P]rior to enactment of [OBBB], distinctions between graduate and professional students were typically not made for the purposes of student loan limits") (hereinafter, "**CRS REPORT**").

36. Congress, however, authorized the Secretary to permit graduate and professional students enrolled in programs that require "specialized training" to borrow additional Unsubsidized Loans. 20 U.S.C. § 1078-8(d)(2)(A)(ii); *see also* 2026 NPRM at 4277 (discussing

---

[14] StudentAid.gov, *Federal Versus Private Loans*, https://studentaid.gov/understand-aid/types/loans/federal-vs-private.

[15] *See id.*

[16] Another type of Direct Loan, the Direct Subsidized Loan, was available to graduate and professional students prior to July 1, 2012. The Budget Control Act of 2011 eliminated the availability of Direct Subsidized Loans to graduate and professional students beginning July 1, 2012. Pub. L. No. 112-25, §502, 125 Stat. 240, 266.

[17] https://www.congress.gov/crs_external_products/R/PDF/R48768/R48768.6.pdf.

loan limits for health professionals).

37. Historically, and prior to July 1, 2026, the Department exercised this additional borrowing authority with respect to students enrolled in approved "health professions" programs.[18]

38. In June 2005, the Department approved CNME-accredited ND programs in the United States as "health professions" programs.[19]

39. In doing so, the Department allowed ND program students to borrow up to an additional $26,667 annually in Unsubsidized Loans, and up to $189,215 in the aggregate, above the annual and aggregate limits for other graduate and professional students.[20] The authority to award additional unsubsidized [Direct] Loan amounts to eligible Naturopathic Medicine students was "effective for any loan period that begins on or after May 1, 2005."[21] *Id.*; *see also* 2025-2026 FSA HANDBOOK, *supra* n.18, at vol. 8, pp.38-39 ("The increased unsubsidized amounts that an eligible health professions student may receive are in addition to the regular $20,500 Unsubsidized Loan annual loan limit for graduate and professional students.").[22]

---

[18] *See* ED, GEN-08-04, *Dear Colleague Letter*, *Aggregate Loan Limit for Graduate and Professional Students Preparing for the Health Professions* (Apr. 18, 2008), https://fsapartners.ed.gov/sites/default/files/attachments/dpcletters/GEN0804Attach.pdf ("Since 1996, the Department has . . . increase[d] the aggregate loan limits for graduate and professional students enrolled in certain approved health profession programs . . . ."); *see also* ED, Dear Colleague Letters, GEN-96-14, GEN-97-14, 98-L-209; FSAPartners.ed.gov, 2025-2026 Federal Student Aid Handbook, vol. 8, ch. 4, pp. 38-39, *Annual and Aggregate Loan Limits, Increased Unsubsidized Annual Loan Limits for Certain Health Professions Students*, https://fsapartners.ed.gov/knowledge-center/fsa-handbook/2025-2026/vol8/ch4-annual-and-aggregate-loan-limits ("FSA HANDBOOK").

[19] GEN-05-09, *Increased Unsubsidized Loan Amounts for Naturopathic Medicine Students* (June 2005), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2005-07-05/gen-05-09-increased-unsubsidized-loan-amounts-naturopathic-medicine-students.

[20] *Id.*

[21] *Id.*

[22] The Department contends that OBBB eliminated the higher "health profession" loan limits effective July 1, 2026. *See* Final Rule at 23818 ("Because the limits set forth in Section 455(a)(4) explicitly apply to all Federal Direct Unsubsidized Loans made to graduate and professional

40. The Department increased the aggregate loan limit for ND program students to $224,000 in 2009-2010.[23]

41. Historically, and prior to July 1, 2026, graduate and professional students in need of additional financial assistance, beyond Unsubsidized Loans, could borrow Grad PLUS Loans, up to the full "cost of attendance" of their programs, to finance the remaining portion not covered by Unsubsidized Loans. *See* 34 C.F.R. § 685.203(f)(1) (limit on Grad PLUS Loans is "the cost of attendance minus other financial assistance for the student"); 20 U.S.C. § 1087ll (defining "cost of attendance" to include tuition and fees, and costs for books and supplies, food and housing, transportation, etc.).

42. In sum, prior to July 1, 2026, "graduate" and "professional" students were generally treated the same for Direct Loan Program purposes. Likewise, "prior to" July 1, 2026, "graduate and professional degree programs were considered together solely for loan limit purposes." Final Rule at 23816. As is relevant here, the only distinction for Unsubsidized Loan limit purposes was between graduate and professional students in approved "health professions" programs; students attending CNME-accredited ND programs historically could borrow a higher amount of Unsubsidized Loans.

**B. 2007 Rule Defining "Professional Degree"**

43. While graduate and professional students generally had the same Unsubsidized Loan limits before July 1, 2026, the Department previously defined "graduate or professional

---

students on or after July 1, 2026, including those enrolled in health profession programs, the increased annual and aggregate loan limits established by the Secretary for graduate and professional students enrolled in certain approved health profession programs will not apply to loans made on or after July 1, 2026.").

[23] *See* GEN-08-04, Dear Colleague Letter, *supra* n.18; FSAPartners.ed.gov, 2009-2010 FSA HANDBOOK, vol. 3, ch. 6, pp. 100-101, https://fsapartners.ed.gov/sites/default/files/2021-03/2009-2010%20Chapter%206%20StaffordPLUS%20Loan%20Periods%20and%20Amounts.pdf.

student," and "professional degree," in 2007. These definitions were not used for Direct Loan limit purposes. These 2007 definitions are nonetheless important because Congress codified these 2007 definitions to delineate separate "graduate" and "professional" student borrowing limits.

44. In 2007, the Department proposed a rule defining "undergraduate student," "graduate or professional student," and "first-professional degree," and other terms applicable to "all Title IV, [HEA] programs." 72 Fed. Reg. 44620 (Aug. 8, 2007) ("**2007 NPRM**"); 72 Fed. Reg. 62014 (Nov. 1, 2007) ("**2007 Rule**").

45. In its notice of proposed rulemaking, the Department explained that it was defining these terms "to highlight the Department's policy that graduate or professional students may not receive aid from undergraduate programs, such as the Pell Grant Program, while also receiving graduate or professional level aid." 2007 NPRM at 44622.

46. In the 2007 NPRM, the Department initially proposed to define a "graduate or professional student" as a student who is enrolled in a program leading to a "first professional degree." 2007 NPRM at 44643.

47. The Department's final rule dropped the word "first" since "it is not necessary to specify whether a professional degree is a first professional degree for Title IV, HEA program purposes." 2007 Rule at 62016.

48. The 2007 Rule defined "graduate or professional student" as "[a] student who":

> (1) Is not receiving title IV aid as an undergraduate student for the same period of enrollment;
>
> (2) Is enrolled in a program or course above the baccalaureate level or is enrolled in a program leading to a professional degree; and
>
> (3) Has completed the equivalent of at least three years of full-time study either prior to entrance into the program or as part of the program itself.

2007 Rule at 62024.

49. The 2007 Rule defined a "professional degree" as:

> A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

2007 Rule at 62025.

50. These definitions were added to the Department's regulations at 34 C.F.R. § 668.2(b).

51. Importantly, the Department's proposed definition of "first-professional degree" (and thus the final definition "professional degree" in the 2007 Rule) was itself "based on the definition [of first-professional degree] currently used by the National Center for Education Statistics (NCES)." 2007 NPRM at 44621.

