**Caleb Crahan** (OSB No. 226470)
ccrahan@thompsoncoburn.com
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, Missouri 63101
Telephone: (314) 552-6477

**Ollie A. Cleveland, III** (*pro hac vice* forthcoming)
tcleveland@thompsoncoburn.com
**Brandt P. Hill** (*pro hac vice* forthcoming)
bhill@thompsoncoburn.com
**Lorrie L. Hargrove** (*pro hac vice* forthcoming)
lhargrove@thompsoncoburn.com
THOMPSON COBURN LLP
2311 Highland Avenue, Suite 330
Birmingham, Alabama 35205
Telephone: (205) 769-4303

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| ASSOCIATION OF ACCREDITED NATUROPATHIC MEDICAL COLLEGES; AMERICAN ASSOCIATION OF NATUROPATHIC PHYSICIANS; and NATUROPATHIC MEDICAL STUDENT ASSOCIATION,<br><br>*Plaintiffs*,<br><br>v.<br><br>LINDA MCMAHON, in her official capacity as U.S. Secretary of Education; and U.S. DEPARTMENT OF EDUCATION,<br><br>*Defendants*. | Case No.: 3:26-cv-1599<br><br>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Request for Oral Argument |

# TABLE OF CONTENTS


TABLE OF CONTENTS ........ i
TABLE OF AUTHORITIES ........ a
LOCAL RULE 7-1 CERTIFICATION ........ 1
MOTION ........ 1
INTRODUCTION ........ 1
FACTUAL BACKGROUND ........ 4
I. The licensed naturopathic medicine profession ........ 4
II. The Higher Education Act and Federal Direct Loan Program ........ 5
III. Direct Loans for graduate and professional students before July 1, 2026 ........ 6
IV. The Department's longstanding treatment of an N.D. and the 2007 Rule ........ 7
V. Congress sets loan limits for graduate students and professional students ........ 10
VI. The 2026 NPRM, AANMC and AANP's comments, and the Final Rule ........ 11
  A. The 2026 NPRM ........ 11
  B. AANMC and AANP submit comments on the 2026 NPRM ........ 12
  C. The Final Rule ........ 13
VII. Litigation, stay of "Professional Degree" definition in the Final Rule, Electronic Announcement, and letters to the Department ........ 13
LEGAL STANDARD ........ 15
ARGUMENT ........ 15
I. Plaintiffs are likely to show that the Final Rule violates the APA ........ 15
  A. The Final Rule is contrary to law and in excess of statutory authority because its "professional degree" definition departs from the statutory three-part test ........ 15
    1. The Final Rule contains numerous unlawful extra-statutory requirements ........ 16
    2. An N.D. meets the operative three-part test ........ 18
  B. The Final Rule's exclusion of an N.D. was arbitrary and capricious ........ 20
    1. The Final Rule unevenly applied its extra-statutory requirements ........ 21
    2. The Department departed from past practices ........ 22
    3. The Department unreasonably found that an N.D. is not "similar" to the "professional degrees" in the Final Rule ........ 24

4. Several "professional degrees" added in the Electronic Announcement are not similar to the 11 degrees in the Final Rule ........ 26

II. Plaintiffs and their members are suffering irreparable harm under the Final Rule ........ 26

A. Harm to Students and NMSA and AANP Members ........ 27

1. Prospective Students ........ 27

2. Students enrolled in ND programs prior to July 1, 2026 ........ 28

B. Harm to AANMC's Member Institutions ........ 30

C. Harm to Plaintiffs AANMC, AANP, and NMSA ........ 31

1. Loss of current and prospective members ........ 31

2. Loss of member dues ........ 32

3. Harm to Plaintiffs' missions and core business activities ........ 33

III. The balance of the equities and the public interest favor an injunction ........ 34

IV. The Court should preliminarily enjoin the Final Rule's determination as to an N.D. ........ 34

CONCLUSION ........ 35

CERTIFICATE OF SERVICE ........ 36

# TABLE OF AUTHORITIES

**Cases**

U.S. Supreme Court

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)....20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020)....22

*Diamond Alt. Energy v. EPA*, 606 U.S. 100 (2025)....32

*Digit. Realty Tr. v. Somers*, 583 U.S. 149 (2018)....18

*Encino Motorcars v. Navarro*, 579 U.S. 211 (2016)....22

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)....20

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)....32–33

*FDA v. Wages & White Lion Invs.*, 604 U.S. 542 (2025)....22

*Gonzales v. Oregon*, 546 U.S. 243 (2006)....15

*Havens Realty v. Coleman*, 455 U.S. 363 (1982)....26

*Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333 (1977)....26

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)....19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29 (1983)....20

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)....31

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008)....15

U.S. Courts of Appeal

*All. for Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)....15

*Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014)....29

*Baltimore Gas & Electric Co. v. FERC*, 954 F.3d 279 (D.C. Cir. 2020)....21, 25, 26

*Constr. Indus. Ass'n v. City of Petaluma*, 522 F.2d 897 (9th Cir. 1975)....32

*East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021)....30

*Fair Hous. Council v. Roommate.com*, 666 F.3d 1216 (9th Cir. 2012)....31, 32

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)....33, 34

*Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134 (9th Cir. 2015) ....................................21

*Polhemus v. Am. Med. Ass'n*, 145 F.2d 357 (10th Cir. 1944)........................................................19

*Valle del Sol v. Whiting*, 732 F.3d 1006 (9th Cir. 2013).............................................................33

*W. Deptford Energy v. FERC*, 766 F.3d 10 (D.C. Cir. 2014)........................................................22

*Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024) ..............................................................34

U.S. District Courts

*Am. Ass'n of Nurse Practitioners v. McMahon*, No. 1:26-cv-01780, 2026 WL 1826176 (Opinion Granting Stay) (D.D.C.) ........................................................... *passim*

*Am. Nurses Ass'n v. U.S. Dep't of Educ.*, No. 1:26-cv-12443 (D. Mass.)................13 n.18, 17, 23

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057 (N.D. Cal. 2019)......................................................................................32

*Drs. for Am. v. OPM*, 766 F. Supp. 3d 39 (D.D.C. 2025)............................................................26

*Friends of Wild Swan v. U.S. Fish & Wildlife Serv.*, 945 F. Supp. 1388 (D. Or. 1996) ..........................................................................................................21

*Forefront Dermatology S.C. v. Crossman*, 642 F. Supp. 3d 947 (D. Ariz. 2022) .........................34

*Kollin v. Brio Inc.*, 677 F. Supp. 3d 1002, 1007 (D. Ariz. 2023)..........................................25 n.27

*Maryland v. U.S. Dep't of Educ.*, No. 1:26-cv-01957 (D. Md.) ............................................13 n.18

*Massachusetts v. NIH*, 770 F. Supp. 3d 277 (D. Mass. 2025), *aff'd*, 164 F.4th 1 (1st Cir. 2026) ............................................................................................34

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-cv-640 (SI), 2026 WL 599621 (D. Or. Mar. 2, 2026)..........................................................................20, 22

*Neighborhood Ass'n of the Back Bay v. Fed. Transit Admin.*, 407 F. Supp. 2d 323 (D. Mass. 2005)...............................................................................................34

*Oregon Nat. Desert Ass'n v. Raby*, 780 F. Supp. 3d 1085 (D. Or. 2025) .....................................35

*PA Educ. Ass'n v. U.S. Dep't of Educ.*, No. 1:26-cv-1941 (D.D.C.) ....................................13 n.18

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ..............................................................34

State Courts

*Davis v. Beeler*, 207 S.W.2d 343 (Tenn. 1947) ..................................................................20 n.24

*North Carolina v. Perry*, 582 S.E. 2d 708 (N.C. App. 2003) ..............................................17 n.22

*Michigan v. Rogers*, 641 N.W.2d 595 (Mich. App. 2001) ....17 n.22

**United States Code & Federal Statutes**

5 U.S.C. § 705 ....35

5 U.S.C. § 706(2)(A) ....15, 35

20 U.S.C. § 1078-8 ....6

20 U.S.C. § 1087a(a) ....6

20 U.S.C. § 1087e(a)(4) .... *passim*

20 U.S.C. § 1087e(a)(8) .... *passim*

20 U.S.C. § 1094(a)(17) ....8

Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 ....5–6

Budget Control Act of 2011, Pub. L. No. 112-25, 125 Stat. 240 ....6 n.8

One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025) .... *passim*

**Code of Federal Regulations**

34 C.F.R. § 668.2(b) .... *passim*

34 C.F.R. § 685.102 (2026) ....13

**Federal Register**

72 Fed. Reg. 44620 (Aug. 8, 2007) (“2007 NPRM”) ....7, 8

72 Fed. Reg. 62014 (Nov. 1, 2007) (“2007 Rule”) ....7, 8

91 Fed. Reg. 4254 (Jan. 30, 2026) (“2026 NPRM”) .... *passim*

91 Fed. Reg. 23768 (May 1, 2026) (“Final Rule”) .... *passim*

**State Statutes**

Alaska Stat. § 08.45.080 ....17 n.21

Ariz. Rev. Stat. Ann. § 32-1555(A) ....17 n.21

Cal. Bus. & Prof. Code § 3660 ....17 n.21

Cal. Bus. & Prof. Code § 3664 ....17 n.21

Cal. Bus. & Prof. Code § 2052 ....17 n.21

Colo. Rev. Stat. § 12-250-114 ....17 n.21

Conn. Gen. Stat. § 20-37 .....17 n.21

Conn. Gen. Stat. § 20-42 .....17 n.21

D.C. Code §§ 3-1205.013–1210.01 .....17 n.21

Haw. Rev. Stat. § 455-9 .....17 n.21

Idaho Code § 54-5117 .....17 n.21

Kan. Stat. Ann. § 65-7211(b) .....17 n.21

Me. Rev. Stat. tit. 32, § 12521 .....17 n.21

Md. Code Ann., Health Occ. § 14-5F-29 .....17 n.21

Md. Code Ann., Health Occ. § 14-5F-30 .....17 n.21

Mass. Gen. Laws ch. 112, § 273 .....17 n.21

Minn. Stat. § 147E.10 .....17 n.21

Mont. Code Ann. § 37-26-401 .....17 n.21

N.H. Rev. Stat. Ann. § 328-E:3 .....17 n.21

N.H. Rev. Stat. Ann. § 328-E:14 .....17 n.21

N.M. Stat. Ann. § 61-12G-10 .....17 n.21

N.D. Cent. Code § 43-58-03 .....17 n.21

N.D. Cent. Code § 43-58-12 .....17 n.21

Or. Rev. Stat. § 685.020 .....17 n.21

63 Pa. Cons. Stat. § 272.201 .....17 n.21

63 Pa. Cons. Stat. § 272.206 .....17 n.21

P.R. Laws Ann. tit. 20, § 2465–2466 .....17 n.21

R.I. Gen. Laws § 5-36.1-4 .....17 n.21

Utah Code Ann. § 58-71-301 .....17 n.21

Utah Code Ann. § 58-1-501(1)(a) .....17 n.21

V.I. Code Ann. tit. 27, § 192 .....17 n.21

Vt. Stat. Ann. tit. 26, § 4122(a)(1)–(2) ....................17 n.21

Wash. Rev. Code § 18.36A.030....................17 n.21

Wis. Stat. § 466.02(1)(a)-(b)....................17 n.21

Wis. Stat. § 466.09....................17 n.21

Wyo. Stat. Ann. § 33-26-102(a)(xi)....................19 n.23

**Books**

Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 322–26 (2012) ....................22