52. NCES is a division within the Department responsible for analyzing data that is submitted by institutions of higher education that receive Title IV funds. *See* 20 U.S.C. §§ 9541, 9511.

53. Under [NCES's] definition, "a first professional degree would be limited to degree programs that require a level of professional skill beyond that normally required for a bachelor's degree as well as a professional license." 2007 NPRM at 44621.

54. NCES at the time had "used" these "criteria" for classifying a "first-professional degree" in its "Integrated Postsecondary Education Data System" ("**IPEDS**"). 2026 NPRM at 4262.

55. IPEDS is a "system of interrelated surveys" that NCES requires institutions that

participate in Title IV to complete.[24] *See* 20 U.S.C. § 1094(a)(17). The surveys collect data about institutions' programs and students, which NCES publishes annually. NCES historically organized data by, among other categories, "degree level," including by "undergraduate degree" and "first-professional degree," and by "field of study."

56. "At the time" of the 2007 Rule, "NCES considered the first-professional degree as one which 'encompasses certain occupationally specific and closely regulated degree programs.'" 2026 NPRM at 4263.

57. NCES classified "Naturopathic medicine" (N.D.) as one such "first-professional degree."

58. NCES classified 10 other "first-professional degrees": medicine (M.D.), chiropractic (D.C. or D.C.M.), dentistry (D.D.S. or D.M.D.), optometry (O.D.), osteopathic medicine (D.O.), pharmacy (Pharm.D.), podiatry (Pod.D. or D.P.M.), veterinary medicine (D.V.M.), law (LL.B. or J.D.), and theology (M.Div., M.H.L., or B.D.).

59. NCES published tables annually listing these 11 "examples" of "first-professional degrees."

60. For example, NCES published the following table in 2001 (relating to data reported for the 1999-2000 academic year):

[24] NCES.ed.gov, *About IPEDS*, https://nces.ed.gov/ipeds/about-ipeds.

**Table 278.—First-professional degrees conferred by degree-granting institutions, by racial/ethnic group, major field of study, and sex of student: 1999–2000**

| Major field of study | Total |
|---|---|
| 1 | 2 |
| **All fields** | **80,057** |
| Dentistry (D.D.S. or D.M.D.) | 4,250 |
| Medicine (M.D.) | 15,286 |
| Optometry (O.D.) | 1,293 |
| Osteopathic medicine (D.O.) | 2,236 |
| Pharmacy (Pharm.D.) | 5,669 |
| Podiatry (Pod.D. or D.P.) or podiatric medicine (D.P.M.) | 569 |
| Veterinary medicine (D.V.M.) | 2,251 |
| Chiropractic medicine (D.C. or D.C.M.) | 3,809 |
| Naturopathic medicine | 202 |
| Law (LL.B. or J.D.) | 38,152 |
| Theology (M.Div., M.H.L., B.D., or Ord.) | 6,129 |
| Other | 211 |

*See* NCES.ed.gov, *First-Professional Degrees Conferred By Degree-Granting Institutions, By Racial/Ethnic Group, Major Field of Study, and Sex of Student: 1999-2000.*[25]

61. Various other Department and NCES publications identified these "first-professional degrees," including "Naturopathic Medicine."

62. For example, in 2004, the Department explained that "programs considered to be first-professional degree programs" and "recognized as first-professional programs by the Department of Education" include, among others, "Naturopathic Medicine."[26]

63. The "professional degree" definition the Department adopted in the 2007 Final Rule listed 10 of the 11 degrees that the Department (and NCES) had classified as "first-professional degrees," not including an N.D.

64. But the 2007 Rule's "professional degree" definition is illustrative, as it expressly

[25] https://nces.ed.gov/programs/digest/d01/dt278.asp. This table omits certain statistical categories that are not relevant for purposes of this Complaint.

[26] NCES.ed.gov, *IPEDS Web-Based Data Collection Fall 2004*, https://nces.ed.gov/ipeds/pdf/webbase2004/editspec_ic.pdf (emphasis added).

states: "***Examples*** of professional degrees ***include but are not limited*** to [listing 10 degrees]." (emphasis added).

65. In the years after the 2007 Rule, the Department continued to treat an N.D. as a "first-professional degree."

66. NCES's published table in 2011 listing "first-professional degrees" appears identical to the 2001 table pictured above.

67. After 2011, NCES discontinued use of the first-professional degree term and began classifying degrees in "selected professional fields." NCES's tables moving forward continued to list "Naturopathic medicine" as a degree in a "professional field" alongside the 10 other degrees.[27]

68. The Department classified an N.D. as a "professional" degree for other purposes as well.

69. For example, the Department organizes degree programs by "CIP Code." The CIP is a "taxonomic coding scheme"; its "purpose is the organization, collection, and reporting of fields of study and program completions." *Introduction to the Classification of Instructional Programs: 2020 Edition*, NCES.ed.gov.[28]

70. The CIP is organized at three levels: (1) a two-digit series that is the most general group of related instructional programs; (2) a four-digit series that represents the "intermediate" grouping of instructional programs that have similar content and objectives; and (3) a six-digit

---

[27] *See* NCES.ed.gov, *Degrees Conferred By Degree-Granting Institutions in Selected Professional Fields, By Sex of Student, Control of Institution, and Field of Study: Selected Years, 1985-86 Through 2009-10*, https://nces.ed.gov/programs/digest/d11/tables/dt11_295.asp (defining "Other" in a footnote, stating that it "**Includes naturopathic medicine**") (emphasis added). In 2022, the Department stopped reporting on "professional degrees" and moved to report Bachelors, Masters and Doctoral degrees with "health professions and related programs" broadly grouped together. *See* CRS REPORT, *supra* ¶35, at 7.

[28] https://nces.ed.gov/ipeds/cipcode/Files/2020_CIP_Introduction.pdf.

series that represents specific instructional programs and is the most detailed program classification in the CIP. *Id.*

71. The Department organizes programs leading to an N.D. under the two-digit CIP Code 51, titled "Health Professions and Related Clinical Sciences," and defined as "Instructional programs that prepare individuals to practice as ***licensed professionals*** and assistants in the health care professions and related clinical sciences and administrative and support services."[29] Programs leading to an N.D. fall more specifically under the four-digit CIP Code 51.33, titled "Alternative and Complementary Medicine and Medical Systems." Programs leading to an N.D. fall most specifically under the six-digit CIP Code 51.3303, titled "Naturopathic Medicine/Naturopathy (ND)," and defined as "[a] program that prepares individuals for the independent ***professional*** practice of naturopathic medicine."[30]

72. Similarly, the Department continued to enumerate naturopathic medicine as a "health profession," authorizing students in CNME-accredited ND programs to borrow more Unsubsidized Loans than other graduate and professional students. *See supra* ¶36–38.

## III. Congress acts to lower student loan limits

### A. The One Big Beautiful Bill Act

73. OBBB, signed into law by the President on July 4, 2025, brought about several changes to the Direct Loan Program, and codified them in a new subsection (a)(4) to 20 U.S.C. § 1087e. *See* Pub. L. No. 119-21, tit. VIII, subtit. B, § 81001; 139 Stat. 72, 334.