**Congressional Research Service Reports**

CONG. RSCH. SERV., *The Department of Education's Proposed Rule to Define "Professional Student": FAQ*, at p. 1 (orig. *pub*. Dec. 17, 2025), https://www.congress.gov/crs-product/R48768....................6, 10

**Internet Sources**

Am. Acad. of Anesthesiologist Assistants, *Certification*, https://www.anesthetist.org/certifcation-practice-map ....................21 n.25

CNME, *Naturopathic Program Accreditation*, https://cnme.org/naturopathic-accreditation/....................5 n.5

2009-2010 FSA Handbook, vol. 3, ch. 6, *Stafford/PLUS Loan Periods and Amounts*, https://fsapartners.ed.gov/sites/default/files/2021-03/2009-2010%20Chapter%206%20StaffordPLUS%20Loan%20Periods%20and%20Amounts.pdf....................7 n.11

2025-2026 FSA Handbook, vol. 8, *Annual and Aggregate Loan Limits, Increased Unsubsidized Annual Loan Limits for Certain Health Professions Students*, https://fsapartners.ed.gov/knowledge-center/fsa-handbook/2025-2026/vol8/ch4-annual-and-aggregate-loan-limits ....................7 n.11

GEN-96-14, ED, Dear Colleague Letter....................6 n.9

GEN-97-14, ED, Dear Colleague Letter....................6 n.9

GEN-98-18, ED, Dear Colleague Letter....................6 n.9

GEN-08-04, Aggregate Loan Limit for Graduate and Professional Students Preparing for the Health Professions (Apr. 18, 2008), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2008-04-18/gen-08-04-aggregate-loan-limit-graduate-and-professional-students-preparing-health-professions ....................6 n.9

GEN-05-09, Increased Unsubsidized Loan Amounts for Naturopathic Medicine Students (June 30, 2005), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2005-07-05/gen-05-09-increased-unsubsidized-loan-amounts-naturopathic-medicine-students ....................7 n.10

Naturopathy, *NIH National Center for Complementary and Integrative Health*, https://www.nccih.nih.gov/health/naturopathy....................4 n.4

NCES.ed.gov, *About IPEDS*, https://nces.ed.gov/ipeds/about-ipeds....................8 n.12

NCES.ed.gov, *Detail for CIP Code 51*, https://nces.ed.gov/ipeds/cipcode/cipdetail.aspx?y=55&cipid=88742....................10 n.17

NCES.ed.gov, *Detail for CIP Code 51.3303*, https://nces.ed.gov/ipeds/cipcode/cipdetail.aspx?y=55&cipid=87829....................10 n.17

NCES.ed.gov, *Degrees Conferred By Degree-Granting Institutions in Selected Professional Fields, By Sex of Student, Control of Institution, and Field of Study: Selected Years, 1985-86 Through 2009-10*, https://nces.ed.gov/programs/digest/d11/tables/dt11_295.asp....................10 n.15

NCES.ed.gov, *First-Professional Degrees Conferred By Degree-Granting Institutions, By Racial/Ethnic Group, Major Field of Study, and Sex of Student: 1999-2000*, https://nces.ed.gov/programs/digest/d01/dt278.asp....................9

NCES.ed.gov, *IPEDS Web-Based Data Collection Fall 2004*, https://nces.ed.gov/ipeds/pdf/webbase2004/editspec_ic.pdf....................9 n.14

NCES.ed.gov, *Introduction to the Classification of Instructional Programs: 2020 Edition*, https://nces.ed.gov/ipeds/cipcode/Files/2020_CIP_Introduction.pdf ..........10 n.16

StudentAid.gov, *Federal Versus Private Loans*, https://studentaid.gov/understand-aid/types/loans/federal-vs-private....................6 n.6

U.S. Dep't of Educ., *Update to List of Professional Degree Programs Due to Court Order* (General 26-42) (June 29, 2026); https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2026-06-29/update-list-professional-degree-programs-due-court-order-updated-july-10-2026....................14 n.19, 26, 35

## LOCAL RULE 7-1 CERTIFICATION

Pursuant to Local Rule 7-1(a), undersigned counsel for Plaintiffs certifies that Plaintiffs have made good faith efforts to resolve the dispute through a teleconference with the Defendants Linda McMahon and the U.S. Department of Education and have been unable to do so.

## MOTION

Plaintiffs the Association of Accredited Naturopathic Medical Colleges ("**AANMC**"), the American Association of Naturopathic Physicians ("**AANP**"), and the Naturopathic Medical Student Association ("**NMSA**") (altogether, "**Plaintiffs**") move for a preliminary injunction under Rule 65 against a new rule issued by Defendants the U.S. Department of Education and Secretary Linda McMahon[1] that became effective July 1, 2026. *See* 91 Fed. Reg. 4254 (Jan. 30, 2026) ("**2026 NPRM**"); 91 Fed. Reg. 23768 (May 1, 2026) ("**Final Rule**"). This Motion is supported by declarations attached as exhibits.[2]

## INTRODUCTION

This motion seeks to enjoin the Department's Final Rule that restricts students pursuing a Doctor of Naturopathic Medicine degree to $100,000 in total student loans instead of $200,000. The Department's Final Rule stems from the July 4, 2025 Working Families Tax Cuts Act—better known as the "One Big Beautiful Bill Act" or "**OBBB**." In OBBB, Congress established new limits on the amount of federal loans that "graduate students" and "professional students" can borrow to

[1] The Department and the Secretary are collectively referred to as the "**Department**" or "**ED**" unless specified otherwise.

[2] *See* Declarations of Dr. JoAnn Yánez ("**AANMC Decl.**"), Ex. 1; Dr. Desta Golden ("**NMSA Decl.**"), Ex. 2; Laura Farr ("**AANP Decl.**"), Ex. 3; Randy Frisch ("**Bastyr Decl.**"), Ex. 4; Melanie Henriksen ("**NUNM Decl.**"), Ex. 5; Lise Alschuler ("**Sonoran Decl.**"), Ex. 6; Randy Swenson ("**NUHS Decl.**"), Ex. 7; Tara Topper ("**Topper Decl.**"), Ex. 8; Gerardo A. Melendez Teran ("**Teran Decl.**"), Ex. 9; Ariana Sorci ("**Sorci Decl.**"), Ex. 10; Keaton Scanlon ("**Scanlon Decl**."), Ex. 11; Alawna Thompson ("**Thompson Decl.**"), Ex. 12; Alyssa Abraham ("**Abraham Decl.**"), Ex. 13; Kailee Keiser ("**Keiser Decl.**"), Ex. 14; Cozetta Case ("**Case Decl.**"), Ex. 15.

pay for a post-bachelor program of study. Historically, "graduate" and "professional" students were treated equally for loan limit purposes. But now they are treated differently.

Whether a student is a "graduate" or a "professional" student depends on whether their program awards a "graduate degree" or a "professional degree." OBBB says this question is to be resolved based on a preexisting three-part test found in a preexisting regulation located at 34 C.F.R. § 668.2 as of July 4, 2025. The test asks whether (1) the degree "signifies completion of the academic requirements for beginning practice in a given profession"; (2) the degree signifies "a level of professional skill beyond that normally required for a bachelor's degree"; and (3) the profession that degree holders enter "generally requires professional licensure."

The Department determined that a Doctor of Naturopathic Medicine degree ("**N.D.**") does not meet the test and thus is not a "professional degree." That determination is flawed because the Department ignored that (1) graduates from a four-year, accredited naturopathic medicine program have completed the academic requirements necessary to begin practice; (2) the degree is at a doctoral level; and (3) to practice as a naturopathic medical doctor, one must be licensed. An N.D. thus meets each part of the three-part test. Instead, the Department reached its conclusion by overlaying the test with various criteria that do not appear in the regulation that OBBB codified.

The Final Rule is contrary to law and in excess of statutory authority. The Department's primary justification is that "professional licensure is not generally required" because not every state's laws consider naturopathic medicine to be a licensed profession. But the details of state law are not a consideration under the plain language of the three part test. United States jurisdictions, including 23 states, Washington, D.C., and two U.S. territories, license the profession and provide access to naturopathic medicine to more than 50% of the U.S. population. In every one of these 26 U.S. jurisdictions, one *must* be licensed or risk violating scope of practice laws that protect titles

such as "naturopathic doctor," "naturopathic medical doctor," or "naturopathic physician." If a state does not license naturopathic medicine doctors, then the profession simply does not exist in its current, modern iteration. Consequently, licensure is not only generally required, licensure is required 100% of the time.