74. Three changes are relevant here.

---

[29] *See* NCES.ed.gov, Detail for CIP Code 51, https://nces.ed.gov/ipeds/cipcode/cipdetail.aspx?y=55&cipid=88742 (emphasis added).

[30] *See* NCES.ed.gov, Detail for CIP Code 51.3303, https://nces.ed.gov/ipeds/cipcode/cipdetail.aspx?y=55&cip=51.3303.

75. *First*, Congress discontinued Grad PLUS Loans for "graduate or professional students" effective July 1, 2026. *See* 20 U.S.C. § 1087e(a)(3)(C).

76. *Second*, Congress established Unsubsidized Loan annual and aggregate borrowing limits for "graduate students" and separately for "professional students," also effective July 1, 2026. *See* 20 U.S.C. § 1087e(a)(4)(A).

77. Specifically, Congress set the Unsubsidized Loan limit for "graduate students" at $20,500 per year, and up to $100,000 in the aggregate, but established a higher limit ($50,000 per year, up to $200,000 in the aggregate) for "professional students." 20 U.S.C. § 1087e(a)(4)(B).[31]

78. *Third*, OBBB defined "graduate student" and "professional student" for purposes of the new limits.

79. The term "graduate student" is defined as "a student enrolled in a program of study that awards a graduate credential (other than a professional degree) upon completion of the program." 20 U.S.C. § 1087e(a)(4)(C)(i).

80. The term "professional student" is defined as "a student enrolled in a program of study that awards a professional degree, as defined under [§] 668.2 of title 34, Code of Federal Regulations (as in effect on July 4, 2025), upon completion of the program." 20 U.S.C. § 1087e(a)(4)(C)(ii).

81. The definition of "professional degree" in 34 C.F.R. § 668.2 "in effect on July 4, 2025" was the same definition from the 2007 Rule. *See supra* ¶20.

82. The consequence of OBBB was to draw a line between a "graduate student" and "professional student" that previously did not exist.

---

[31] As noted above, previously, the annual Unsubsidized Loan limit was $20,500 for both "graduate" and "professional" students, except that students in "health profession" programs could access higher limits. *See supra* ¶36–38; 34 C.F.R. § 685.203 (2025).

83. OBBB contains an "interim exception," or grandfathering provision, allowing students in a program who were enrolled as of June 30, 2026 and who had "received a loan" for that same program prior to July 1, 2026, to continue borrowing Grad PLUS Loans and Unsubsidized Loans at pre-OBBB levels, on or after July 1, 2026, for the duration of their "expected time to credential." 20 U.S.C. § 1087e(a)(4), (8). The "expected time to credential" is defined in OBBB as the *lesser* of (1) three academic years from July 1, 2026; or (2) the difference between the program's length and the period of the program that the student completed as of June 30, 2026. *Id.* § 1087e(a)(8)(B).

**B. The 2026 NPRM**

84. On January 30, 2026, the Department published a Notice of Proposed Rulemaking to amend the regulations for the Direct Loan Program.

85. The 2026 NPRM recognized that OBBB "borrowed and codified the Department's regulatory definition of the term 'professional degree' in 34 C.F.R. [§] 668.2" that was promulgated in the 2007 Rule, and that "[t]he definition of professional degree has not been further amended since November 1, 2007." 2026 NPRM at 4262–63.

86. The 2026 NPRM further recognized that 34 C.F.R. § 668.2 "establishes a three-part test" to qualify as a "professional degree."

> (1) "the degree must signify completion of the academic requirements for beginning practice in a given profession";
>
> (2) "the profession the graduate enters must require a level of professional skill beyond what is normally required for a bachelor's degree"; and
>
> (3) the profession must "generally require[] professional licensure."

2026 NPRM at 4262.

87. The 2026 NPRM's proposed definition of "professional degree," however, added additional criteria. These criteria appear in bold below.

(1) A professional degree is a degree that:

(i) Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a bachelor's degree;

(ii) **Is generally at the doctoral level**, **and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework**;

(iii) Generally requires professional licensure **to begin practice**; and

(iv) **Includes a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (2)(i) of this definition**.

(2) A professional degree may be awarded in the following fields:

(i) Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (DC or DCM.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.).

2026 NPRM at 4332–33.

88. Thus, on top of the three-part test in 34 C.F.R. § 668.2, the 2026 NPRM proposed that a "professional degree" must (1) "generally [be] at the doctoral level"; and (2) require "at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework." 2026 NPRM at 4260–61.

89. These two criteria originated in NCES's definition of "first-professional degree." *See supra* ¶43–50. The 2026 NPRM recognized that "[w]hen the regulation was promulgated in 2007, the definition of professional degree in 34 C.F.R. [§] 668.2 was based on the long-standing definition of a first-professional degree used by the Department's [NCES]." 2026 NPRM at 4261.

90. As noted above, NCES's tables classified "Naturopathic medicine" as a "first professional degree" in 2007. When NCES discontinued use of that term in favor of a "professional" "field" classification in 2011, it continued to encompass "Naturopathic medicine." *Supra* ¶57–67.

91. The 2026 NPRM added a third criterion on top of the three-part test: that a program "includes a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (2)(i) of this definition." 2026 NPRM at 4332.

92. The Department acknowledged that the 10 degrees in 34 C.F.R. § 668.2 were "codified by Congress into the definition." 2026 NPRM at 4262. In addition to maintaining these 10 degrees, the 2026 NPRM added one degree (Doctorate of Clinical Psychology) as a "professional degree." 2026 NPRM at 4309.

93. Critically, the 2026 NPRM ***eliminated*** the "Examples include but are not limited to" phrase that appears before the list of 10 "professional degrees" in § 668.2 and thus in OBBB. *See id*. at 4332–33. The 2026 NPRM instead stated that to be a "professional student" one "***Must be*** enrolled in a program leading to" one of the 11 listed "professional degrees." *Id*. at 4333.

94. Accordingly, an N.D. was not listed as a "professional degree." The Department provided the following justification for not including an N.D.:

> The Department determined that an N.D. did not satisfy the professional degree definition because the regulatory landscape surrounding naturopathic medicine is unsettled. Currently, only 23 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands license naturopathic physicians. Furthermore, the practice of naturopathy is explicitly banned in three states. Fla. Stat. § 458.305; S.C. Code Ann. § 40–31–10; and Tenn. Code Ann. § 63–6–205. While universal licensure of practitioners in a given field by every state is not required for a degree to be a professional degree, because of the fact that less than half of states license naturopathic physicians and some states ban the practice of naturopathy entirely, the

> Department determined that an N.D. cannot clearly be said to be required for entrance into a specific profession or lead to licensure at this moment in time.

2026 NPRM at 4265.

### C. AANMC and AANP submit comments on the 2026 NPRM

95. AANMC and AANP jointly submitted comments to the Department on the 2026 NPRM.

96. AANMC and AANP explained, first, why an N.D. met the three-part test for a "professional degree" in 34 C.F.R. § 668.2(b) and OBBB.

97. On the first prong, an N.D. "signifies completion of the academic requirements to begin practicing" as a naturopathic medicine doctor. Upon completion of an ND program and earning an N.D., graduates have completed all *academic* requirements to begin practicing as naturopathic medicine doctors. The N.D. degree signifies readiness to sit for an entry-to-practice licensing examination (NPLEX) and, upon licensure, to enter independent primary care practice.