The Final Rule is also arbitrary and capricious. The highlight of the Department's arbitrary and capricious decision-making is its treatment of other degree programs. After litigation over the Final Rule in other matters led to one court entering a stay of certain aspects, the Department reconsidered whether certain degrees met the three-part test for purposes of professional degree status. The Department concluded that certified anesthesiologist assistants met the test, including that "professional licensure is generally required" despite that only 22 states license certified anesthesiologist assistants. Accordingly, certified anesthesiologist assistants now have professional degree status. In stark contrast, the Department ignored Plaintiffs' attempts to informally resolve this dispute over the N.D. degree, including this very same point.

Plaintiffs are three naturopathic medicine associations that collectively represent six institutions of higher education who offer accredited, four-year, doctoral-level naturopathic medicine degree programs ("ND programs"),[3] in addition to students and prospective students in ND programs as well as licensed naturopathic medicine doctors. The harm for each one of these groups is real. Most students cannot make up for the reduction in borrowing capacity with their own funds, and private student loans are not a viable option. Reduced enrollment means reduced tuition revenue for schools, and fewer students leads to fewer licensed naturopathic doctors causing reduced membership in each Plaintiffs' association.

---

[3] This Complaint refers to the credential awarded by these programs as an "**N.D.**" and to the programs awarding the credential as "**ND programs**."

Time is of the essence because the graduate degree loan limits are in place now. ND programs and the naturopathic medicine profession are suffering irreparable harm and respectfully request that the Court enter a preliminary injunction under the Administrative Procedure Act ("**APA**") directing the Department to treat the N.D. degree as of July 1, 2026, as a "professional degree." Plaintiffs further ask the Court to prohibit the Department from enforcing the lower loan limits against ND program students pending a final judgment on the merits.

## FACTUAL BACKGROUND

### I. The licensed naturopathic medicine profession

Naturopathic medicine blends elements of modern conventional medicine and scientific knowledge with traditional and natural forms of medicine. Naturopathic doctors diagnose, treat and manage patients with acute and chronic conditions holistically in private practices, integrative health clinics, multidisciplinary medical centers, and hospitals. AANMC Decl. ¶9; AANP Decl. ¶16. Many patients turn to naturopathic medicine as an alternative, or complement, to conventional medicine. Data shows the number of U.S. adults using naturopathic medical treatment has increased nearly sevenfold since 2002.[4] Similarly, the number of licensed naturopathic doctors has grown from 2,000 in 2000 to approximately 8,000 in the U.S. today, and the number of U.S. jurisdictions that license (or register) naturopathic medicine doctors has increased from 11 in 2000 to 26 today, with several more states considering legislation. AANMC Decl. ¶10–11.

All 26 U.S. jurisdictions require a license to practice as a naturopathic medicine doctor. *See* Compl. ¶25 n.11 (citing state laws). Licensure has several core requirements. First, applicants for licensure must graduate from an ND program accredited by the Council on Naturopathic

[4] Naturopathy, NIH National Center for Complementary and Integrative Health, https://www.nccih.nih.gov/health/naturopathy; *see also* AANMC Decl. ¶13.

Medicine Education ("**CNME**"). CNME is a programmatic accreditor that "accredits four-year, primarily campus-based doctoral programs in naturopathic medicine (ND programs) that qualify graduates for licensure in the U.S. and Canada, including all AANMC's members' ND programs.[5] Second, applicants must sit for and pass the Naturopathic Physicians Licensing Examinations ("**NPLEX**"). The NPLEX is a comprehensive two-part national licensing examination that tests biomedical and clinical sciences, as well as diagnostic and therapeutic knowledge. *See* Compl. ¶21. Third, applicants must meet any jurisdiction-specific requirements. *See* Compl. ¶22; AANP Decl. ¶23. Upon licensure, naturopathic medicine doctors in all 26 jurisdictions are authorized to perform various types of medical treatment and services in accordance with "scope of practice" laws, including independently diagnosing patient illness and disease and treating and managing patients. Compl. ¶24; AANP Decl. ¶23.

Conversely, in all 26 jurisdictions, unlicensed individuals are not allowed to practice naturopathic medicine as outlined by state scope of practice laws. Unlicensed individuals generally can serve as "wellness consultants" but may not provide medical care or treatment and may not identify themselves as naturopathic doctors. *See* Compl. ¶25. In these jurisdictions, neither non-licensed individuals nor those licensed in another jurisdiction may practice medicine or provide treatment and care to patients. AANP Decl. ¶24.

## II. **The Higher Education Act and Federal Direct Loan Program**

Congress passed the Higher Education Act of 1965 ("**HEA**") "[t]o strengthen the

[5] *See* CNME, Naturopathic Program Accreditation, https://cnme.org/naturopathic-accreditation/. AANMC's members are National University of Natural Medicine (Portland, OR) ("**NUNM**"); National University of Health Sciences (Chicago, IL) ("**NUHS**"); Sonoran University of Health Sciences (Phoenix, AZ) ("**Sonoran**"); Bastyr University (campuses in Kenmore, WA and San Diego, CA) ("**Bastyr**"); Canadian College of Naturopathic Medicine (campuses in Vancouver, BC and Toronto, ON); and the Universidad Ana G. Mendez (Gurabo, Puerto Rico).

educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." Pub. L. No. 89-329, 79 Stat. 1219. Title IV of the HEA authorizes student aid programs, including a "Direct Loan Program" by which the Department issues loans directly to students to help pay for "their courses of study." 20 U.S.C. § 1087a(a). Direct Loans "offer several advantages," including fixed interest rates that are "often lower than private loans" and options for flexible repayment plans and loan forgiveness.[6] Direct Loans are the "largest source of federal financial assistance to support students' postsecondary education pursuits." CONG. RSCH. SERV., *The Department of Education's Proposed Rule to Define "Professional Student": FAQ*, at p. 1 (orig. pub. Dec. 17, 2025).[7]

## III. Direct Loans for graduate and professional students before July 1, 2026

Relevant here are Direct Unsubsidized Loans ("**Unsubsidized Loans**").[8] Prior to July 1, 2026, graduate and professional students generally could borrow Unsubsidized Loans in the same amount ($20,500 annually, $138,500 aggregate). *See* 2026 NPRM at 4272 (charts comparing limits before and after July 1, 2026). But Congress authorized the Department to increase Unsubsidized Loan limits for "students engaged in specialized training." 20 U.S.C. § 1078-8(d)(2)(A). Since 1996, the Department used that authority to increase loan limits for "graduate and professional students enrolled in certain approved health profession programs."[9] In 2005, the Department added

[6] StudentAid.gov, *Federal Versus Private Loans*, https://studentaid.gov/understand-aid/types/loans/federal-vs-private.
[7] https://www.congress.gov/crs-product/R48768 (hereinafter, "**CRS REPORT**").
[8] A second type of Direct Loan, known as the Grad PLUS Loan, was eliminated by OBBB. A third type, the Direct Subsidized Loan, was discontinued for graduate and professional students in July 2012. *See* Pub. L. No. 112-25, § 502, 125 Stat. 240, 266.
[9] GEN-08-04, *Aggregate Loan Limit for Graduate and Professional Students Preparing for the Health Professions* (Apr. 18, 2008), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2008-04-18/gen-08-04-aggregate-loan-limit-graduate-and-professional-students-preparing-health-professions; *see also* ED, GEN-96-14, GEN-97-14, and GEN-98-18.

CNME-accredited ND programs to the list of "approved health profession" programs.[10] Students in these "health profession" programs could borrow up to $46,667 annually, and up to $224,000 in the aggregate.[11]

## IV. <u>The Department's longstanding treatment of an N.D. and the 2007 Rule</u>

In 2007, the Department proposed definitions of "undergraduate student," "graduate or professional student," and "first-professional degree." 72 Fed. Reg. 44620 (Aug. 8, 2007) ("**<u>2007 NPRM</u>**"). The distinctions highlighted "the Department's policy that graduate or professional students may not receive aid from undergraduate programs, such as the Pell Grant Program, while also receiving graduate or professional level aid." *Id.* at 44622. The 2007 NPRM defined a "graduate or professional student" as "a student who is . . . enrolled in a program leading to a first-professional degree," and proposed the following definition of a "first-professional degree":

> A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

*Id.* at 44643. The 2007 Rule dropped the word "first" and stated it was "not necessary to specify whether a professional degree is a first professional degree for Title IV, HEA program purposes."

---

[10] GEN-05-09, *Increased Unsubsidized Loan Amounts for Naturopathic Medicine Students* (June 30, 2005), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2005-07-05/gen-05-09-increased-unsubsidized-loan-amounts-naturopathic-medicine-students.

[11] *See* 2009-2010 FSA HANDBOOK, vol. 3, ch. 6, pp. 100-101, *Stafford/PLUS Loan Periods and Amounts*, https://fsapartners.ed.gov/sites/default/files/2021-03/2009-2010%20Chapter%206%20StaffordPLUS%20Loan%20Periods%20and%20Amounts.pdf; 2025-2026 FSA HANDBOOK, vol. 8, pp. 38-39, *Annual and Aggregate Loan Limits, Increased Unsubsidized Annual Loan Limits for Certain Health Professions Students*, https://fsapartners.ed.gov/knowledge-center/fsa-handbook/2025-2026/vol8/ch4-annual-and-aggregate-loan-limits.

72 Fed. Reg. 62014, 62016 (Nov. 1, 2007) ("**2007 Rule**"). The "professional degree" definition in the 2007 Rule otherwise remained the same. *Id.* at 62025. Importantly, the Department stated that the proposed definition of "first-professional degree"—and thus the final "professional degree" definition—was "based on the definition currently used by the National Center for Education Statistics." *Id.* at 44621. These definitions were codified at 34 C.F.R. § 668.2.

The National Center for Education Statistics ("**NCES**") is a division in the Department responsible for analyzing data submitted by Title IV institutions. "Under [NCES's] definition a first professional degree would be limited to degree programs that require a level of professional skill beyond that normally required for a bachelor's degree as well as a professional license." 2007 NPRM at 44621. NCES "used" these "criteria" to classify a "first-professional degree" in its "Integrated Postsecondary Education Data System" ("**IPEDS**"). 2026 NPRM at 4262. IPEDS is a "system of interrelated surveys" NCES requires Title IV institutions to complete that NCES organizes and publishes annually.[12] 20 U.S.C. § 1094(a)(17). NCES organized data by "degree level," including "undergraduate degree" and "first-professional degree," and by "field of study."