98. Second, an N.D. "requires a level of professional skill beyond what is normally required for a bachelor's degree," as earning an N.D. requires students to acquire doctoral-level clinical competencies, obtained through four years of post-baccalaureate education.

99. Third, "professional licensure is generally required" to enter the profession that an N.D. holder enters. AANP and AANMC rebutted the 2026 NPRM's decision to exclude an N.D. on the basis that "less than half of states license naturopathic physicians." 26 U.S. jurisdictions, including 23 states, D.C., Puerto Rico, and the U.S. Virgin Islands, require that an individual be licensed to practice. They emphasized that such a "majority-state licensure" requirement is not part of the three-part test, and is not the proper framing of the question of whether "professional licensure is generally required." Those who enroll in an ND program and earn an N.D. upon

graduation acquire knowledge, specialized skills, and clinical training that prepares them specifically to practice as licensed naturopathic doctors in these 26 U.S. jurisdictions. Thus, in order to utilize the education and training they acquire by earning an N.D. and thus provide naturopathic medicine treatment and services in 100% of these 26 U.S. jurisdictions, an N.D. holder *must* be licensed. Moreover, no state allows naturopathic medical treatment without licensure. In fact, if one attempts to practice naturopathic medicine without a license, they face criminal prosecution.

100. AANMC and AANP disputed the 2026 NPRM's conclusion that licensure is not "generally required" for naturopathic medicine doctors since three states ban the practice. Such a requirement—that practice be permitted *everywhere*—is not in the three-part test and is irrelevant to whether "licensure is *generally* required."

101. AANMC and AANP highlighted the flaws in the Department's logic that the naturopathic medicine profession's "regulatory landscape" is purportedly "unsettled." They explained that the Department's logic ignores the standard professionalization pathway followed by other healing arts it currently recognizes as "professional." For example, osteopathic medicine (D.O.) and chiropractic (D.C.) both faced historical state prohibitions before systematically working state-by-state to lift bans and secure licensure. If the Department had applied its current logic to the D.O. or D.C. professions in the mid-20th century, it would have excluded them as "unsettled" despite their robust educational standards.

102. AANMC and AANP also recounted the Department's longstanding treatment of an N.D. as a "first-professional degree" alongside the same 10 degrees classified as "professional degrees" in the 2026 NPRM.

103. AANP and AANMC also pointed to inconsistencies in the 2026 NPRM's treatment

of an N.D. and other degrees.

**D. The Final Rule**

104. The Department published the Final Rule on May 1, 2026.

105. The Final Rule made no material changes to the 2026 NPRM's "professional degree" definition. Final Rule at 23882; *see* 34 C.F.R. § 685.102 (2026) (codifying definition of "professional student," including definition of "professional degree").

106. The Department dismissed the many arguments AANMC, AANP, and others advanced for including an N.D. as a "professional degree."

107. The Department stated that an "ND cannot be included in the list of professional degrees because it does not pass all parts of the operative test." The Department acknowledged that "obtaining a Doctor of Naturopathic Medicine does prepare students to begin practice in naturopathic medicine." Final Rule at 23794. But the Department reiterated that "an N.D. would not" satisfy the test because "less than half of States license NDs and some States ban the practice of naturopathy altogether." *Id.*

108. With respect to the three states' limitations on the practice of naturopathic medicine, which osteopathic medicine and the chiropractic professions had historically faced as well, the Department replied that it does "not believe that the history of other degree programs is relevant," and called "this claim [] a red herring" with "no predictive value." Final Rule at 23794.

109. The Department also explained that an N.D. is not "substantially similar" to the 11 "professional degrees" in the Final Rule. It stated: "To be considered a professional degree, a degree must meet the three-prong test ***and be similar in character to the degrees Congress included in the illustrative list*** in the definition of professional degree." Final Rule at 23785 (emphasis added). It emphasized that "the statute has an operative test and there is contextual

information in the illustrative list of degrees that helps to further interpret the definition." *Id.* at 23790. The Department nevertheless concluded that an N.D. "is not substantially similar" to the 11 listed degrees, "so it cannot be considered a professional degree." *Id.* at 23794.

110. The Department also "decline[d] to adopt the commenters' argument that prior NCES/IPEDS 'first professional degree' classifications . . . affect which degrees are included in the definition of *professional degree*." *Id.* It reasoned that "[i]nclusion in NCES data tables is irrelevant," since "we are interpreting the statute . . . which does not reference IPEDS reporting classification." *Id.* at 23790, 23794.

111. Elsewhere in the Final Rule's preamble, however, the Department took a different view and stated that it "believes the former inclusion of such programs in the definition of *professional degree* ***is relevant***." *Id.* at 23788 (emphasis added). In fact, the Department highlighted that the "list of programs in § 668.2 was based on the definition of *first-professional degree* used by [NCES]." Final Rule at 23784 n.6. The Department cited *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) and *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014) and stated that "the longstanding practice of the government" remained "consistent over time," which cautioned against *expanding* the definition of "professional degree" to include programs that were not enumerated in statute. Final Rule at 23788.

112. Moreover, recently, in pending litigation about this same rule but focused on other healthcare degree programs, the Department similarly leveraged NCES's "first-professional degree" definition to argue that other degrees were not "professional degrees" and that the definition should not be expanded, stating:

> Although the eventual defined term was "professional degree," it was originally termed "first professional degree." **That is important** because, as the Department explained when it proposed § 668.2, **the definition was**

> **"based on the definition currently used by the National Center for Educational Statistics (NCES)**.

*Am. Ass'n of Nurse Practitioners*, No. 1:26-cv-01780-BAH, Doc. 23 (Opp. to Mot. for Stay) at p.26 (D.D.C.) (quoting 2007 NPRM at 44621) (emphases added).

113. In its briefing in that case and other litigation, the Department characterized the requirements in the "IPEDS definition" as "668.2's ***precursor***," conceded that "when the Department promulgated § 668.2 with the ***same list of professions as the IPEDS definition***, § 668.2 '***brought the old soil***' with it" and "***carried over***" those degrees, and admitted that "when Congress cross-referenced § 668.2 in [OBBB], it ***intended to incorporate that same administrative interpretation***." *Id.* (emphasis added); *Am. Nurses Ass'n v. U.S. Dep't of Educ.*, No. 1:26-cv-12443 (PBS), Doc. 42 (Opp. to Mot. for Prelim. Inj. & Stay) at p. 21 (D. Mass. June 6, 2026) (emphasis added, citations omitted).

## IV. Litigation challenging the Final Rule and "Professional Degree" definition

114. Four other lawsuits—not including this one—have been filed against the Department challenging the Final Rule and its definition of "professional degree."

115. In one case brought in federal district court in D.C., several nursing associations moved for a stay of the Final Rule's extra-statutory "professional degree" requirements. *Am. Ass'n of Nurse Practitioners v. McMahon*, No. 1:26-cv-01780 (BAH) (D.D.C.). In a second case, also filed in federal district court in D.C., physician assistants/associates' associations similarly moved for a stay as well, including a stay of a requirement in the "preamble" to the Final Rule that to be "professional," a degree must not lead to employment where one is "supervised by a licensed professional." *PA Educ. Ass'n v. U.S. Dep't of Educ.*, No. 1:26-cv-1941 (BAH) (D.D.C.). These two cases were consolidated.