At the time of the 2007 Rule, "NCES considered the first-professional degree as one which 'encompasses certain occupationally specific and closely regulated degree programs.'" 2026 NPRM at 4263. NCES classified "Naturopathic medicine" (N.D.) as one such "first-professional degree." Beginning in 1999, NCES published tables listing an "N.D." and 10 other "examples" of "first-professional degrees." The 1999-2000 table is below:

[12] NCES.ed.gov, *About IPEDS*, https://nces.ed.gov/ipeds/about-ipeds.

**Table 278.—First-professional degrees conferred by degree-granting institutions, by racial/ethnic group, major field of study, and sex of student: 1999–2000**

| Major field of study | Total |
|---|---|
| 1 | 2 |
| **All fields** | **80,057** |
| Dentistry (D.D.S. or D.M.D.) | 4,250 |
| Medicine (M.D.) | 15,286 |
| Optometry (O.D.) | 1,293 |
| Osteopathic medicine (D.O.) | 2,236 |
| Pharmacy (Pharm.D.) | 5,669 |
| Podiatry (Pod.D. or D.P.) or podiatric medicine (D.P.M.) | 569 |
| Veterinary medicine (D.V.M.) | 2,251 |
| Chiropractic medicine (D.C. or D.C.M.) | 3,809 |
| Naturopathic medicine | 202 |
| Law (LL.B. or J.D.) | 38,152 |
| Theology (M.Div., M.H.L., B.D., or Ord.) | 6,129 |
| Other | 211 |

NCES.ed.gov, *First-Professional Degrees Conferred By Degree-Granting Institutions, By Racial/Ethnic Group, Major Field of Study, and Sex of Student: 1999-2000*.[13] Other Department publications denoted naturopathic medicine and these same "first-professional degrees." For example, in 2004, the Department explained that "programs considered to be first-professional degree programs" and "recognized as first-professional programs by the Department of Education" include, among others, "Naturopathic Medicine."[14]

The 2007 Rule's "professional degree" definition listed 10 of the 11 same degrees that the Department classified as "first-professional degrees." Although it did not expressly list an N.D., the "professional degree" definition is illustrative. It states: "***Examples*** of professional degrees ***include but are not limited*** to [listing 10 degrees]." And the small number of naturopathic medicine degrees (202) was less than half of the next smallest category (Podiatry) and less than

[13] https://nces.ed.gov/programs/digest/d01/dt278.asp. This image omits certain categories that are not relevant for purposes of this Motion.
[14] NCES.ed.gov, *IPEDS Web-Based Data Collection Fall 2004*, https://nces.ed.gov/ipeds/pdf/webbase2004/editspec_ic.pdf (emphasis added).

1% of the total number of first-professional degrees.

After the 2007 Rule, NCES continued to treat an N.D. as a "first-professional degree" in IPEDS tables and for other purposes until 2011. NCES discontinued the "first-professional degree" term and began classifying degrees in "selected professional fields." CRS REPORT*, supra*, at 6. From then on, NCES continued to treat "Naturopathic medicine" as a degree in a "professional field" alongside the 10 other degrees.[15] For decades and still today, naturopathic medicine programs leading to an N.D. are housed under CIP Codes[16] that include programs which prepare individuals "for the independent professional practice of naturopathic medicine," specifically "as licensed professionals . . . in the health care professions."[17]

## V. Congress sets loan limits for graduate students and professional students

OBBB codified changes to the Direct Loan Program in a new subsection (a)(4) to 20 U.S.C. § 1087e. *See* Pub. L. No. 119-21, tit. VIII, subtitle B, § 81001; 139 Stat. 72, 334. The new Unsubsidized Loan limits for "graduate students" are $20,500 annually and up to $100,000 in the aggregate. 20 U.S.C. § 1087e(a)(4)(A). OBBB set higher limits for "professional students" at $50,000 annually and up to $200,000 in the aggregate. *Id.* In contrast to prior practice, OBBB separately defined "graduate student" and "professional student." Now, a "professional student" is "a student enrolled in a program of study that awards a professional degree, as defined under

---

[15] *See* NCES.ed.gov, *Degrees Conferred By Degree-Granting Institutions in Selected Professional Fields, By Sex of Student, Control of Institution, and Field of Study: Selected Years, 1985-86 Through 2009-10*, https://nces.ed.gov/programs/digest/d11/tables/dt11_295.asp (defining "Other" in a footnote, stating that it "**Includes naturopathic medicine**") (emphasis added).

[16] NCES organizes degree programs by "CIP Code" for "reporting of fields of study and program completions." NCES.ed.gov, Introduction to the Classification of Instructional Programs: 2020 Edition. https://nces.ed.gov/ipeds/cipcode/Files/2020_CIP_Introduction.pdf.

[17] *See* NCES.ed.gov, *Detail for CIP Code 51*, https://nces.ed.gov/ipeds/cipcode/cipdetail.aspx?y=55&cipid=88742; NCES.ed.gov, *Detail for CIP Code 51.3303*, https://nces.ed.gov/ipeds/cipcode/cipdetail.aspx?y=55&cipid=87829.

[34 C.F.R.] § 668.2 . . . (as in effect on July 4, 2025), upon completion of the program." *Id.* § 1087e(a)(4)(C)(ii). A "graduate student" is "a student enrolled in a program of study that awards a graduate credential (other than a professional degree) upon completion of the program." *Id.* § 1087e(a)(4)(C)(i). The new limits were effective on or after July 1, with an "interim exception" for students enrolled in a program as of June 30. Such "grandfathered" students can borrow under the pre-July 1 framework for the duration of their "expected time to credential." *Id.* § 1087e(a)(8).

## VI. The 2026 NPRM, AANMC and AANP's comments, and the Final Rule

### A. The 2026 NPRM

In January 2026, the Department proposed a new definition of a "professional degree." 2026 NPRM at 4332–33. The Department recognized that Congress "borrowed and codified" the Department's "longstanding" definition of the term "professional degree" and that the § 668.2 definition "establishes a three-part test" for a "professional degree." *Id.* at 4262. But it proposed to "draw upon" the three-part test to add new criteria, *id.*, appearing in bold:

> (1) A professional degree is a degree that:
> (i) Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a bachelor's degree;
> (ii) **Is generally at the doctoral level**, **and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework**;
> (iii) Generally requires professional licensure **to begin practice**; and
> (iv) **Includes a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (2)(i) of this definition**.
> (2) A professional degree may be awarded in the following fields:
> (v) Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (DC or DCM.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.).

*Id.* at 4332–33. The Department stated that because the 10 degrees in § 668.2 were "codified by

Congress into the definition," *id.* at 4262, it was "foreclosed, by statute, from removing them," Final Rule at 23791. The 2026 NPRM proposed adding only one more "professional degree" to the list of 10: a Doctorate of Clinical Psychology.

In direct contrast with OBBB, the 2026 NPRM ***eliminated*** the statutory "[e]xamples include but are not limited to" phrase that appears before the list of 10 "professional degrees" in § 668.2. 2026 NPRM at 4332. Again contrasting with OBBB, the definition stated that to be a "professional student," one *"[m]ust* be enrolled in a program leading to" a "professional degree." *Id*. at 4332–33 (emphasis added). The 2026 NPRM explained "the regulatory landscape surrounding naturopathic medicine is unsettled" as "less than half of states license naturopathic physicians" and because "the practice of naturopathy is explicitly banned in three states." *Id.* at 4265. Accordingly, the Department did not classify an N.D. as a "professional degree."

**B. AANMC and AANP submit comments on the 2026 NPRM**

AANMC and AANP submitted comments explaining why an N.D. meets the three-part test. AANMC Decl. ¶57. Focusing on the "professional licensure is generally required" element, they emphasized that the Department imposed both (1) a "majority of state" licensure requirement and (2) a "practice be legally permitted everywhere" requirement, neither of which is in the statute, and is irrelevant to whether "professional licensure is generally required."

AANMC and AANP recounted the treatment of an N.D. as a "first-professional degree" alongside the same 10 "professional degrees" in § 668.2, the designation of naturopathic medicine as a "health profession," and the organization of ND programs under CIP Codes as programs preparing individuals for the "professional" and "licensed" practice of naturopathic medicine. AANMC and AANP also noted inconsistency in the treatment of an N.D. versus other degrees.

### C. The Final Rule

The Final Rule, published on May 1, 2026, made no material changes to the 2026 NPRM's "professional degree" definition. Final Rule at 23882; *see* 34 C.F.R. § 685.102 (2026) (defining "professional student"). In addition to rejecting AANMC's and AANP's arguments, the Department said that an N.D. "is not substantially similar" to the 11 degrees, "so it cannot be considered a professional degree." Final Rule at 23794.

## VII. <u>Litigation, stay of "Professional Degree" definition in the Final Rule, Electronic Announcement, and letters to the Department</u>

Four lawsuits—not including this one—have been filed over the definition of "professional degree."[18] In two consolidated cases in the U.S. District Court for the District of Columbia, plaintiffs moved to stay the "professional degree" requirements in the Final Rule's definition and in the preamble. On June 24, 2026, Judge Beryl A. Howell granted the stay and concluded that the Final Rule "imposed new requirements absent from the preexisting definition adopted by Congress," which the Department "lacked the authority to make" because "Congress did not direct the Department to evaluate and update the regulatory definition already in 34 C.F.R. § 668.2 with any new eligibility criteria." *Am. Ass'n of Nurse Practitioners,* 2026 WL 1826176, at *16.