116. In *Maryland v. Dep't of Educ.*, No. 1:26-cv-01957 (D. Md.), a group of states sued

over the new loan limits. Similarly, another nurses association and nine other national nursing organizations brought a lawsuit in the District of Massachusetts. *See Am. Nurses Ass'n v. U.S. Dep't of Educ.*, No. 1:26-cv-12443 (D. Mass.).

117. On June 24, 2026, Judge Howell of the U.S. District Court for the District of Columbia granted the plaintiffs' requested stay. *See Am. Ass'n of Nurse Practitioners*, -- F. Supp. 3d --2026 WL 1826176, at *24. The court found that the Final Rule "imposed new requirements absent from the preexisting definition adopted by Congress and turned an illustrative list of qualifying degrees into an exhaustive one." *Id.* at *5. The court further explained that the Department likely "lacked the authority to make . . . material changes to Congress's required definition," since "Congress did not direct the Department to evaluate and update the regulatory definition already in 34 C.F.R. § 668.2 with any new eligibility criteria." *Id.* at *16.

118. The court found that "the Department lacked the authority to make [five] material changes to Congress's required definition." *Am. Ass'n of Nurse Practitioners*, 2026 WL 1826176, at *16. Specifically, the court found that the Department expressly added four material changes to the definition of  a "professional degree" that are were not in the statute: (1) "generally at the doctoral level," (2) "requires at least six academic years of postsecondary education coursework for completion," (3) must fall within "a four-digit CIP code . . . in the same intermediate group as the fields listed in" the list of ten examples adopted by the Act or in Clinical Psychology," and (4) converting "the list of ten 'examples' of professional degree fields in the 2007 regulatory definition . . . into an exclusive list of qualifying degrees." *Id.* at *15–16. The Department added a fifth material change in the preamble to the Final Rule: that "a professional must not 'be supervised by another professional' with 'more education, training, and qualifications.'" *Id.* at *16.

119. The court ordered that "the regulatory definition from part (i) of the [Final] Rule

and the additional free-from-supervision requirement is stayed," but stated "the list of qualifying degrees in part (ii) of the Rule is not." *Id.* at *22. The court explained that it would not stay "part (ii) on the understanding that the list of qualifying degrees is not exclusive." *Id.*

120. The court also declined "in the first instance" to determine whether any particular degree was a "professional degree" under the statutory three-part test. The court instead permitted the Department to reassess whether "certain degrees" are "professional degree[s]," based *only* on "the proper three-criteria," which the Department represented it could do "relatively quickly." *Id.* at *22–23.

121. On July 1, 2026, the U.S. District Court for the District of Massachusetts in *American Nurses Ass'n* held a hearing on the plaintiffs' motion for a stay and the impact of the stay ruling in *American Ass'n of Nurse Practitioners*. The court did not rule on the motion but expressed its agreement with the *American Ass'n of Nurse Practitioners* opinion. The parties have since filed supplemental briefs on plaintiffs' motion. *See Am. Nurses Ass'n*, No. 1:26-cv-12443, Doc. 54 (Pls.' Supp. Br.), Doc. 55 (Defs. Supp. Br.) (D. Mass.).

**V. Electronic Announcement following stay order and Plaintiffs' letters to the Department**

122. Following the June 24, 2026 stay order in *American Ass'n of Nurse Practitioners*, the Department published an Electronic Announcement on June 28, 2026. The Electronic Announcement contained an "interim list" of 18 new degrees that meet the three-part test which the Department would "treat" as a "professional degree," including degrees relevant to nursing and physician associate/assistant plaintiffs in *American Ass'n of Nurse Practitioners*.[32] The

[32] U.S. Dep't of Educ., *(General 26-42) Update to List of Professional Degree Programs Due to Court Order*, https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2026-06-29/update-list-professional-degree-programs-due-court-order-updated-july-10-2026

Department stated that these degrees would be considered "professional degrees" only "for the duration of the Court's stay," and that it would "continue to defend" the "professional degree" definition in the Final Rule. *Id.*

123. The Electronic Announcement also listed several degrees that were "not considered . . . professional degrees for the duration of the stay." *Id.*

124. Neither list in the Electronic Announcement mentioned an N.D.

125. So on June 30, 2026, counsel for AANP and AANMC wrote to the Department requesting that it revisit its prior determination as to an N.D. The letter explained that although the preamble to the Final Rule previously concluded that an N.D. did not meet "all parts of the operative test,"[33] that conclusion was impermissibly based on extra-statutory requirements and considerations that had been set aside by the D.C. district court in *Am. Ass'n of Nurse Practitioners*.

126. AANP and AANMC also pointed to inconsistencies in the Department's treatment of an N.D. versus other degrees. For example, in the Final Rule, the Department concluded that certified anesthesiologist assistants ("CAAs") "meet the three-part operative test"—including the "generally requires professional licensure" requirement—despite the fact that only 24 jurisdictions (22 states, D.C., and Guam) license CAAs.[34] The Department excluded an N.D. because "less than half of States license naturopathic physicians," yet the naturopathic profession is licensed by *more U.S. jurisdictions* (26) than CAAs (24).

127. AANMC and AANP highlighted other flaws. The Department had excluded an N.D. because it purportedly "is not substantially similar" to the 11 degrees in the Final Rule." Final Rule at 23794. Yet, the Electronic Announcement added several "professional degrees" that are not

[33] Final Rule at 23768, 23794–95.

[34] *See* Am. Acad. of Anesthesiologist Assistants, *Certification*, https://www.anesthetist.org/certifcation-practice-map (typographical error in original link).

"similar" to the 11 degrees in the Final Rule. For example, some newly-added degrees are two-year master's degrees that have far fewer academic requirements and rigor than four-year, doctoral-level degrees (*e.g.*, athletic training (MSAT); occupational therapy (MSOT); physician assistant (MSPA); and anesthesiologist assistant (CAA)).

128. The Department updated its Electronic Announcement on July 10, 2026, providing clarification as to certain degrees and CIP Codes. *See Update to List of Professional Degree Programs Due to Court Order*, *supra* n.32. Again, the Department did not mention the N.D. degree.

129. Counsel for AANMC and AANP therefore sent another letter to the Department on July 15, 2026. The Department has not responded to either the June 30 or July 15 letter as of this filing.

130. The Department therefore has declined the opportunity the *American Ass'n of Nurse Practitioners* court afforded it to assess "in the first instance" whether a "certain degree[]" is a "professional degree[]" under the "proper" three-part test. 2026 WL 1826176, at *23. The Department instead is apparently relying on its prior determination in the Final Rule as to an N.D. as its final determination.

131. The extra-statutory requirements in the Final Rule's definition of "professional degree" (and those in the preamble) are contrary to law, in excess of statutory authority, and arbitrary and capricious, in violation of the APA.

132. Among other things, the Department's "professional degree" definition conflicts with OBBB's text, turns the statutory illustrative list of "professional degrees" in OBBB into an exclusive list, adds extra-statutory requirements not found in OBBB, and excludes an N.D. based on considerations not in the statutory definition. The Department further ignored its longstanding

classification of an N.D. as a "first-professional degree" alongside the same 10 degrees listed in 34 C.F.R. § 668.2(b) (2025), its approval of "naturopathic medicine" as a "health profession," and its classification of ND programs as "prepar[ing] individuals to practice as licensed professionals," and further, treats an N.D. and other degrees inconsistently in various respects.