Judge Howell specifically stayed the following "extra-statutory" requirements from becoming effective on July 1, 2026: that a "professional degree" (1) be "generally at the doctoral level," (2) "require[] at least six academic years of postsecondary education coursework for completion," (3) fall within "a four-digit CIP code . . . in the same intermediate group as the [11 degrees] listed in" the Final Rule; and (4) the requirement that "a professional must not 'be

[18] *See Am. Ass'n of Nurse Practitioners v. McMahon*, No. 1:26-cv-01780 (D.D.C.); *PA Educ. Ass'n v. U.S. Dep't of Educ.*, No. 1:26-cv-1941 (D.D.C.); *Maryland v. U.S. Dep't of Edu*c., No. 1:26-cv-01957 (D. Md.)*; Am. Nurses Ass'n v. U.S. Dep't of Educ.*, No. 1:26-cv-12443 (D. Mass.).

supervised by another professional' with 'more education, training, and qualifications.'" *Id.* at *23. Judge Howell also found "likely unlawful" the provision that "turned an illustrative list of qualifying degrees into an exhaustive one." *Id.* at *23. But the court declined to set this provision aside "on the understanding" that it was "not necessary" since the parties did not dispute that the 11 degrees are "professional degrees." *Id.* The court also declined to decide, "in the first instance," whether "certain degrees" were "professional degrees" under the operative three-part test. *Id.* Instead the court permitted the Department to reassess based only on "the proper three-criteria," which the Department represented it could do "relatively quickly." *Id*. at *22–23.

Five days after the June 24 stay, the Department issued an Electronic Announcement, listing 18 new degrees that meet the three-part test, which the Department said it would "treat" as "professional degrees" "for the duration of the Court's stay."[19] The Electronic Announcement also listed degrees that were "not considered professional degrees." *Id.* Neither list mentioned an N.D.

On June 30, 2026, AANMC and AANP wrote to the Department to explain the conclusion that an N.D. did not meet "all parts of the operative test"[20] similarly relied on impermissible extra-statutory criteria that had been set aside and requested the Department reassess. AANMC Decl. ¶69. The Department did not respond but later made minor updates to the Electronic Announcement on July 10 that again did not mention an N.D. AANMC and AANP wrote again to the Department on July 15. *Id.* The Department has not responded to that letter either. *See id.* An N.D.'s treatment as a non-"professional degree" in the Final Rule and the preamble (and its omission from the Electronic Announcement) is the unlawful final agency action challenged here.

---

[19] U.S. Dep't of Educ., *Update to List of Professional Degree Programs Due to Court Order* (General 26-42) (June 29, 2026); https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2026-06-29/update-list-professional-degree-programs-due-court-order-updated-july-10-2026 (hereinafter, "**Electronic Announcement**").
[20] Final Rule at 23768, 23794–95.

## LEGAL STANDARD

To obtain a preliminary injunction, Plaintiffs must establish (1) a likelihood of success on the merits; (2) that irreparable harm is likely without preliminary relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's sliding-scale approach, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

## ARGUMENT

### I. Plaintiffs are likely to show that the Final Rule violates the APA

Plaintiffs are likely to succeed on the merits of their APA claims that the Final Rule is contrary to law and in excess of statutory authority, and separately, is arbitrary and capricious.

#### A. The Final Rule is contrary to law and in excess of statutory authority because its "professional degree" definition departs from the statutory three-part test

The Final Rule is contrary to law and in excess of statutory authority because its "professional degree" definition conflicts in numerous respects with Congress's definition. 5 U.S.C. § 706(2)(A); Compl. ¶166–74 (Count I). Agency action is "contrary to law" when it is not "authorized by the statutory text." *Am. Ass'n of Nurse Practitioners*, 2026 WL 1826176, at *14 (quoting *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006)).

When Congress imposed separate loan limits for "graduate" and "professional" students, it stated that a "professional student" is "a student enrolled in a program of study that awards a professional degree" as defined by 34 C.F.R. § 668.2 "(as in effect on July 4, 2025)." 20 U.S.C. § 1087e(a)(4)(C)(ii). In doing so, Congress "codified" the 2007 Rule's definition of "professional

degree" in § 668.2 and its three-part test. Under that test, a "professional degree" is one for which (1) the degree "signifies both completion of the academic requirements for beginning practice in a given profession"; (2) the degree signifies "a level of professional skill beyond that normally required for a bachelor's degree"; and (3) "professional licensure is also generally required." 34 C.F.R. § 668.2.

1. <u>The Final Rule contains numerous unlawful extra-statutory requirements</u>

The Final Rule and the preamble added "requirements" for a "professional degree" that were not in § 668.2 on July 4, 2025. Judge Howell set aside the Final Rule's "professional degree" *definitional* requirements, as well as the *preamble's* "no supervision" requirement that the Department "superimposed" onto the definition. *See Am. Ass'n of Nurse Practitioners*, 2026 WL 1826176, at *5, *24. Plaintiffs ask the Court to set aside these extra-statutory requirements in the Final Rule as well. But Judge Howell was not asked to consider other extra-statutory requirements that the preamble similarly "superimposed" onto an N.D. These requirements are equally unlawful, and must too be set aside.

The Department's apparent requirement that all, or at least over "half of states," license a profession is not in the three-part test. And it misunderstands the licensing scheme of a profession generally as it relates to scope of practice. The Final Rule appears to interpret "[p]rofessional licensure is generally required" to mean that a majority of, or all states must license a profession. But this interpretation is not supported by the language of this element and presupposes that a particular profession exists at all when a state does not provide licensure. Here, every jurisdiction where an individual may legally practice as a naturopathic medicine doctor requires licensure. In that sense, licensure is not just "generally required"; licensure is required 100% of the time.

The primary relevance of a state's licensing regime is how the state defines scope of

practice and the extent to which an individual can practice a particular profession *without* a license. In this instance, if unlicensed individuals attempt to practice as naturopathic doctors in the 26 jurisdictions that require licensure, they face civil or criminal penalties.[21] Conversely, in jurisdictions that do not license the profession, one may never "begin practice" as a naturopathic medicine doctor. Instead, an individual's profession in an unregulated state would be as a "wellness consultant," or a similar title, to avoid running afoul of laws that prohibit the unlicensed practice of medicine.[22] The Department ignores scope of practice as it relates to the definition of a profession because if a state does not license naturopathic medical doctors, then the profession simply does not exist in that state.

To compare, the Department jettisoned a number of other degrees from "professional degree" status on the basis that they do not require *any* license to practice. *See*, *e.g.*, Final Rule at 23792 (rejecting an MBA because it "does not itself carry accompanying licensure"); *id*. at 23801 (rejecting the MPH, DrPH, and related Master's in Epidemiology because "licensure is not required"); *id.* at 23808 (rejecting advanced degrees in public policy or public administration fields

[21] *See* Alaska Stat. § 08.45.080; Ariz. Rev. Stat. Ann. § 32-1555(A)(1)–(2); Cal. Bus. & Prof. Code §§ 3660, 3664, 2052; Colo. Rev. Stat. § 12-250-114; Conn. Gen. Stat. §§ 20-37, 20-42; D.C. Code §§ 3-1205.013–1210.01; Haw. Rev. Stat. § 455-9; Idaho Code § 54-5117; Kan. Stat. Ann. § 65-7211(b); Me. Rev. Stat. tit. 32, § 12521; Md. Code Ann., Health Occ. §§ 14-5F-29 to 14-5F-30; Mass. Gen. Laws ch. 112, § 273; Minn. Stat. § 147E.10; Mont. Code Ann. § 37-26-401; N.H. Rev. Stat. Ann. §§ 328-E:3, 328-E:14; N.M. Stat. Ann. § 61-12G-10; N.D. Cent. Code §§ 43-58-03, 43-58-12; Or. Rev. Stat. § 685.020; 63 Pa. Cons. Stat. §§ 272.201, 272.206; P.R. Laws Ann. tit. 20, § 2465–2466; R.I. Gen. Laws § 5-36.1-4; Utah Code Ann. § 58-71-301, 58-1-501(1)(a); V.I Code Ann. tit. 27, § 192; Vt. Stat. Ann. tit. 26, § 4122(a)(1)–(2); Wash. Rev. Code § 18.36A.030; Wis. Stat. §§ 466.02(1)(a)–(b), 466.09.

[22] For example, neither Michigan nor North Carolina license naturopaths, but the lack of licensure does not permit anyone to practice as a "naturopathic medical doctor" or a "naturopath." *See Michigan v. Rogers*, 641 N.W.2d 595 (Mich. App. 2001) (holding that Michigan's statutory definition of "practice of medicine" was not unconstitutional in regards to an individual charged with practicing medicine without a license); *North Carolina v. Perry*, 582 S.E.2d 708 (N.C. App. 2003) (upholding conviction of individual claiming to be a naturopath for practicing medicine without a license).

because "licensure is not required to enter such fields."). Indeed, one may "practice" in these professions with no license in any state without penalty. But one *must* be licensed to be a naturopathic medicine doctor in order to practice medicine.

The Department's purported requirement that the "regulatory landscape" be "settled" is also not in the three-part test. "When a statute includes an explicit definition, we must follow that definition." *Digit. Realty Tr. v. Somers*, 583 U.S. 149, 160 (2018). Here, "Congress did not direct the Department to evaluate and update the regulatory definition already in 34 C.F.R. § 668.2 with any new eligibility criteria . . . . In fact, Congress did the opposite." *Am. Ass'n of Nurse Practitioners*, 2026 WL 1826176, at *16. Indeed, the Department has twice recognized that "settled" state law is *not* required, first in connection with a different degree and the relevance of variance in state laws regarding required supervision to the "professional" determination. The Department "decline[d] to amend the regulations to create a dynamic classification keyed to a ***certain numerical court*** [*sic*] ***of State laws***, as this would undermine clarity, predictability, and nationally uniform administration." Final Rule at 23787. Second, in litigation over this same Final Rule, the Department argued that it "cannot achieve a clear, nationally uniform framework. . . if that framework depends on the idiosyncrasies of a ***few State laws***." *Am. Nurses Ass'n*, No. 1:26-cv-12443, Doc. 42 (Opp. to Mot. to Stay), at p. 24 (emphasis added).