## VI. Harm to Plaintiffs, their member schools and students, and the naturopathic medicine profession

133. Because of the unlawful Final Rule and preamble excluding an N.D. from the "professional degree" definition, codified at 34 C.F.R. § 685.102 (2026), Plaintiffs and their members have been and will continue to be harmed.

### A. Harm to prospective ND program students

134. Under the Final Rule, students who enroll in ND programs on or after July 1, 2026 are ineligible for the higher Unsubsidized Loan amounts available to "professional students."

135. New students are instead limited to borrowing $20,500 in Unsubsidized Loans annually and $100,000 in the aggregate, instead of the $50,000 annual and $200,000 aggregate limits available to "professional students." 20 U.S.C. § 1087e(a)(4).

136. Prospective students wishing to enroll in ND programs are suffering immediate consequences. With the Final Rule's July 1, 2026 effective date, the lack of professional degree loan limits has made an ND program unaffordable for many, causing students who had planned to enroll in fall 2026 to simply forego naturopathic medicine school and their dreams of becoming an N.D.

137. Students in ND programs heavily rely on Unsubsidized Loans to finance their educations. The average tuition and fees for ND programs at AANMC member institutions in the United States ranges between approximately $26,000 up to $60,000 per year. In addition to tuition and fees, students can generally expect to incur up to $120,000 in living expenses, books, supplies,

fees, and other required educational costs over four years, depending on regional cost-of-living estimates and individual circumstances.

138. Most ND program students borrow significantly more than $100,000 to finance their four-year ND programs.

139. Limiting ND program students to the $20,500 "graduate student" annual limit for Unsubsidized Loans, rather than the $50,000 limit for "professional students," will result in a $29,500 annual shortfall. Likewise, limiting ND program students to the $100,000 "graduate student" aggregate limit, rather than the $200,000 limit for "professional students," will result in a $100,000 aggregate shortfall.

140. Under the Final Rule, ND program students face a 59% reduction in annual borrowing capacity and a 50% reduction in aggregate borrowing capacity compared to "professional students."

141. The Department, in having classified "naturopathic medicine" as a "health profession," recognized that students in CNME-accredited ND programs require "specialized training" and therefore deserve "access to higher loan limits" compared to other graduate and professional students Final Rule at 23818; *see supra* ¶36–38.

142. Most students cannot afford to pay out-of-pocket for their ND programs.

143. New students enrolling on or after July 1, 2026 have had to locate other sources of funding, and many have been unsuccessful in doing so. Some are older students with parents who do not want to pay for an adult child's professional education. Many have looked to private loans, but private loans are far more expensive than, and lack important benefits and advantages of, Unsubsidized Loans. Many students have not been able to get private loans because they do not have a co-signer. Even those students who have qualified for private loans are subject to much

higher interest rates than Unsubsidized Loans.

144. As a result, these prospective students face a higher cost of their education with private loans. Many simply are unable to afford the cost of an ND program, earn an N.D., and begin their careers as licensed naturopathic medicine doctors.

145. Many prospective students planned to enroll in ND programs at AANMC member institutions on or after July 1, 2026. However, a growing number of prospective students have changed their plans and decided to forgo enrollment because they cannot finance their education using Unsubsidized Loans at the higher "professional student" limits.

146. The Final Rule has already resulted in new students not enrolling in ND programs they otherwise would have enrolled in.

147. For example, one prospective student, Tara Topper, had planned to enroll in a ND program at AANMC member institution Bastyr University in fall 2026. After being admitted, she made the "gut-wrenching choice" to defer because she cannot afford the program without Unsubsidized Loans at the "professional student" amounts. She tried private loans, but the interest rates were too high, and she would have had to leverage her condominium. Ms. Topper had intended to be an AANP and NMSA member, but because she has decided not to enroll, she will not be. If she is able to obtain Unsubsidized Loans at the "professional student" limits, she will be able to attend and will enroll.

148. Another prospective student, Gerardo A. Melendez, was admitted to the fall 2026 ND program at AANMC member school Ana G. Mendez University in Puerto Rico. Because an N.D. is not treated as a "professional degree," he could not afford the program. Private loans were not an option for him because he had no co-signer, and, in any event, would have had much higher interest rates. He had no choice but to withdraw his enrollment from Ana G. Mendez University's

ND program and "forego his career goals of becoming a licensed naturopathic doctor." If the Department recognizes an N.D. as a "professional degree," Mr. Melendez will be able to afford the program and will plan to enroll immediately thereafter.

**B. Harm to current ND program students**

149. Students enrolled prior to July 1, 2026 in ND programs also stand to suffer as a result of the Final Rule.

150. As noted above, OBBB contains a grandfathering provision that provides an "interim exception" for students enrolled as of June 30, 2026 who "received a loan" for that program prior to July 1, 2026. *See supra* ¶83. Such students remain eligible to borrow Unsubsidized Loans at the pre-July 1, 2026 limits, including the higher limits for "health professions," and remain eligible to borrow Grad PLUS Loans, for the duration of their "expected time to credential," so long as they remain continuously enrolled in the program after June 30, 2026. 20 U.S.C. § 1087e(a)(4), (8); 2026 NPRM at 4268. Current students are either not eligible or lose eligibility for "grandfathering" if the student (1) was not enrolled in a graduate or professional program of study as of June 30, 2026; (2) did not receive at least one disbursement of a Direct Loan prior to June 30, 2026; (3) did not remain continuously enrolled in the same program after June 30, 2026 (with the exception of a 180-day or less approved leave of absence); or (4) is enrolled beyond the student's "expected time to credential."

151. Many students do not meet the grandfathering requirements. At least one current ND program student, Keaton Scanlon who is an NMSA and AANP member, enrolled in an ND program at AANMC member institution National University of Natural Medicine in fall 2025 and received an Unsubsidized Loan. After completing one semester, Ms. Scanlon on December 31, 2025 took what was intended to be a year leave of absence due to pregnancy, a family illness, and

relocation. That one-year leave of absence has made her ineligible for grandfathering. She is therefore subject to the new, lower loan limits because the Department refuses to recognize an N.D. as a "professional degree." She is planning to resume her studies in January 2027, but if she is unable to access "professional student" loan limits, she cannot afford to return to the program.

152. Countless other current students, who are presently eligible for the grandfathering provision today, nonetheless stand to lose that treatment in the future once their "expected time to credential" expires. Final Rule at 23818. A student's "expected time to credential" is "the difference between the program's length and the period of the program that the student completed as of June 30, 2026." 20 U.S.C. § 1087e(a)(8)(B). "Program length" is the "amount of time in weeks, months, or years .. for a full-time student to complete the specific program of study." Final Rule at 23781. As a result, students who take less than a full course load will not "complete" their programs before the date of their "expected time to credential." *See id.* at 23782. ("Part-time students, who enroll in fewer credits per academic term, may have an expected time to credential equal to zero on July 1, 2026. These students would not be eligible for the interim exception and would be subject to the new loan limits on or after July 1, 2026.").