2. <u>An N.D. meets the operative three-part test</u>

First, upon completing an ND program and earning an N.D., graduates have completed all *academic* requirements to begin practicing as naturopathic doctors. The degree signifies readiness to sit for entry-to-practice national licensing examinations (the NPLEX) and, upon licensure, to enter independent practice. There are no other academic requirements. The Final Rule conceded that "obtaining a Doctor of Naturopathic Medicine does prepare students to begin practice in

naturopathic medicine." Final Rule at 23794. Second, an N.D. "requires a level of professional skill beyond what is normally required for a bachelor's degree." Indeed, an N.D. requires doctoral-level clinical competencies obtained through several years of post-baccalaureate education. The Department did not dispute an N.D. satisfies this element. Third, as discussed, "professional licensure is generally required." Every one of the 26 regulating jurisdictions mandates licensure to practice naturopathic medicine. In every jurisdiction, only those who complete an accredited ND program are eligible to take the NPLEX, and only those who pass the NPLEX are eligible for licensure. One without an N.D. is prohibited from providing naturopathic medical care to patients. Only licensees can diagnose—which may include medical history, physical exams, lab tests, and diagnostic imaging—and treat patients. "Professional licensure" is required without exception.

The same restrictions on practice exist in non-regulating jurisdictions, including three states where the practice of naturopathy is banned. Graduates with an N.D. cannot practice and apply the knowledge and skills they learned in school without potentially running afoul of scope of practice laws prohibiting the unlicensed practice of medicine. Graduates who work in non-regulating jurisdictions are not entering "the practice" of naturopathic medicine because they cannot provide medical care.[23]

Finally, the Department's condition that the "regulatory landscape" be "settled" among all states improperly elevates the policies of certain states over others. "Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens," and that these are "primarily, and historically . . . matter[s] of local concern." *Medtronic, Inc. v.*

[23] For example, Wyoming defines "practicing medicine" as "Offers or undertakes to prevent, diagnose, correct or treat, in any manner, by any means, method or device, any human disease, illness, pain, wound, fracture, infirmity, defect or abnormal physical or mental condition, injury, deformity or ailment, including the management of pregnancy and parturition." Wyo. Stat. Ann. § 33-26-102(a)(xi).

*Lohr*, 518 U.S. 470, 475 (1996). Echoing the point, the Tenth Circuit explained that states' "right to regulate trades and callings concerning public health . . . are properly subject to police regulation, the details of which are primarily with the Legislature and are not to be interfered with by the federal court so long as fundamental constitutional rights are not violated." *Polhemus v. Am. Med. Ass'n*, 145 F.2d 357, 359 (10th Cir. 1944). The states' power in this arena is precisely why the three states' restrictions have been upheld.[24] But that principle works both ways. When states elect to license practitioners in professions concerning public health, they must be respected by the federal government, including the executive branch.

The Final Rule's extra-statutory, "more stringent requirements" are contrary to law and in excess of statutory authority. *See Am. Ass'n of Nurse Practitioners*, 2026 WL 1826176, at *23. Because an N.D. meets the three-part test, the Final Rule and the preamble must be set aside.

### B. The Final Rule's exclusion of an N.D. was arbitrary and capricious

The Final Rule separately violates the APA because it is arbitrary and capricious. The arbitrary-and-capricious standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The "reasoned decision making requirement includes a duty to explain any departure from prior norms." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-cv-640 (SI), 2026 WL 599621, at *6 (D. Or. Mar. 2, 2026). Agencies must "articulate[] a satisfactory explanation" and "a rational connection between the facts found and the choice made." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).

The Final Rule's exclusion of an N.D. fails this standard repeatedly. First and foremost, the Department impermissibly "relied" on factors that "Congress ha[d] not intended it to consider,"

---

[24] *See, e.g.*, *Davis v. Beeler*, 207 S.W.2d 343 (Tenn. 1947).

*i.e.*, those extra-statutory requirements discussed above. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. But the irrationality of the Final Rule runs deeper and unevenly applied its extra-statutory requirements, ignored the Department's longstanding treatment of an N.D. as a "professional" degree, and treated an N.D. and other degrees inconsistently.

1. The Final Rule unevenly applied its extra-statutory requirements

The Final Rule is arbitrary and capricious because it applied extra-statutory criteria, including the "majority of state" licensure requirement, unevenly. "[A]n internally inconsistent analysis is arbitrary and capricious." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015). "The great principle that like cases must receive like treatment" is "black letter administrative law." *Baltimore Gas & Electric Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020).

Even assuming the relevance of how many states license a profession to whether "licensure is generally required," the Department was more strict with an N.D. than other degrees. The Final Rule concluded that certified anesthesiologist assistants (CAAs) "meet the three-part operative test" (including that "professional licensure is generally required") despite that just 24 jurisdictions (22 states, D.C., and Guam) maintain a licensing regime permitting practice.[25] Final Rule at 23805; *see also* Electronic Announcement, *supra* n.19. "[A]n agency must provide [] a reasoned explanation for . . . treating *similar situations* differently." *Baltimore Gas*, 954 F.3d at 283 (emphasis in original). There is no way the Department can "reasonably" explain its treatment of an N.D. given that *more* jurisdictions license naturopathic doctors than CAAs. Because the Final Rule's treatment of an N.D. compared to CAAs is "so questionable and internally inconsistent," it is "arbitrary and capricious." *Friends of Wild Swan v. U.S. Fish & Wildlife Serv.*, 945 F. Supp. 1388, 1397 (D. Or. 1996).

[25] *See* Am. Acad. of Anesthesiologist Assistants, *Certification*, https://www.anesthetist.org/certifcation-practice-map.

2. The Department departed from past practices

For decades, the Department classified an N.D. as a "first-professional degree," considered naturopathic medicine a "health profession," and regarded ND programs as "prepar[ing] individuals for the independent ***professional practice*** of naturopathic medicine" as ***licensed professionals***." *Supra* n.17. Under the prior construction canon, this longstanding meaning indicates that the definition of "professional degree" includes an N.D. *See* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 322–26 (2012).

The Department's current position that treats a doctoral-level N.D. as a "graduate degree" ignores this history. "It is textbook administrative law that an agency must provide a reasoned explanation" for both "departing from precedent," *W. Deptford Energy v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014), and "disregarding facts and circumstances that underlay or were engendered by [a] prior policy," *Encino Motorcars v. Navarro*, 579 U.S. 211, 222 (2016). "The change-in-position doctrine" precludes agencies from "mislead[ing] regulated entities." *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 567–68 (2025). "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020).

In addressing AANMC and AANP's comments on the 2026 NPRM, the Department paid lip service to its past treatment of an N.D. Yet in the course of addressing other degrees in the rulemaking and most recently in other litigation over the Final Rule, the Department has inextricably linked the "longstanding" NCES definition of "first-professional degree," which included an N.D., to the § 668.2 list that OBBB codified. In doing so, the Department contradicts itself and makes it impossible to credibly defend an N.D.'s continued omission. "Unexplained inconsistency between agency actions is a reason for holding an interpretation to be an arbitrary

and capricious change." *Nat'l Wildlife Fed'n*, 2026 WL 599621, at *6.

Consider first that both in 2007 and in 2026 the Department stated that the 2007 Rule's "professional degree" definition was "based on the longstanding definition of a first-professional degree used by [NCES]." 2026 NPRM at 4261. The Final Rule emphasized "rel[iance] on" the "historical context in which [the 2007 Rule's § 668.2] list was originally developed by the Department." Final Rule at 23785. To briefly recap that "historical context": between 1999 and 2011, NCES classified "Naturopathic medicine" as a "first-professional degree" for IPEDS purposes. When NCES discontinued that term in favor of a "professional" "field" classification in 2011, it continued to include "Naturopathic medicine." The Department, meanwhile, in 2004 "recognized . . . first-professional programs" included "Naturopathic Medicine." And from 2005 until this year, the Department allowed students attending CNME-accredited ND programs to borrow more Unsubsidized Loans because "naturopathic medicine" was an "approved health profession." Finally, still today, the Department's CIP Codes define an ND program as one that "prepares individuals to practice as licensed professionals."

Returning to the Final Rule, the Department highlighted its "approach to put significant weight on the historical treatment of 'first-professional degrees' and the illustrative list derived from the National Center for Education Statistics (NCES) classifications." Final Rule at 23787. It reiterated that it "believes the former inclusion of such programs in the definition of *professional degree* ***is relevant***." *Id.* at 23788 (emphasis added).

The Department recently reiterated this position in litigation. *See Am. Ass'n of Nurse Practitioners*, No. 1:26-cv-01780, Doc. 23 (Opp. to Mot. for Stay), at p.14 ("§ 668.2's definition of 'professional student' was based on a previous definition of 'first professional student'"). In pending litigation, the Department has even leveraged the "first-professional degree" definition in

order to justify the Final Rule's exclusion of other degrees, stating:

> Although the eventual defined term was "professional degree," it was originally termed "first professional degree." **That is important** because, as the Department explained when it proposed § 668.2, **the definition was "based on the definition currently used by the National Center for Educational Statistics (NCES)**."

*Id.* at 26 (quoting 2007 Rule at 62015 & 2007 NPRM at 44621) (emphases added). Moreover, the Department has characterized the "IPEDS definition" as "668.2's ***precursor***," and argued that "when Congress cross-referenced § 668.2 in [OBBB], it ***intended to incorporate that same administrative interpretation***." *Id.* at 27–28. Significantly, the Department conceded that "when the Department promulgated § 668.2 with the ***same list of professions as the IPEDS definition***, § 668.2 '***brought the old soil***' with it." *Am. Nurses Ass'n*, No. 1:26-cv-12443, Doc. 42 (Opp. to Mot. for Prelim. Inj. & Stay), at p.21 (emphasis added, citations omitted).

These statements are irreconcilable with the Final Rule's treatment of an N.D. that disclaimed the "relevance" and "importan[ce]" of the NCES's "first-professional degree" definition and the NCES/IPEDS list. Final Rule at 23794–95.[26] The Department cannot have it both ways, and it has made concessions throughout the rulemaking process and now in litigation that preclude it from taking a different position here. The Department's exclusion of an N.D. is arbitrary and capricious for this additional reason.

3. <u>The Department unreasonably found that an N.D. is not "similar" to the "professional degrees" in the Final Rule</u>

The Department also excluded an N.D. based on its purported lack of "similarity" to the

[26] The Court should not overlook that the "first-professional degree" definition "existed in a paradigm where there were no significant legal consequences for a degree being counted, or not, as a professional degree," 2026 NPRM at 4263, and "served a very limited purpose," *Am. Ass'n of Nurse Practitioners*, 2026 WL 1826176, at *4. The insignificance of the definition then weighs in favor of Plaintiffs' interpretation now. A definition promulgated with little industry input or external pressure that survived for decades calls into question the motivation behind the Department's new interpretation today.