153. At least one current student who is an NMSA and AANP member, Ariana Sorci, is in this situation. To illustrate, Ms. Sorci enrolled in an ND program at National University of Health Sciences ("**NUHS**") in 2024 and borrowed a Direct Loan prior to July 2026. But Ms. Sorci will lose her eligibility for grandfathering in the future because she did not take a full course load at NUHS, such that her "expected time to credential" will expire before she completes her program and graduates. Ms. Sorci therefore would only be able to borrow at the lower "professional student" loan limits to finance the remainder of her program, and as a result, eventually may need to withdraw, leaving her with debt but no degree, and no choice but to relinquish her NMSA and

AANP membership.

154. Students may require additional time to complete their programs for reasons entirely unrelated to academic performance, including disability-related accommodations, serious illness, pregnancy and childbirth, caregiving responsibilities, military service, financial hardship, or other approved interruptions in enrollment. Although these students remain enrolled in accredited programs and continue to make satisfactory academic progress, they will lose grandfathered loan eligibility because they have not completed their programs prior to their "expected time to credential." The Final Rule's exclusion of an N.D. as a "professional degree" thus disproportionately harms students whose educational paths have been extended by circumstances that institutions routinely accommodate and that federal law often protects.

**C. Harm to AANMC's Institutional Members**

155. AANMC's institutional members likewise will suffer, and already are suffering, due to the Final Rule's exclusion of an N.D.

156. With fewer students able to afford ND programs, AANMC member institutions are facing immediate reduced student enrollment. At National University of Natural Medicine, for example, deposits for first-time, first-year students have declined by approximately 40%. Sonoran University of Health Sciences has conducted approximately half as many interviews of new students as it did at this time last year. Many schools, including Bastyr, have had several prospective students choose not to enroll because they simply cannot afford the program without access to higher "professional student" loan limits. Current students, many of whom have borrowed to complete the early years of their programs, are also dropping out because they are not grandfathered and cannot afford to finish their programs without loans at "professional student" limits.

157. Reduced enrollment decreases substantial tuition revenue that these schools rely on to operate. Student tuition paid using Direct Loans represents approximately 70% of tuition revenue. Even a modest enrollment contraction will therefore translate into millions of dollars in lost revenue within a single academic cycle.

158. The Final Rule risks destabilizing the institutional framework of these schools that is required to educate future naturopathic medicine clinicians and has a disastrous domino effect. As one school (Sonoran) put it:

> The lower borrowing cap reduces the pool of students able to enroll and persist; reduced enrollment reduces tuition revenue, reduced revenue forces programmatic contraction; and programmatic contraction further undermines Sonoran's ability to attract and retain students and sustain its accreditation standing, each of which further depresses future enrollment and revenue. This cyclical dynamic means the overall revenue loss Sonoran will experience as a result of the RISE rule's graduate borrowing cap and exclusion of naturopathic medicine from professional degree status cannot be measured by the initial reduction in [] eligible students, but must account for the cascading and largely irreversible institutional harm that follows.

Such reduced revenue has long term effects and poses financial insolvency risks. Some schools may even discontinue their programs altogether, as one former AANMC member decided to do earlier this year.

159. At the very least, the Final Rule is already causing significant disruptions that detract from schools' primary educational mission. Member schools will have to scale back academic programming, delay or reduce faculty hiring, limit clinical placements, curtail student support services, and reduce workforce development initiatives designed to address ND provider shortages and expand patient access to care.

160. The Department's analysis shows that among private non-profit small entities, the average share of annual loan volume above the new limits is 21%. *See* 2026 NPRM at 4320 (Table 5.8). For AANMC member institutions, this figure is dramatically higher. As an illustrative

example, one AANMC member, National University of Natural Medicine, ("**NUNM**") reports that federal loan funds applied directly to tuition represent approximately 71% of NUNM's total net tuition revenue.

161. Finally, the anticipated (and already occurring) enrollment decline will disproportionately affect students from families earning below median income. Students from low- and middle-income backgrounds have the least access to alternative financing options such as family wealth or private loans requiring co-signers. The Final Rule effectively eliminates naturopathic medicine as a career option for these populations.

**D. Harms to NMSA, AANMC, and AANP**

**1. NMSA**

162. Plaintiffs have provided examples of prospective students (Tara Topper, Gerardo Melendez) who would have become NMSA members, but because they have chosen not to enroll due to lack of access to the professional degree limits, will not now. Because the Final Rule will result in fewer individuals enrolling in ND programs, NMSA's membership will suffer. Membership dues bring in revenue of $60 per student, which generates approximately $65,000 annually. Dues payments constituted 70% of NMSA's 2026 budget. The reduction in associated revenue will harm NMSA's ability to provide the same level of services it now provides to the ND student community.

**2. AANMC**

163. Because the Final Rule will result in fewer individuals enrolling and will risk the viability of ND programs, Plaintiff AANMC's membership will suffer. Membership dues bring in revenue of approximately $300,000 annually. Membership dues payments constituted 30% of AANMC's 2026 budget. The amount an AANMC member school pays in dues is contingent, in

part, on enrollment. If enrollment declines, so does the amount of membership dues, which means less revenue to AANMC. In addition, residency application and match revenue generates approximately $20,000 annually. The reduction in associated residency revenue will harm AANMC's ability to provide the same level of services it now provides to the ND educational community.

164. Indeed, AANMC's membership already has suffered. The University of Western States in Portland ("UWS") recently withdrew its AANMC membership in June 2026 in large part due to the Final Rule. UWS was launching an ND program in Oregon. In April 2025, CNME awarded UWS's ND program "candidacy" status, allowing it to operate provided that it fully met CNME's accreditation standards within five years. UWS joined AANMC in 2025 and pledged member dues to AANMC for the entirety of calendar year 2026 totaling $40,256.00. Because it withdrew on June 30, AANMC received only half the 2026 dues amount.

**3. AANP**

165. Because the Final Rule will result in fewer ND program students and fewer N.D.s ultimately pursuing licensure, AANP's membership will suffer too. Membership dues bring in revenue of $400,000 annually. CME tuition generates approximately $325,000 annually. Dues payments constituted 30% of AANP's 2026 budget. Fewer students enrolled in ND programs means fewer AANP student members. In addition, fewer students means fewer students becoming naturopathic medicine doctors, and thus fewer AANP members. Further, the schools that pay dues to AANP, faced with declined enrollment, may no longer be able to do so at the same amounts, or at all. The reduction in associated revenue will harm AANP's ability to provide the same level of services it has provided to the ND profession and patient interests for decades. Further, with fewer students being educated and becoming licensed, there will be fewer healthcare professionals

trained to meet the needs of the already overburdened healthcare system, especially in rural areas which rely on licensed naturopathic doctors to fill provider shortages.

## CAUSES OF ACTION

### COUNT I
### APA—CONTRARY TO LAW AND IN EXCESS OF STATUTORY AUTHORITY
### 5 U.S.C. § 706(2)(A)

166. Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

167. A reviewing court must "hold unlawful and set aside agency actions findings and conclusions found . . . not in accordance with law" or "in excess of statutory jurisdiction, authority." 5 U.S.C. § 706(2)(A).

168. The Final Rule is "final agency action," as are the preamble's conclusions and the Electronic Announcement, because they mark the consummation of the agency's decisionmaking process and establish rights and obligations or create binding legal consequences for Plaintiffs and their members. *See* 5 U.S.C. § 704.