11 "professional degrees" in the Final Rule. But an N.D. *is* "similar" to nearly all those 11 degrees, at least in the ways that matter under the three-part test. Courts "require agencies to justify different results reached under the same rule in order to lend predictability and intelligibility to the announced standard, promote fair treatment, and facilitate judicial review." *Baltimore Gas*, 954 F.3d at 286.

Under the three-part test, an N.D., just like the listed degrees in conventional and osteopathic medicine, chiropractic, optometry, pharmacy, podiatry, veterinary medicine, and clinical psychology, all "require doctoral level education, extensive supervised clinical training, national licensing examinations, State licensure for independent practice, and ongoing professional competency requirements." Final Rule at 23790.[27]

Specifically under the "licensure is generally required" element, naturopathic medicine and the other fields "on the enumerated list"—with the exception of theology—"have generally one pathway toward licensure, which includes earning the requisite degree first prior to sitting for a licensure exam." *Id.* at 23786. There is no "alternative pathway" to licensure: one must earn an N.D. from a CNME-accredited program and pass the NPLEX.

Even under the criteria Judge Howell set aside, they are "similar." ND programs generally require seven to eight total years of schooling—and thus more than "six academic years of postsecondary education coursework for completion." And licensed naturopathic doctors are likewise not "supervised by another professional." Moreover, an N.D. falls under the same 2-digit CIP Code as over 15 degrees now considered "professional," including most of the original 11. The Department's only rebuttal on this point is that "[c]omparable language between two NCES

[27] One district court in the Ninth Circuit recently rejected the argument that licensed naturopathic medicine physicians do not "practice medicine." *Kollin v. Brio Inc.*, 677 F. Supp. 3d 1002, 1007–08 (D. Ariz. 2023) (holding that licensed naturopathic physicians are physicians and thus were "exempt from the minimum wage and overtime protections of the [Fair Labor Standards Act.]").

CIP code definitions does not alone make the two programs substantially similar." Final Rule at 23795. But shared CIP Codes are not the only way in which these degrees are alike, as discussed.

4. Several "professional degrees" added in the Electronic Announcement are not similar to the 11 degrees in the Final Rule

That similarity is highlighted by the fact that several of the 18 degrees added in the Electronic Announcement are *dissimilar* to the 11 in the Final Rule. Indeed, some are *two-year master's degrees*. *See* Electronic Announcement, s*upra* n.19 (*e.g*., athletic training (MSAT), occupational therapy (MSOT), physician assistant (MSPA), and certified anesthesiologist assistant (CAA)). In contrast, nearly all 11 "professional degrees" in the Final Rule are doctoral-level degrees like an N.D. And other degrees impose far less "academic requirements" to complete and substantially less rigor than an N.D. and those 11 degrees. "[A]gencies must reasonably explain disparate treatment of similarly situated parties." *Baltimore Gas*, 954 F.3d at 285–86. Because the Department has not done that here, its Final Rule is arbitrary and capricious.

## II. Plaintiffs and their members are suffering irreparable harm under the Final Rule

The Final Rule is irreparably injuring prospective students who had planned to enroll in ND programs, current students enrolled in ND programs who are members of NMSA and AANP, AANMC member institutions, as well as the three Plaintiff associations. An association may sue "on behalf of its members" for injuries that members have sustained, *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), or may "sue on their own behalf for injuries they have sustained," *Havens Realty v. Coleman*, 455 U.S. 363, 379 n.19 (1982). Here, harm is irreparable because plaintiffs are "suffering" and "will suffer" ongoing harm that is "both certain and great, actual not theoretical." *Drs. for Am. v. OPM*, 766 F. Supp. 3d 39, 53–54 (D.D.C. 2025) (cleaned up).

### A. Harm to Students and NMSA and AANP Members

#### 1. Prospective Students

Students who enroll in ND programs on or after July 1, 2026 face lower loan limits than students in other professional degrees. These lower limits will force some students to "forgo their educational and professional goals." *Am. Ass'n of Nurse Practitioners*, 2026 WL 1826176, at *19. Such is the case here. Annual tuition for an ND program ranges from $26,000 to $60,000. AANMC Decl. ¶36. On top of tuition, students may incur $120,000 or more in living expenses for housing, books, supplies, and other educational costs over four years. *See id.*

To finance the cost of their educations, most students (80–90%) have borrowed Direct Loans. *E.g.*, Sonoran Decl. ¶19; NUHS Decl. ¶19; Bastyr Decl. ¶17. The new limits reduce annual borrowing capacity by 59% ($50,000 to $20,500) and aggregate borrowing capacity by 50% ($200,000 to $100,000) compared to "professional students." Students will have to find alternative sources of funding, and most students cannot cover the shortfall out-of-pocket. *See* Topper Decl. ¶8–11; Teran Decl. ¶7–10. ND students are often in their 30s, and as a result, many do not have parental support or a co-signer to secure private loans or assist with personal costs. *See* Sonoran Decl. ¶31. Their only potential option, therefore, is private student loans that "are not always available, often impose more burdensome terms and higher interest rates, and are not eligible for federal public service loan forgiveness programs." *Am. Ass'n of Nurse Practitioners*, 2026 WL 1826176, at *1. Some students may not qualify for private loans without a co-signer or without passing a credit check, and those who do face crippling interest rates. Pushing prospective students to "'accept economically burdensome private loans' . . . are injuries that cannot be fully rectified by any final judgment at the conclusion of litigation." *Id.* at *19 (citation omitted).

Prospective students planning to enroll in ND programs at AANMC member institutions

on or after July 1, 2026 have changed their plans because of the Final Rule. Tara Topper was admitted to Bastyr University's ND program to begin in fall 2026. *See* Topper Decl. ¶6. But she had to "make the gut-wrenching choice to defer" because of her "inability to afford" the program. *Id.* Ms. Topper researched private loans but could not "find financing with terms" comparable to Unsubsidized Loans and would have "likely need[ed] to leverage [her] condo as collateral." *Id.* ¶9–10. Consequently, she decided not to attend. *Id.* ¶11. Her story is not uncommon. *See*, *e.g.*, Teran Decl. ¶¶7–10; Sonoran Decl. ¶27; NUHS Decl. ¶28–29. Without relief, prospective students will not matriculate or become licensed naturopathic doctors. But if the Court grants relief, Ms. Topper and others would enroll "immediately." *See, e.g.*, Topper Decl. ¶14; Teran Decl. ¶13.

2. <u>Students enrolled in ND programs prior to July 1, 2026</u>

Currently enrolled students (who are NMSA and AANP members) are suffering irreparable harm of their own. As discussed above, OBBB contains a grandfathering provision for students enrolled as of June 30, 2026. *See supra* Background § V. These students generally remain eligible to borrow Unsubsidized Loans at pre-July 1, 2026 limits but only for the duration of their "expected time to credential" subject to numerous restrictions. 20 U.S.C. § 1087e(a)(4), (8). Multiple ND students who were enrolled as of June 30, 2026 do not qualify for grandfathering and are now subject to "graduate student" limits for the remainder of their education.

For example, Kailee Keiser paid her first 3 years of tuition out of her personal savings from her time as an educator and nanny. Keiser Decl. ¶11. Now, Ms. Keiser doesn't qualify for grandfathering because she never used federal student aid. *Id.* Consequently, Ms. Keiser cannot afford to finish her education. *Id.* ¶13. Another student, Keaton Scanlon, enrolled in an ND program at NUNM in fall 2025, is ineligible for grandfathering because she took an extended leave of absence on December 31, 2025 due to a "pregnancy, family illness, and a physical relocation."

Scanlon Decl. ¶5, 9. Leaves of absence for grandfathering purposes are "limited to 180 days," making her ineligible for grandfathering. Final Rule at 23815 (citing 34 C.F.R. § 668.22). Although Ms. Scanlon planned to resume her studies in January 2027, she will be subject to "graduate student" loan limits, and unless she can access the "professional student" limits, she "cannot afford it" and will be "forced to withdraw" and relinquish her NMSA and AANP membership. Scanlon Decl. ¶12–14. Other students are either ineligible for grandfathering or cannot afford or obtain private loans and will withdraw if the Final Rule is not enjoined. *See* NUHS Decl. ¶31; Thompson Decl. ¶10–14; Case Decl. ¶16–25.

Even students who are grandfathered *now* will lose access to the pre-OBBB borrowing regime *before* they graduate. OBBB provides that grandfathered students remain eligible only for the duration of their "expected time to credential," which is defined as the *lesser* of (1) three academic years from July 1, 2026; or (2) the difference between the program's length and the period of the program that the student completed as of June 30, 2026. 20 U.S.C. § 1087e(a)(8)(B). To illustrate, Ariana Sorci enrolled in an ND program at NUHS in September 2024. *See* Sorci Decl. ¶6. Because she took less than a full course load, she will not graduate before the date of her "expected time to credential." *Id.* ¶11. Ms. Sorci therefore will be unable to finance the final 2 trimesters under the pre-OBBB framework, and as a result, "will need to withdraw" due to the lower limits, without having earned a degree but accumulating substantial debt. *Id.* ¶16.

* * *

In short, the Department expected that students "may have to drop out of their program due to their inability to afford their program through alternative means," Final Rule at 23855, and that is exactly what happened. As Judge Howell observed, "several district courts have held [that] lost educational opportunities and an inability to pursue one's chosen vocation are sufficient to

establish irreparable harm." *Am. Ass'n of Nurse Practitioners*, 2026 WL 1826176, at *19 (citing cases); *see also Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("loss of opportunity to pursue [a] chosen profession[s] constitutes irreparable harm").

These students need relief as even a final judgment in the future will leave these students with no choice presently and no recourse in the future for private loans borrowed with crippling interest rates. "[W]here parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021).