169. The Final Rule and the preamble's exclusion of an N.D. from the definition of "professional degree" is contrary to law and exceeds its statutory authority.

170. The Final Rule and the preamble are contrary to law and in excess of statutory authority because Congress codified a non-exhaustive list of examples of "professional degrees" that the Department treated as an "exhaustive" list.

171. The Final Rule and the preamble are contrary to law and in excess of statutory authority because the Department relied on extra-statutory requirements for classification as a "professional degree" that are not found in 34 C.F.R. § 668.2 (2025) and OBBB. The Department acted without Congressional authority to rewrite the definitions of "professional student" and "professional degree" that Congress established in OBBB. The Department included additional

requirements in the preamble to the Final Rule and in the regulatory definition of "professional degree" that are not imposed or expressly authorized by Congress.

172. The Final Rule and the preamble are contrary to law and in excess of statutory authority because the Department imposed extra-statutory requirements to conclude that an N.D. is not a "professional degree," including that "less than half of states license naturopathic physicians," that three states prohibit the practice of naturopathy, that the "regulatory landscape" surrounding the naturopathic profession is "unsettled," and that an N.D. is not "substantially similar" to the 11 degrees in the Final Rule, which are not found in 34 C.F.R. § 668.2 (2025) and OBBB.

173. The Final Rule and the preamble are contrary to law and in excess of statutory authority because an N.D. satisfies the three-part "professional degree" test in 34 C.F.R. § 668.2 (2025) and OBBB.

174. Because the Final Rule and the preamble are contrary to law and exceed statutory authority, the Court must declare them unlawful and set them aside under the APA.

**<u>COUNT II</u>**
**APA—ARBITRARY AND CAPRICIOUS**
**5 U.S.C. § 706(2)(A)**

175. Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

176. A reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

177. The Final Rule and the preamble are arbitrary and capricious because the Department did not provide a reasoned explanation for why an N.D. does not meet the three-part test.

178. The Final Rule and the preamble are arbitrary and capricious because the

Department's determination that an N.D. is not a "professional degree" relied on factors that it was not entitled to consider.

179. The Final Rule and the preamble are arbitrary and capricious because the Department failed to consider all the relevant data. Specifically, the Department recognized "the longstanding practice of the government" that remained "consistent over time" when it wanted to limit a "professional degree," but ignored the same evidence when declining to include ND programs that were part of that very same consistent, longstanding practice of the government.

180. The Final Rule and the preamble are arbitrary and capricious because the Department departed from past practice and policies.

181. The Final Rule and the preamble are arbitrary and capricious because the Department departed from the Department's longstanding classification of an N.D. as a "health profession."

182. The Final Rule and the preamble are arbitrary and capricious because the Department departed from the Department's and NCES's longstanding classification of an N.D. as a "first-professional degree."

183. The Final Rule and the preamble are arbitrary and capricious because the Department ignored Plaintiffs' and their members' significant reliance interests.

184. The Final Rule and the preamble are arbitrary and capricious because the Department failed to consider that the Department's and NCES's list of 10 degrees in the "first-professional degree" definition "encompasses certain occupationally specific and closely regulated degree programs," and that NCES's definition and tables specifically included "Naturopathic medicine."

185. The Final Rule and the preamble are arbitrary and capricious because the

Department ignored the Department's classification of ND programs leading to an N.D. under two-digit CIP Code 51 because they "prepare individuals to practice as ***licensed professionals*.**"

186. The Final Rule, the preamble, and the Electronic Announcement are arbitrary and capricious because the Department treated "similar" degrees inconsistently. An N.D. is substantially similar to many of the identified "professional degrees" in the Final Rule; it is a four-year doctorate level program, enables graduates to sit for and pass an entry-to-practice licensing exam (the NPLEX), and requires licensure for independent practice.

187. The Final Rule and the preamble, as well as the Electronic Announcement, are arbitrary and capricious because the Department did not evenly apply the three-part test to an N.D. and to other degrees.

188. The Department concluded that an N.D. is not a "professional degree" based on its lack of "similarity" to degrees identified as "professional degrees," which is inconsistent with the fact that certain "professional degrees" identified in the Final Rule and in the Electronic Announcement are not "similar" to each other.

189. The Final Rule, the preamble, and the Electronic Announcement are arbitrary and capricious because the Department's conclusion that an N.D. is not a "professional degree" was based on a requirement that a "majority of states" license naturopathic physicians conflicts with the Department's treatment of other degrees identified as "professional degrees," despite less than half of states, or no states, licensing and regulating those professions.

190. Because the Final Rule, the preamble, and the Electronic Announcement are arbitrary and capricious, the Court should declare them unlawful and set them aside under the APA.

## PRAYERS FOR RELIEF

Plaintiffs respectfully request that this Court:

1. Declare that the Final Rule's definition of "professional student" and "professional degree" at 34 C.F.R. § 685.102 (2026) as applied to an N.D. is contrary to law and in excess of statutory authority, and thus violates the APA;

2. Declare that the Final Rule's definition of "professional student" and "professional degree" at 34 C.F.R. § 685.102 (2026) as applied to an N.D. is arbitrary and capricious, and thus violates the APA;

3. Declare that an N.D. is a "professional degree" within the meaning of 34 C.F.R. § 685.102 (2026);

4. Hold unlawful and set aside, pursuant to 5 U.S.C. § 706(2), and stay, pursuant to 5 U.S.C. § 705, the Final Rule's extra-statutory requirements, including but not limited to those set forth in the preamble, that the Department relied upon to determine that an N.D. is not a "professional degree";

5. Preliminarily and permanently enjoin the Department by directing it to treat an N.D. as a "professional degree," and to treat students in ND programs as "professional students" eligible to access Direct Unsubsidized Loans at limits applicable to "professional students" under 20 U.S.C. § 1087e(a)(4)(A)(ii), (B)(ii), and (C)(ii);

6. Preliminarily and permanently enjoin the Department from enforcing the Direct Unsubsidized Loan limits applicable to "graduate students" under 20 U.S.C. § 1087e(a)(4)(A)(i), (B)(i), and (C)(i) to students in ND programs;

7. Award Plaintiffs attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

8. Award Plaintiffs any other relief as may be necessary or required.

Respectfully submitted,

**THOMPSON COBURN LLP**

Dated: July 31, 2026

*/s/ Caleb S. Crahan*
Caleb Crahan (OSB No. 226470)
One US Bank Plaza
St. Louis, Missouri 63101
P. (314) 552-6477
E. ccrahan@thompsoncoburn.com

*/s/ Ollie A. Cleveland, III*
Ollie A. Cleveland, III ("Tres") (*Pro hac vice forthcoming)*
Brandt P. Hill (*Pro hac vice forthcoming*)
Lorrie L. Hargrove (*Pro hac vice forthcoming*)

2311 Highland Avenue, Suite 330
Birmingham, Alabama 35205
P. (205) 769-4303
E. tcleveland@thompsoncoburn.com
bhill@thompsoncoburn.com
lhargrove@thompsoncoburn.com

*Attorneys for Plaintiffs Association of Accredited Naturopathic Medical Colleges; American Association of Naturopathic Physicians; and Naturopathic Medical Student Association*