**B. Harm to AANMC's Member Institutions**

With fewer students able to afford ND programs, AANMC member institutions are facing irreparable harm of their own through reduced enrollment. Several schools "have already had prospective students decide not to enroll this year," resulting in "refund[s] [of] their enrollment deposits." AANMC Decl. ¶76; *see also* NUHS Decl. ¶29 (10 of 34 applicants to enroll in fall 2026 have "cancelled their applications," citing "professional degree" loan limits); NUNM Decl. ¶24 ("Deposits for first time, first year students are down by approximately 40%"); Bastyr Decl. ¶26 (20% decline in applications for fall 2026 from fall 2025); Sonoran Decl. ¶31 (noting withdrawal of a student who was "unable to secure funding to complete" ND program). Tuition paid using Direct Loans represents approximately 70% of member schools' revenue. *E.g.*, NUNM Decl. ¶18. Even modest enrollment contractions will translate into millions of dollars in lost revenue. "Cuts to the overall budget will be required." NUHS Decl. ¶33.

Moreover, the loss of tuition revenue is not just causing a "disruption" to the schools' "balance sheet." Sonoran Decl. ¶33. The Final Rule is destabilizing schools' institutional framework. Some schools are already cutting faculty and staff, and plan to scale back academic

programming, delay or reduce faculty hiring, limit clinical placements, and reduce workforce initiatives designed to address ND provider shortages and expand access to care. *See* NUNM Decl. ¶23. These harms threaten lasting disruptions to member institutions. Sonoran Decl. ¶35 (describing compounding effects of reduced enrollment). These harms are "far from speculative." *Am. Ass'n of Nurse Practitioners*, 2026 WL 1826176, at *10.

**C. Harm to Plaintiffs AANMC, AANP, and NMSA**

Plaintiffs' loss of current members and the inability to successfully recruit future members are "predictable effect[s]" of the Final Rule. *Dep't of Com.*, 588 U.S. at 768–70.

1. <u>Loss of current and prospective members</u>

First, the Final Rule has already caused a loss of existing members for all Plaintiffs. Both NMSA and AANP have members who are students (approximately 1,700 for NMSA, several hundred for AANP), and because some of these members cannot finance the remainder of their education without access to higher loan limits, they will forego their ND degree and either no longer be members of both associations or not become a member. *See, e.g.*, Sorci Decl. ¶18; Teran Decl. ¶12–13. And AANMC has already lost one institutional member: University of Western States ("UWS") in Portland recently withdrew on June 30, 2026. AANMC Decl. ¶77. The Final Rule was a "factor in UWS's decision." *Id.*

Second, the Final Rule likewise is inhibiting Plaintiffs' ability to recruit future members. "An action that invades an organization's interest in recruiting members" constitutes "an injury." *Fair Hous. Council v. Roommate.com*, 666 F.3d 1216, 1225 (9th Cir. 2012) (Ikuta, J., concurring in part and dissenting in part). With fewer students enrolling, fewer students will join NMSA and AANP, and for AANP, fewer students will become naturopathic physicians who join AANP. AANP Decl. ¶27–28; NMSA Decl. ¶16. Because the Final Rule will result in fewer individuals

pursuing an N.D., a central "effect" is to "discourage" institutions from developing new ND programs, impacting AANMC's "recruit[ment]" of new institutional members. "A membership organization suffers injury from government action that has the effect of . . . reducing membership in that organization." *Planned Parenthood Fed'n v. Kennedy*, 792 F. Supp. 3d 227, 267 (D. Mass. 2025) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459–60 (1958)).

2. Loss of member dues

The loss of members will result in the loss of dues. "Monetary costs are of course an injury." *Diamond Alt. Energy v. EPA*, 606 U.S. 100, 111 (2025). "A loss of even a small amount of money is ordinarily an injury." *City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*, 408 F. Supp. 3d 1057, 1120 (N.D. Cal. 2019). Here, Plaintiffs are losing a "substantial amount" of member dues. *Id.*

NMSA member dues are $60 per student and constitute 70% of NMSA's budget. NMSA Decl. ¶12. Fewer students means less dues and thus less revenue. *Id.* ¶16. AANMC's member dues range between $40,000 and $60,000 and constitute 94% of the 2026 budget. AANMC Decl. ¶24. AANMC already lost $20,128 in 2026 dues when UWS withdrew last month. *Id.* ¶77. Because AANMC members pay dues based partly on enrollment, "when enrollment declines, dues follow." AANMC Decl. ¶24. Indeed, one member stated that if enrollment declines continue, it will "not be able to pay" dues. NUNM Decl. ¶35. Approximately 30% of AANP's $1.3 million 2026 budget comes from licensed physician member and student member dues. AANP Decl. ¶9, 26. And AANP's continuing medical education generates another $325,000 annually. *Id.* ¶26. Loss of membership "directly weakens a core source of AANP's revenue." *Id.* ¶28. These financial losses stem directly from the Final Rule, "hinder" Plaintiffs' "ability to function," *Fair Hous. Council*, 666 F.3d at 1225 (Ikuta, J., concurring in part and dissenting in part), and injure Plaintiffs "in a

very real sense." *Constr. Indus. Ass'n v. City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975).

3. Harm to Plaintiffs' missions and core business activities

Beyond the loss of members and revenue, the Final Rule has "directly affected and interfered with" Plaintiffs' missions and "core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024); *see also Valle del Sol v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (irreparable harm if "ongoing harms to [plaintiffs'] organizational missions").

NMSA, AANMC, and AANP have already devoted substantial organizational resources, staff time, and programming to address the Final Rule's harms, impeding their primary missions. NMSA has already made significant "operational reductions," including "canceling its in-person Leadership Summit and strategic planning meeting, pausing longstanding travel and educational grant programs for student members, reducing conference programming, and deferring planned staff compensation adjustments." NMSA Decl. ¶17. NMSA explained "[t]hese decisions were made to preserve [NMSA's] organization's financial stability in light of anticipated revenue losses." *Id.* Plaintiff AANMC has been forced to limit participation in trainings and conferences, curriculum competencies, naturopathic residencies, and naturopathic medicine research. AANMC Decl. ¶77. And AANP will spend less time and resources in core member education programs, including "professional coaching" and "strength[ing] post-graduate career opportunities." AANP Decl. ¶29. AANP already diverted resources that licensed physicians rely on to respond to member concerns about the Final Rule, educate members regarding the Final Rule's impact, and mitigate anticipated workforce shortages. *Id.* This diversion threatens AANP's ability to accomplish its mission to support the education, training, and professional development of licensed NDs. *Id.* ¶30. The Final Rule, for each Plaintiff, is fundamentally "mak[ing] it more difficult" to accomplish their primary missions. *See League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

## III. <u>The balance of the equities and the public interest favor an injunction</u>

The balance of the equities and the public interest merge when the government is a party. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024). For all the reasons above, the Department's "professional degree" definition is likely unlawful as one court has already ruled, and the Final Rule's application to an N.D. is equally unlawful. "There is generally no public interest in the perpetuation of unlawful agency action," *League of Women Voters*, 838 F.3d at 12. In other words, the Department "cannot suffer harm from an injunction that merely ends an unlawful practice," *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). "The public interest is served when administrative agencies comply with their obligations under the APA." *Id.*

A preliminary injunction is also warranted because "the public has an interest in minimizing restrictions to medical care." *Forefront Dermatology S.C. v. Crossman*, 642 F. Supp. 3d 947, 956 (D. Ariz. 2022). Naturopathic medicine is a "distinct and important health care profession" that exists alongside conventional medicine. AANMC Decl. ¶8. Fewer students becoming licensed naturopathic physicians means fewer healthcare professionals trained to meet the needs of an already overburdened healthcare system. *Id.* ¶80. Accordingly, "a preliminary injunction would preserve public health, and by extension, serve the public interest." *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 326 (D. Mass. 2025), *aff'd*, 164 F.4th 1 (1st Cir. 2026).

## IV. <u>The Court should preliminarily enjoin the Final Rule's determination as to an N.D.</u>

The Court should issue a preliminary injunction. AANMC and AANP contacted the Department twice following Judge Howell's stay order and the Electronic Announcement with no response. *See supra* Background § VII. Consequently, the Department is resting on its determination, and giving the Department yet another opportunity is futile. The Court should direct the Department to classify an N.D. as a "professional degree" on an "interim basis" like the 18

degrees added in the Electronic Announcement. This relief is well within the Court's authority under Rule 65 and the APA. *See* 5 U.S.C. § 705 (authorizing court "on such conditions as may be required and to the extent necessary to prevent irreparable injury," to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review"); *id.* § 706(2) (authorizing a court to "hold unlawful and set aside" unlawful agency action).

Finally, Plaintiffs respectfully request that the Court exercise its "discretion" to not impose a security requirement as any bond imposed on three nonprofit associations would be "unjust" for all the reasons above. *See, e.g.*, *Oregon Nat. Desert Ass'n v. Raby*, 780 F. Supp. 3d 1085, 1109 (D. Or. 2025) (imposing no bond). Indeed, this lawsuit is about student loans that will be repaid.

## CONCLUSION

The Court should grant Plaintiffs' Motion and enter the proposed order.

Dated: August 3, 2026

**THOMPSON COBURN LLP**

*/s/ Caleb S. Crahan*
Caleb Crahan (OSB No. 226470)
One US Bank Plaza
St. Louis, Missouri 63101
P. (314) 552-6477
E. ccrahan@thompsoncoburn.com

*/s/ Ollie A. Cleveland, III*
Ollie A. Cleveland, III ("Tres") (*Pro hac vice forthcoming)*
Brandt P. Hill (*Pro hac vice forthcoming*)
Lorrie L. Hargrove (*Pro hac vice forthcoming*)
2311 Highland Avenue, Suite 330
Birmingham, Alabama 35205
P. (205) 769-4303
E. tcleveland@thompsoncoburn.com
bhill@thompsoncoburn.com
lhargrove@thompsoncoburn.com

*Attorneys for Plaintiffs Association of Accredited Naturopathic Medical Colleges, American Association of Naturopathic Physicians, and Naturopathic Medical Student Association*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of August, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court for the U.S. District Court for the District of Oregon, by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

*/s/ Caleb S. Crahan*
Caleb Crahan