CHRISTIAN DIBBLEE (D.C. Bar No. 90002557)
KATHRYN L. ALKIRE (FL Bar No. 1050146)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 353-5980
Email: Christian.R.Dibblee@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

ASSOCIATION OF ACCREDITED NATUROPATHIC MEDICAL COLLEGES, *et al.*,

Plaintiffs,

v.

LINDA MCMAHON, in her official capacity as U.S. Secretary of Education, *et al.*,

Defendants.

Case No.: 3:26-cv-1599

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ..... 1

BACKGROUND ..... 2

The Working Families Tax Cuts Act ..... 2

Reimagining and Improving Student Education ..... 4

Post-Issuance Developments ..... 8

This Litigation ..... 10

LEGAL STANDARD ..... 11

ARGUMENT ..... 11

I. Plaintiffs Have Not Established a Likelihood of Success on the Merits ..... 11

A. Excluding the N.D. degree from the higher loan caps is not contrary to law ..... 11

1. The N.D. degree fails the WFTCA's first criterion ..... 12

2. The N.D. degree fails the WFTCA's third criterion ..... 13

3. The Rule correctly excludes the N.D. degree because it is dissimilar from the list of degrees in 34 C.F.R. § 668.2 ..... 17

4. The Court should adopt the Department's interpretation for other reasons. ..... 20

B. Excluding the N.D. degree was not arbitrary or capricious. ..... 21

II. Plaintiffs Have Failed To Establish Irreparable Harm ..... 25

A. Plaintiffs' Delay Weighs Against Finding Irreparable Harm ..... 25

B. Plaintiffs Lack Associational Standing On Behalf Of Prospective Students and Current Student Members ..... 26

C. Plaintiffs Fail to Establish Irreparable Harm To The Plaintiff Organizations And Their Institutional Members ..... 29

III. The Balance Of Equities And The Public Interest Weigh Against A Stay ..... 33

IV. Any Relief Should Be Appropriately Limited ........ 36

A. Plaintiffs' Requested Vacatur and Declaratory Relief Are Final Merits Remedies, Not Proper Preliminary Relief ........ 36

B. Any Injunctive Relief Should Be Limited To The Relevant Portions Of The Rule ........ 36

C. Any Injunctive Relief Should Be Limited To Plaintiffs And Their Members Who Have Demonstrated Standing ........ 37

V. If The Court Grants Preliminary Relief, It Should Require Plaintiffs To Post Security and Issue a Stay Pending Appeal ........ 39

CONCLUSION ........ 40

**TABLE OF AUTHORITIES**

**CASES**

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........ 35

*Al Otro Lado v. Wolf*,
952 F.3d 999 (9th Cir. 2020) ........ 28

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008) ........ 19

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*,
511 F. App'x 398 (6th Cir. 2013) ........ 25

*Am. Ass'n of Nurse Pracs. v. McMahon*,
— F. Supp. 3d —, 2026 WL 1826176 (D.D.C. Jun. 24, 2026) ........ 9, 18, 24

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
3 F.4th 373 (D.C. Cir. 2021) ........ 37

*Am. Nurses Ass'n v. U.S. Dep't of Educ.*,
— F. Supp. 3d —, 2026 WL 2294606 (D. Mass. Aug. 10, 2026) ........ 10, 26

*Arizona All. for Retired Americans v. Mayes*,
— F.4th —, 2026 WL 2277101 (9th Cir. Aug. 7, 2026) ........ 27

*Arrington v. Daniels*,
516 F.3d 1106 (9th Cir. 2008) ........ 21

*Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*,
72 F.4th 284 (D.C. Cir. 2023) ........ 37

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) ........ 32

*Cal. Pharmacists Ass'n v. Kent*,
No. 19-cv-2999-JSW, 2020 WL 4460547 (N.D. Cal. Feb. 21, 2020) ........ 29

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ........ 29, 30

*California v. Trump*,
963 F.3d 926 (9th Cir. 2020) ........ 19

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) .......... 25

*Circuit City Stores v. Adams*,
532 U.S. 105 (2001) .......... 18

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 28

*Connecticut v. Massachusetts*,
282 U.S. 660 (1931) .......... 30

*Crickon v. Thomas*,
579 F.3d 978 (9th Cir. 2009) .......... 21

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) .......... 34, 39

*Dickinson v. Trump*,
174 F.4th 634 (9th Cir. 2026) .......... 38

*Familias Unidas por la Justicia, AFL-CIO v. U.S. Dep't of Lab.*,
795 F. Supp. 3d 1325 (W.D. Wash. 2025) .......... 28

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 32

*Fischer v. United States*,
603 U.S. 480 (2024) .......... 18

*Freiberg v. Francois*,
No. 4:05CV177-RH/WCS, 2006 WL 2362046 (N.D. Fla. Aug. 15, 2006) .......... 15

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) .......... 25, 26

*Gill v. Whitford*,
585 U.S. 48 (2018) .......... 37

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995) .......... 17

*Hawai'i v. Trump*,
233 F. Supp. 3d 850 (D. Haw. 2017) .......... 19

*Hilton v. Braunskill*,
481 U.S. 770 (1987) ........ 40

*Huron Mountain Club v. U.S. Army Corps of Eng'rs*,
545 F. App'x 390 (6th Cir. 2013) ........ 25

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
634 F.2d 1197 (9th Cir. 1980) ........ 29

*L.A. Press Club v. Noem*,
171 F.4th 1179 (9th Cir. 2026) ........ 38

*Lackey v. Stinnie*,
604 U.S. 192 (2025) ........ 36

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........ 20

*Matthews v. Ryan*,
No. 18-03740-PHX-MTL (MHB), 2020 WL 3050571 (D. Ariz. June 8, 2020) ........ 30

*Members of Jamestown Sch. Comm. v. Schmidt*,
699 F.2d 1 (1st Cir. 1983) ........ 37

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
571 U.S. 161 (2014) ........ 17

*Mosaic Co. v. United States*,
160 F.4th 1340 (Fed. Cir. 2025) ........ 20

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 21

*Murthy v. Missouri*,
603 U.S. 43 (2024) ........ 26, 27

*N. Mariana Islands v. United States*,
686 F. Supp. 2d 7 (D.D.C. 2009) ........ 25

*N.H. Indonesian Cmty. Support v. Trump*,
157 F.4th 29 (1st Cir. 2025), *cert denied sub nom., Trump v. Doe*, 2026 WL 1871309 (U.S. June 30, 2026) ........ 38

*Nat'l Ass'n of Home Builders v. EPA*,
667 F.3d 6 (D.C. Cir. 2011) ........ 32

*Nat'l Fam. Plan. & Reprod. Health Ass'n v. Gonzales*,
468 F.3d 826 (D.C. Cir. 2006) .......... 28

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
606 U.S. —, 145 S. Ct. 2658 (2025) .......... 39

*Nat'l Taxpayers Union, Inc. v. United States*,
68 F.3d 1428 (D.C. Cir. 1995) .......... 32

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 11

*North Carolina v. FERC*,
730 F.2d 790 (D.C. Cir. 1984) .......... 37

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
762 F.2d 1374 (9th Cir. 1985) .......... 25, 26, 29

*O'Brien v. Town of Caledonia*,
748 F.2d 403 (7th Cir. 1984) .......... 30

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
48 F. Supp. 3d 87 (D.D.C. 2014) .......... 25

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976) .......... 28

*Perfect 10, Inc. v. Google, Inc.*,
653 F.3d 976 (9th Cir. 2011) .......... 31

*Phillips v. Cnty. of Riverside*,
No. 5:19-cv-1518-VAP-MAAx, 2024 WL 650182 (C.D. Cal. Jan. 26, 2024) .......... 30

*Price v. City of Stockton*,
390 F.3d 1105 (9th Cir. 2004) .......... 31, 37, 38

*River Runners for Wilderness v. Martin*,
593 F.3d 1064 (9th Cir. 2010) .......... 21

*Rutherford v. United States*,
608 U.S. —, 146 S. Ct. 1320 (2026) .......... 20

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*,
100 F.4th 1039 (9th Cir. 2024) .......... 37

*Schrier v. Univ. of Colo.*,
427 F.3d 1253 (10th Cir. 2005) ..... 30

*Sekhar v. United States*,
570 U.S. 729 (2013) ..... 24

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) ..... 20, 21

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ..... 27

*Texas v. EPA*,
156 F.4th 523 (5th Cir. 2025) ..... 20

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ..... 38

*Trinity Servs., Inc. v. Marshall*,
593 F.2d 1250 (D.C. Cir. 1978) ..... 18

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ..... 37, 38

*United States v. Monsanto*,
491 U.S. 600 (1989) ..... 19

*United States v. Philip Morris USA, Inc.*,
396 F.3d 1190 (D.C. Cir. 2005) ..... 18

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ..... 30, 36, 39

*Warth v. Seldin*,
422 U.S. 490 (1975) ..... 26, 38

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..... 11, 29

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ..... 29

*Wolfe v. Logan*,
No. 2:22-cv-6463-JLS-PD, 2023 WL 2347133 (C.D. Cal. Jan. 2, 2023) ..... 30

*Y&O Harlington Corners Wing, LLC v. Musa*,
No. 1:21-cv-97, 2023 WL 11991175 (S.D. Tex. Dec. 6, 2023) .......... 15

*Zepeda v. INS*,
753 F.2d 719 (9th Cir. 1983) .......... 38

**STATUTES**

5 U.S.C. § 705 .......... 36

20 U.S.C. § 1082 .......... 1, 20

20 U.S.C. § 1087e .......... 2, 3, 28

20 U.S.C. § 1098a(b)(2) .......... 4

20 U.S.C. § 1221e-3 .......... 1, 20

20 U.S.C. § 3441 .......... 1, 20

20 U.S.C. § 3471 .......... 1, 20

20 U.S.C. § 3474 .......... 1, 20

Alaska Stat. § 08.45.050(3) .......... 14

Fla. Stat. § 462.17(5) .......... 15, 19

Haw. Rev. Stat. § 455-11(15) .......... 14

Higher Education Act of 1965,
Pub. L. No. 89-329, 79 Stat. 1219 (1965) .......... 1

Idaho Code § 54-5110(2) .......... 14

Kan. Stat. Ann. § 65-7211(a) .......... 14

Mass. Gen. Laws ch. 112 .......... 14

Md. Code Ann. Health Occ. § 14-5F-30(b) .......... 14

Me. Stat. tit. 32 § 12521(1) .......... 14

N.M. Stat. Ann. § 61-12 .......... 14

S.C. Code Ann. § 40-31-10 .......... 15, 19

Tenn. Code Ann. § 63-6-205(a) .......... 15, 19

Working Families Tax Cuts Act,
Pub. L. No. 119-21, 139 Stat. 72 (2025) .......... 2, 28, 31

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 119-106 (2025), *as reprinted in* 2025 U.S.C.C.A.N. 10 .......... 33

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

34 C.F.R. § 668.2 .......... *passim*

34 C.F.R. § 685.203 .......... 2

Fed. R. Civ. P. 65 .......... 38, 39

Public Hearing; Negotiated Rulemaking Committees,
90 Fed. Reg. 35261 (July 25, 2025) .......... 4

Reimagining and Improving Student Education,
91 Fed. Reg. 4254 (Jan. 30, 2026) .......... *passim*

Reimagining and Improving Student Education—Federal Student Loan Program Final Requirements,
91 Fed. Reg. 23768 (May 1, 2026) .......... *passim*

**OTHER AUTHORITIES**

Am. Soc'y of Anesthesiologists, *Statement on Certified Anesthesiologist Assistants (CAAs): Description and Practice* (Oct. 26, 2022),
https://perma.cc/DL2W-C7PF .......... 22

Clayton Caldwell, Wyo. Legis. Serv. Off., *Naturopathic Doctor Title Requirements by State*, App. A (July 2025),
https://wyoleg.gov/LSOResearch/2025/NATUROPATHIC%20DOCTOR%20TITLE%20REQUIREMENTS%20BY%20STATE%20(Combined).pdf .......... 14

Fed. Student Aid, Income-Driven Repayment Plans,
https://studentaid.gov/manage-loans/repayment/plans/income-driven
(last visited Aug. 24, 2026) .......... 34

*Generally*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) .......... 14

*Generally*, Webster's New World College Dictionary (4th ed. 2008) .......... 14, 22

IPEDS, 2012-13 Survey Materials: Glossary,
https://perma.cc/45C3-TLYY ........ 23

IPEDS, *Mapping Old Post-baccalaureate Award Levels with New Award Levels*,
https://perma.cc/R66D-PVC6 ........ 22

NACIQI Transcript March 24-25, 2026 (Day 2 March 25, 2026),
https://perma.cc/S7RT-D4TM ........ 35

NCES, *Digest of Education Statistics 2001* (Feb. 2002),
https://perma.cc/W9WT-CWYK ........ 23, 24

NCES, *Postsecondary Institutions in the United States: Fall 2005 and Degrees and Other Awards Conferred: First Look* (Dec. 2006),
https://perma.cc/ET8B-9EJ3 ........ 23, 24

NIH, Nat'l Ctr. for Complementary and Integrative Health, *Naturopathy*,
https://www.nccih.nih.gov/health/naturopathy (last updated Apr. 2025) ........ 12

Prairie Naturopathic Doctors, *Traditional Naturopath vs. Licensed Naturopath* (Jan. 1, 2024),
https://perma.cc/MJ3P-QYPY ........ 12

Report and Suggestions from IPEDS Technical Review Panel #7,
https://perma.cc/8DYW-YVK2 ........ 23

U.S. Dep't of Educ., College Scorecard,
https://perma.cc/22FH-5KK2 (last visited Aug. 24, 2026) ........ 34

Valerie Gettings, *The Difference Between a Licensed Naturopathic Doctor and a Traditional Naturopath in North America* (Aug. 22, 2023),
https://perma.cc/YP8N-ZMBM ........ 13

William J. Kepler, *Why Naturopathic Medicine Deserves First-Professional Degree Designation* (Mar. 2006),
https://perma.cc/QE7A-Q3LG ........ 23

WUSF, *DeSantis vetoes holistic therapy oversight, prison driving program* (Jun. 29, 2026),
https://perma.cc/C6KG-HXCY ........ 15

## INTRODUCTION

The cost of higher education has risen dramatically over the past several decades, leaving millions of Americans burdened by substantial student debt. Concerned with the unsustainable strain on students, taxpayers, and the federal lending system, Congress enacted, and President Trump signed into law, the Working Families Tax Cuts Act ("WFTCA") to reform federal student lending and promote affordability in higher education. Among other changes, the WFTCA sought to encourage institutions to align educational costs with economic outcomes, curb excessive borrowing, and place federal student aid on a more fiscally sustainable footing. The WFTCA amended portions of the Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 ("HEA"), and made significant changes to the federal student aid framework, including by establishing new borrowing limits and restructuring available federal student loan programs. One such change was to establish new borrowing limits for graduate and professional students.

"When Congress passes legislation amending statutory provisions regarding programs administered by an agency, that agency is tasked with implementing those changes in its regulations." Reimagining and Improving Student Education, 91 Fed. Reg. 4254, 4256 (Jan. 30, 2026). Federal student loan programs are administered by the U.S. Department of Education ("Department"), and Congress has granted the Secretary of Education broad authority to implement those programs. *See* 20 U.S.C. § 1221e-3; *see also id.* §§ 1082, 3441, 3474, 3471. The Secretary exercised this delegated authority by promulgating a Rule to implement the WFTCA's statutory reforms. *See* Reimagining and Improving Student Education—Federal Student Loan Program Final Requirements, 91 Fed. Reg. 23768 (May 1, 2026) ("Rule").

Three organizations challenge the Rule's exclusion of the Doctor of Naturopathic Medicine ("N.D.") degree from the higher loan limits available for professional degrees, *see generally*

Compl., ECF No. 1, and seek a preliminary injunction preventing the Department from excluding students seeking N.D. degrees from the higher loan limits, *see* Pls.' Mot. for Prelim. Inj. ("Motion" or "Mot."), ECF No. 4. That challenge should fail, however, because the Rule is consistent with law and Plaintiffs have not identified any irreparable harm from the Rule that requires preliminary relief. The balance of equities and the public interest also weigh heavily against the extraordinary remedy of a preliminary injunction, which would disrupt the implementation of Congress's chosen reforms and undermine the Department's efforts to administer the federal student aid system in accordance with statutory mandates. If the Court disagrees, any remedy should be limited to the challenged portions of the Rule that the Court determines are likely unlawful and to the Plaintiffs who have demonstrated standing.

## BACKGROUND

**The Working Families Tax Cuts Act**

On July 4, 2025, Congress enacted, and President Trump signed into law H.R. 1, colloquially known as the Working Families Tax Cuts Act, or WFTCA. *See* Pub. L. No. 119-21, 139 Stat. 72 (2025). Among other things, the WFTCA amended the Department's Direct Loan program to establish loan caps for graduate and professional students and to terminate graduate and professional federal Direct PLUS loans altogether.[1] *See* 20 U.S.C. § 1087e. The WFTCA added multiple subparagraphs to the HEA and codified the caps on student loans at 20 U.S.C. § 1087e(a)(4). *See* Pub. L. No. 119-21, § 81001, 139 Stat. at 334–35. That provision caps borrowing by "a graduate student, who is not a professional student" to $20,500 for "any academic

[1] Under the prior version of the HEA, graduate and professional students could obtain Direct Unsubsidized Loans up to $20,500 per year ($138,500 in aggregate). *See* 34 C.F.R. § 685.203 (2025); *see also* NPRM at 4273 (comparison chart). Graduate and professional students in need of additional federal financial assistance could then obtain uncapped Direct PLUS loans at a higher interest rate than Direct Unsubsidized Loans to cover up to the full cost of attendance.

year or its equivalent." 20 U.S.C. § 1087e(a)(4)(A)(i). By contrast, the maximum annual amount that "a professional student may borrow in any academic year or its equivalent [is] $50,000." *Id.* § 1087e(a)(4)(A)(ii).

Congress also established new aggregate limits for both graduate and professional students, with professional students qualifying for a higher cap. The aggregate limit for a graduate student "who is not (and has not been) a professional student," is $100,000. *Id.* § 1087e(a)(4)(B)(i)(I). For a professional student "who is not (and has not been) a graduate student," the WFTCA establishes a $200,000 aggregate cap. *Id.* § 1087e(a)(4)(B)(ii)(I). All loan limits "begin[] on July 1, 2026," *id.* § 1087e(a)(4)(A), (B), but these new limits do not apply during the expected time to credential[2] of students currently enrolled in a program of study at a university or college and who have received a loan (or on whose behalf a loan was made) for that program of study "as of June 30, 2026," *id.* § 1087e(a)(8) ("grandfathering provision").

For purposes of the loan caps, the WFTCA defined graduate students and professional students. A "graduate student" is "a student enrolled in a program of study that awards a graduate credential (other than a professional degree) upon completion of the program." *Id.* § 1087e(a)(4)(C)(i). And a "professional student" "means a student enrolled in a program of study that awards a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (as in effect on [the date of enactment of this paragraph]), upon completion of the program." *Id.* § 1087e(a)(4)(C)(ii). In short, Congress's definition of professional student depends on the degree that student is seeking. And for the requisite degrees, Congress relied on a defined

[2] For the purpose of the exception to the loan limits, "expected time to credential" means the lesser of (1) three academic years, or (2) the period determined by calculating the difference between the program length for the program of study in which the individual is enrolled and the period of the program of study the student has completed as of June 30, 2026. 20 U.S.C. § 1087e(a)(8)(B).

term in the Code of Federal Regulations at 34 C.F.R. § 668.2.

As of the date of the WFTCA's enactment, July 4, 2025, 34 C.F.R. § 668.2 defined a professional degree as:

> A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

*Id*.

**Reimagining and Improving Student Education**

Three weeks after the WFTCA's enactment, the Department announced its intent to establish a negotiated rulemaking committee and hear public comments. *See* Public Hearing; Negotiated Rulemaking Committees, 90 Fed. Reg. 35261 (July 25, 2025). All regulations promulgated under the HEA must go through negotiated rulemaking unless the Department has good cause to dispense with those requirements. *See* 20 U.S.C. § 1098a(b)(2). True to that mandate, the Department and the negotiated rulemaking committee convened "over multiple sessions in the fall of 2025," ultimately reaching consensus on proposed new regulatory text to be codified at 34 C.F.R. § 685.102(b) and that the Department published in a Notice of Proposed Rulemaking ("NPRM") titled Reimagining and Improving Student Education. 91 Fed. Reg. at 4254, 4256. That NPRM included a definition of "professional student" for purposes of the WFTCA's loan limits. *Id*. at 4262. The Department noted that its proposed definition set forth "the best reading of [the WFTCA] using the tools of statutory construction." *Id.*

The Department acknowledged that the WFTCA definition, adopting § 668.2's definition

wholesale, "establishes a three-part test" for a professional degree: (1) "the degree must signify completion of the academic requirements for beginning practice in a given profession"; (2) "the profession the graduate enters must require a level of professional skill beyond what is normally required for a bachelor's degree"; and (3) "the profession that a degree holder would enter after graduating generally requires professional licensure." *Id.* Those three requirements were included in the new proposed regulation as separate criteria. *See id.* at 4332. As for the specific degrees enumerated in § 668.2, because they "were codified by Congress into the definition as examples," the Department determined that those specific degrees are professional degrees. *Id.* at 4262. The Department listed those degrees in a separate subsection, following the proposed criteria, as fields where "[a] professional degree may be awarded." *Id.* at 4332. And the Department proposed adding the Doctorate of Clinical Psychology to that list. *See id.* at 4263.

The Department proposed additional criteria for what qualifies as a professional degree based on the list of degrees in § 668.2. That list, the Department said, "provides additional contextual clues" that assist in "discerning the facial or as applied meaning of the operative test." *Id.* at 4262. Specifically, the Department explained that "the illustrative list of degrees suggests" that a professional degree must "generally be at the doctoral-level" because the list "contains only three non-doctoral degrees." *Id.* The Department further explained that § 668.2's definition of "professional student" was based on a previous definition of "first professional student" in a glossary of terms that the Department published to schools for data reporting. *See id.* Although that glossary definition "served a very limited purpose in the Department's regulations," *id.*, it defined a first professional degree in part as a degree requiring "at least 2 years of college work prior to entering the program" and "a total of at least 6 academic years of college work to complete the degree program." *Id.* Accordingly, the Department proposed in the NPRM that a professional

degree must "generally [be] at the doctoral level" and must require "at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework." *Id.* at 4332.

Lastly, the Department proposed that a degree must have "a four-digit program CIP code . . . in the same intermediate group as" the § 668.2 degrees and clinical psychology. *Id.* CIP refers to the Classification of Instructional Programs ("CIP"), a system designed "for tracking and reporting fields of study and program completion activity." *Id.* at 4264. Requiring the same four-digit codes as the § 668.2 degrees and clinical psychology would encompass any degrees "closely related" to the ones enumerated in the new regulation and would "ha[ve] administrative benefits for the Department and institutions given [CIP codes'] wide use." *Id.*

The NPRM's discussion of the definition of professional degree ended with analysis of specific degrees and why the Department concluded that those degrees did not "meet the professional degree definition." *Id.* at 4265–67. For the N.D. degree, the Department explained that only 26 jurisdictions license naturopathic physicians and that "the practice of naturopathy is explicitly banned in three states," namely Florida, South Carolina, and Tennessee. *Id.* at 4265. The patchwork nature of this regulatory landscape meant the Department could not determine that an N.D. is "required for entrance into a specific profession or lead[s] to licensure." *Id.*

The Department requested comments on its NPRM by March 2, 2026, *see id.* at 4254, and on May 1, 2026, the Department published a final rule inserting a definition of professional degree into 34 C.F.R. § 685.102, *see* Rule at 23882. The preamble to the Rule responded to numerous comments about the proposed definition of "professional student." As in the NPRM, the Department stated that the list of degrees in § 668.2 "provides context and limiting principles" about whether other degrees qualify as professional degrees. *Id.* at 23783. The Department relied

on that list "to identify common characteristics of those degrees" and included those common characteristics as criteria in the Rule. *Id.* at 23785. Namely, the Rule defines a professional degree as a degree that (1) signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree; (2) is generally at the doctoral level and requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework; (3) generally requires professional licensure to begin practice; and (4) includes a four-digit program CIP code in the same intermediate group as the fields listed in § 668.2, plus doctorates in Clinical Psychology, which the Department determined is a professional degree. *See id.* at 23782, 23882. As in the NPRM, the Rule's preamble also discussed how those who received a degree in § 668.2's illustrative list "may obtain a license and practice without supervision of another licensed professional." *Id.* at 23787. The Department thus concluded that degrees leading to employment ordinarily supervised "by a licensed professional in a different occupation" are not substantially similar to the degrees listed in § 668.2. *Id.*

As to the N.D. degree, the Department concluded that it "would not satisfy the first and third part" of "the operative test" in § 668.2. *Id.* at 23794. The Department again noted that "less than half of States license NDs and some States ban the practice of naturopathy altogether." *Id.* Since "professional licensure is not possible in certain States because the practice is altogether prohibited," an N.D. degree "is not required . . . for entry into the profession and licensure is not 'generally required.'" *Id.* Another reason for the Department's conclusion that the N.D. degree is not a professional degree is the contrast between naturopathic medicine and the other degrees listed in § 668.2. "[E]very degree listed in the illustrative list leads to professions that are legal in every State," whereas naturopaths "cannot legally operate in any capacity in certain States." *Id.* That

dissimilarity supported the Department's conclusion that the N.D. degree does not "meet the definition of professional degree." *Id.*

The Department responded to comments about the N.D. degree. Chief among them were several comments asserting that the precursor to § 668.2 had classified the N.D. degree as a "first professional degree." *Id.* Those commenters believed that not including the N.D. degree in the list of professional degrees for purposes of the WFTCA's caps would be "historically inconsistent." *Id.* In response, the Department explained that the WFTCA had adopted § 668.2's definition "as it was codified on the date of the law's enactment." *Id.* Not only was an N.D. degree not included in the illustrative list at that time, it "ha[d] never been included." *Id.* And although Congress "could have" adopted the older definition referenced by the commenters, it "declined to" do so. *Id.* The Department reasoned that Congress's choice in that regard "was intentional." *Id.* Thus, as it had in the NPRM, the Department declined to include the N.D. degree in the list of professional degrees. *See id.*

The Department also noted in the preamble that all portions of the Rule are severable and established the Department's "inten[t] that [the portion of the Rule regarding classification of degrees as professional degrees] is entirely severable" from the rest of the Rule. *Id.* at 23771. The Rule became effective on July 1, 2026. *See id.* at 23768.

**Post-Issuance Developments**

Shortly after the Department finalized the Rule, multiple groups of plaintiffs challenged it in multiple courts. *See Maryland, et al. v. U.S. Dep't of Educ., et al.*, No. 26-cv-1957 (D. Md. May 19, 2026); *Am. Ass'n of Nurse Pracs., et al. v. McMahon, et al.*, No. 26-cv-1780 (D.D.C. May 21, 2026); *Am. Nurses Ass'n, et al. v. U.S. Dep't of Educ., et al.*, No. 26-cv-12443 (D. Mass. May 29, 2026); *PA Educ. Ass'n, et al. v. U.S. Dep't of Educ., et al.*, No. 26-cv-1941 (D.D.C. Jun. 3,

2026).[3] Three groups of plaintiffs in those cases promptly filed motions for preliminary relief.

The court in the District of Columbia ("D.C. court") consolidated two challenges—one brought by physician assistants and another by a consortium of nurses, educators, and public-health professionals—and, on June 24, 2026, issued a stay under section 705 of the Administrative Procedure Act ("APA") of part of the Rule's definition of professional degree. *See Am. Ass'n of Nurse Pracs. ("AANP") v. McMahon*, — F. Supp. 3d —, 2026 WL 1826176 (D.D.C. Jun. 24, 2026). The D.C. court concluded that, as a preliminary matter, the plaintiffs were likely to show that the Department "lacked the authority to make the[] material changes to Congress's required definition," specifically the "'contextual' set of factors" that the Court viewed the Department as having "add[ed] to the three-part test" in the text of § 668.3, as it related to certain nursing and physician assistant degrees. *Id.* at *16. The D.C. court accordingly stayed part (i) of the Rule's definition of professional degree (the part promulgating the contextual factors as a matter of regulatory text) and the "free-from-supervision requirement in the preamble to the Rule." *Id.* at *22. But the D.C. Court noted that its stay decision did "not change the validity or force of the statutory definition," *id.*, and denied a request from some plaintiffs to direct the Department to treat specific degrees as professional, *see id.* at *23. The D.C. court left that determination to the Department in the first instance. *See id.*

Five days later, the Department released an Electronic Announcement in response to the D.C. court's stay, noting the Department's confidence in the lawfulness of the Rule. *See* Ex. 1 at 2.[4] "[T]o facilitate implementation of the [D.C.] [c]ourt's order," the Electronic Announcement

[3] Since Plaintiffs initiated this suit and filed their Motion, one additional case was brought in the District Court for the District of Columbia. *Am. Fed'n of Lab. and Cong. of Indus. Orgs., et al. v. U.S. Dep't of Educ., et al.*, No. 26-cv-2833 (D.D.C. August 11, 2026). The plaintiffs in that case did not move for preliminary relief.

[4] All pincites to filings in this case are to the ECF pagination.

listed programs that the Department would treat "as awarding professional degrees" for the duration of the D.C. court's stay, *id.* at 2–3, and programs the Department would not treat as awarding professional degrees for the same duration, *see id.* at 4. As Plaintiffs say, the N.D. degree was on neither list, nor was it mentioned in an updated Announcement (the "EA") the Department released eleven days later. *See* Ex. 2.

On August 10, 2026, after full briefing and oral argument, the District Court for the District of Massachusetts denied preliminary relief in another challenge seeking a stay or preliminary injunction against enforcement of the Rule's definition of professional degree. *See Am. Nurses Ass'n v. U.S. Dep't of Educ.*, — F. Supp. 3d —, 2026 WL 2294606 (D. Mass. Aug. 10, 2026).

**This Litigation**

Plaintiffs filed suit on July 31, 2026, against Defendants, the United States Department of Education and Linda McMahon in her official capacity as the Secretary of Education. *See* Compl. Plaintiffs are three organizations representing educational institution members offering N.D. degree programs and student members enrolled in such programs. *See* Compl. ¶¶ 6–8. Plaintiffs' Complaint asserts two causes of action, both under the APA. In Count I, Plaintiffs allege that the Department's exclusion of the N.D. degree from the list of professional degrees is contrary to law "because an N.D. satisfies the three-part 'professional degree' test" in § 668.2. *Id.* ¶¶ 166–74. In Count II, Plaintiffs allege that the exclusion of an N.D. degree from the list of professional degrees is arbitrary and capricious. *See id.* ¶¶ 175–90.

On August 3, 2026, Plaintiffs filed a motion for a preliminary injunction, accompanied by fifteen declarations and a proposed order. *See* ECF Nos. 4-2–4-17. In their proposed order for preliminary relief, Plaintiffs ask the Court to award injunctive relief, declaratory relief, and vacatur. *See* Proposed Order at 2–3, ECF No. 4-1. In their Motion, Plaintiffs also ask the Court

to direct "the Department to classify an N.D. as a 'professional degree' on an 'interim basis' like the 18 degrees added in the Electronic Announcement." Mot. at 43–44.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To warrant preliminary injunctive relief, the moving party must show (1) likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) that the balance of equities "tips in his favor," and (4) that an injunction is in the public interest. *Id.* at 20. Where, as here, the government is the party opposing injunctive relief, the last two factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

Plaintiffs are not entitled to the relief they seek. They have not demonstrated a likelihood of success on the merits because the Rule's definition of professional degree and exclusion of the N.D. degree from that definition is consistent with law. Plaintiffs also have failed to demonstrate irreparable harm requiring preliminary relief. Moreover, the balance of the equities tips in the Department's favor.

If the Court disagrees, any remedy should be limited to the challenged portions of the Rule that the Court determines are likely unlawful and to the Plaintiffs who have demonstrated standing. The Court should also require Plaintiffs to post a bond.

### I. Plaintiffs Have Not Established a Likelihood of Success on the Merits

### A. Excluding the N.D. degree from the higher loan caps is not contrary to law

As noted above, the Department determined in the Rule that the N.D. degree is not a professional degree because it does not satisfy the statutory definition of professional degree that Congress adopted in the WFTCA. *See* Rule at 23794. That conclusion was not contrary to law.

### 1. The N.D. degree fails the WFTCA's first criterion

A professional degree must "signif[y] completion of the academic requirements for beginning practice in a given profession." 34 C.F.R. § 668.2. The N.D. degree does not.

To begin, obtaining an N.D. is not the only way to begin practice in "naturopathic medicine." Mot. at 27–28. The National Center for Complementary and Integrative Health within the National Institutes of Health ("NIH") describes naturopathy as "aim[ing] to prevent and treat disease by addressing its root cause, based on the belief that symptoms are the body's way of signaling a problem." NIH, Nat'l Ctr. for Complementary and Integrative Health, *Naturopathy*, https://www.nccih.nih.gov/health/naturopathy (last updated Apr. 2025). "Naturopathic medicine takes a holistic approach to healing, incorporating practices like physical activity, a well-balanced diet, and stress management." *Id.* As that description implies, possessing an N.D. degree is not necessary to practicing naturopathic medicine. Indeed, NIH lists as naturopathic practitioners both licensed naturopathic physicians holding an N.D. degree and so-called "traditional naturopaths." *See id.* The latter cannot "diagnose . . . and treat patients," *id.*, but they can offer their services as "a wellness coach or a health consultant," Prairie Naturopathic Doctors, *Traditional Naturopath vs. Licensed Naturopath* (Jan. 1, 2024), https://perma.cc/MJ3P-QYPY. In other words, they can practice naturopathy without obtaining an N.D.

Plaintiffs challenge this logic apparently because, to them, the term "naturopathic medicine" means only the ability to "legally practice as a naturopathic medicine doctor." Mot. at 25. Plaintiffs see that profession as existing only in States which license naturopathic doctors, meaning an N.D. is required to enter the profession. *See id.* at 26. This argument rests on the faulty premise that a profession exists only where it is licensed. Multiple popular professions do not require licensure, including photography, web development, or strategy consulting.

Plaintiffs then extrapolate from their premise that an N.D. degree holder's "profession in an unregulated state would be as a 'wellness consultant,' or a similar title," apparently because they cannot get licensed as a full naturopathic doctor. Mot. at 26. But that person could still call themselves a naturopathic doctor. The absence of any State regulatory regime prohibits an N.D. degree holder from undertaking the unauthorized practice of medicine as defined by State law, but it would not prohibit an N.D. degree holder from calling themselves a naturopathic doctor in that State. Nor would it prohibit someone who is *not* an N.D. degree holder from calling themselves a naturopathic doctor. Indeed, as a blog post on the website of Plaintiff Association of Accredited Naturopathic Medical Colleges ("AANMC") admits, a naturopathic practitioner in those states can "choose to use the title 'naturopathic doctor'" *without* possessing an N.D. degree. Valerie Gettings, *The Difference Between a Licensed Naturopathic Doctor and a Traditional Naturopath in North America* (Aug. 22, 2023), https://perma.cc/YP8N-ZMBM.

The upshot is that the profession of naturopathic doctor does not exist only in States that license naturopathic doctors by name. A person can legally claim to be a naturopathic doctor provided they do not provide services that qualify as medicine under State law. The profession of naturopathic doctor does not therefore "require" holding an N.D. degree before entry, and the Department's conclusion to that effect in the Rule is not contrary to law.[5] Rule at 23794.

#### 2. The N.D. degree fails the WFTCA's third criterion

Even if the N.D. met the first criterion in the WFTCA's definition, it does not meet the third criterion. That criterion mandates that a degree lead to "practice in a profession where

[5] Plaintiffs cite the Department's acknowledgment that the N.D. degree "does prepare students to begin practice in naturopathic medicine" as if that acknowledgment conceded the first criterion. Rule at 23794; *see* Mot. at 27–28. Far from it. Whether a degree prepares someone for a given profession does not answer whether the degree encompasses the "academic requirements" for entering a profession, which is what the statute requires. 34 C.F.R. § 668.2.

'professional licensure is generally required.'" Rule at 23794 (quoting 34 C.F.R. § 668.2).

As discussed above, professional licensure is not generally required for practice in naturopathy because one does not need a license to practice it. Among the 56 U.S. jurisdictions (comprising 50 States, four territories, and the District of Columbia), 26 have licensing regimes for naturopathic medicine. *See* Mot. at 28; Rule at 23794. In the other jurisdictions, there is no requirement that a naturopathic practitioner get a license. And even in the 26 that do have a licensing regime, one can practice naturopathy without obtaining a license, though they might not be able to use certain titles to describe themselves. *See generally* Clayton Caldwell, Wyo. Legis. Serv. Off., *Naturopathic Doctor Title Requirements by State*, App. A (July 2025), https://wyoleg.gov/LSOResearch/2025/NATUROPATHIC%20DOCTOR%20TITLE%20REQUIREMENTS%20BY%20STATE%20(Combined).pdf (listing the various title restrictions by State on naturopathic doctors). As a matter of plain language, then, licensure is not "generally" required. Dictionaries from around the time of § 668.2's promulgation define "generally" as referring to something "in most instances, usually as a rule." *Generally,* Webster's New World College Dictionary 591 (4th ed. 2008); *see Generally,* Merriam-Webster's Collegiate Dictionary 520 (11th ed. 2003) ("as a rule"). No rule requires professional licensure to be a naturopathic practitioner.

Licensure also does not appear to be generally required to be a "naturopathic medicine doctor." Mot. at 27. In Idaho, for example, an unlicensed person may refer to themselves as a "naturopathic doctor" or an "ND." Idaho Code § 54-5110(2). Other States expressly prohibit or restrict licensed naturopathic practitioners from referring to themselves as "physicians." *See, e.g.*, Alaska Stat. § 08.45.050(3); Haw. Rev. Stat. § 455-11(15); Kan. Stat. Ann. § 65-7211(a); Me. Stat. tit. 32 § 12521(1); Md. Code Ann. Health Occ. § 14-5F-30(b); Mass. Gen. Laws ch. 112, § 273(b); N.M. Stat. Ann. § 61-12G10(E). In short, the existing regulatory landscape is so different from

State-to-State that it is impossible to say that licensure is "generally" required for naturopathic practice.

Professional licensure additionally cannot be "generally" required because three States affirmatively ban the practice of naturopathy. *See* S.C. Code Ann. § 40-31-10; Tenn. Code Ann. § 63-6-205(a); Fla. Stat. § 462.17(5).[6] By adopting the word "generally," Congress understood that professional licensure is not always required for a degree to be professional and that jurisdictions can vary their licensure requirements for particular professions. But they cannot affirmatively do away with that requirement entirely. For example, a real estate agreement requiring that parking spaces and traffic lanes be in the same place "generally" as shown on a site plan does not "allow them to be *eliminated*." *Y&O Harlington Corners Wing, LLC v. Musa*, No. 1:21-cv-97, 2023 WL 11991175, at *1 (S.D. Tex. Dec. 6, 2023). Plaintiffs cannot say that licensure for naturopathic medicine is "generally required" when, in three States, there is no way to obtain that license. And it is not true that professional licensure is "required without exception." Mot. at 28. As explained above, many U.S. jurisdictions do not have a licensing regime as to naturopathy at all and thus do not require professional licensure even though individuals with N.D. degrees can still practice there.

Plaintiffs respond that the Department has imposed a "new eligibility criteri[on]" not included in the WFTCA by purportedly requiring a "settled" regulatory landscape before naming a degree professional. Mot. at 27 (quotations omitted). Not so. The Department reviewed

[6] Florida prohibits the practice of naturopathy without a Florida naturopathy license, but the State has refused to issue new licenses since the late 1950s. *See Freiberg v. Francois*, No. 4:05CV177-RH/WCS, 2006 WL 2362046 (N.D. Fla. Aug. 15, 2006). In June 2026, Governor DeSantis vetoed legislation that would have restored licensing for naturopathic practitioners in Florida. *See* WUSF, *DeSantis vetoes holistic therapy oversight, prison driving program* (Jun. 29, 2026), https://perma.cc/C6KG-HXCY.

multitudinous licensing laws, or lack thereof, to determine the "given profession" of an N.D. degree holder and whether licensure is "generally required" for that profession. 34 C.F.R. § 668.2. *See* Rule at 23794 (explaining how the differential treatment of naturopathy meant N.D.s are excluded under the statutory factors). The unsettled nature of the regulatory landscape was not an additional criterion, but merely a way to determine where the N.D. degree fits in the statutory language and framework adopted by Congress. The Department undertook the exact same analysis for other degrees and concluded that they did not meet the statutory test because of the various licensing requirements across States. *See* Rule at 23801 (excluding social work degrees, Master of Social Work ("MSW") and Doctor of Social Work ("DSW"), because "States have different requirements for social work licensure"); *id.* at 23804 (excluding graduate degrees in marriage and family therapy and applied behavior analysis based on the different State licensure requirements); *id.* (same for art therapy degrees given that "licensure is inconsistent from State to State").

Nothing about that approach contradicts the Department's other statements in the Rule or in other litigation. *Contra* Mot. at 27. Plaintiffs cite statements acknowledging the self-evident proposition that, to achieve the "clear, nationally uniform framework" requested by commenters and required by students and institutions, the Department cannot tailor treatment of each degree to the specific details of jurisdictions' laws. Rule at 23782. For instance, the Department could not say that a pharmacy or optometrist degree is professional only in States with certain scope-of-practice rules. *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. at 23–24, ECF No. 42, *Am. Nurses Ass'n, et al. v. U.S. Dep't of Educ.*, No. 26-cv-12443 (D. Mass. Jun. 16, 2026). The degree is either professional or not based on § 668.2, as adopted by Congress. And based on the overall regulatory landscape, the N.D. degree does not meet the criteria in § 668.2.

That conclusion does not "elevate[] the policies of certain states over others." Mot. at 28.

Again, the Department made a determination based on a holistic assessment of the regulatory landscape. Plaintiffs' request appears to be that the Department should treat the N.D. as a professional degree in the licensing states out of "respect[]" for those regulatory choices. *Id.* at 29. To do so would contradict Congress's choice to adopt § 668.2. Congress could have written in the WFTCA that a degree is professional wherever the resulting profession is licensed in some states. But by adopting a regulation that instead refers to licensure being "generally required," 34 C.F.R. § 668.2, Congress implicitly endorsed a holistic assessment of the regulatory landscape about a profession. Plaintiffs and this Court must respect that choice.

**3. The Rule correctly excludes the N.D. degree because it is dissimilar from the list of degrees in 34 C.F.R. § 668.2**

In addition to correctly determining that the N.D. degree fails the first and third criteria from the WFTCA, the Department also correctly concluded that the N.D. degree is not a professional degree because, unlike "every degree listed in the illustrative list," the N.D degree leads to a profession that "cannot legally operate in any capacity in certain States." Rule at 23794.

The Department must execute the wishes of Congress as expressed in the text of the WFTCA. *See Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 168 (2014) ("Our analysis begins with the statutory text."). Section 668.2's definition is part of that text, and that definition includes an illustrative list of degrees. *See* 34 C.F.R. § 668.2. The canon of *nosictur a sociis*—"a word is known by the company it keeps," *Gustafson v. Alloyd Co.,* 513 U.S. 561, 575 (1995)—requires the Department to interpret "professional degree" based on the words surrounding it, including the illustrative list of degrees. Those degrees provide context for the type of degrees that Congress wanted to designate a professional degree. *See* NPRM at 4263. Similarly, the illustrative list of degrees are specific enumerations of the general term "professional degree." The related canon of *ejusdem generis* teaches that "where specific words precede or follow general

words in an enumeration . . . the general words are construed to embrace only objects similar in nature to those objects enumerated by the specific words." *Trinity Servs., Inc. v. Marshall*, 593 F.2d 1250, 1258 (D.C. Cir. 1978). As applied here, the general term "professional degree" should be interpreted by reference to and in light of common attributes shared by the specific degrees listed in § 668.2. *See Circuit City Stores v. Adams*, 532 U.S. 105, 114 (2001) (applying *ejusdem generis* to "give independent effect to the statute's enumeration of . . . specific categories," which would otherwise be superfluous).

True enough, the illustrative list provides "[e]xamples," which "include but are not limited to" the enumerated degrees. 34 C.F.R. § 668.2. But the illustrative list still has meaning for what is a professional degree. "The words 'including, but not limited to' introduce a non-exhaustive list that sets out specific examples of a general principle." *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1200 (D.C. Cir. 2005). A proper interpretive method allows the Department to "expand on the [degrees] explicitly included in [§ 668.2] only with [degrees] similar in nature to those enumerated." *Id.* Thus, the Department did not err by contrasting the N.D. to the degrees in the illustrative list. Any other approach would not account for Congress's choice to incorporate the entire list of degrees in § 668.2—"Congress would not ordinarily introduce a general term that renders meaningless the specific text that accompanies it," so the Department must rely on the § 668.2 list to interpret "professional degree." *Fischer v. United States*, 603 U.S. 480, 487 (2024).

Plaintiffs might argue, as the D.C. court concluded, that these canons have no place here because the statutory language is unambiguous. *See AANP*, 2026 WL 1826176, at *17. That argument overstates the clarity of the WFTCA. Congress adopted a regulatory definition that neither defines the word "profession" nor explains what level of generality is needed for professional licensure to be "generally required." 34 C.F.R. § 668.2. Whether a particular degree

meets those undefined statutory terms is at the very least a close question, particularly when the degree leads to a profession that, like naturopathy, is not licensed in a majority of jurisdictions and is banned in others. Thus, this is a "close case[]"[7] where the Supreme Court would permit using canons of interpretation to determine the meaning of Congress's language. *United States v. Monsanto*, 491 U.S. 600, 611 (1989).

Proper application of those canons resolves any doubt that the N.D. is not a professional degree. A "common attribute" that "connects the specific items" in the illustrative list is they lead to professions allowed by every U.S. jurisdiction. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). The N.D. does not share that common attribute given prohibitions on the practice of naturopathy in three States. *See* S.C. Code Ann. § 40-31-10; Tenn. Code Ann. § 63-6-205(a); Fla. Stat. § 462.17(5). Plaintiffs do not mention this difference at all, and the similarities they do cite cannot overcome the N.D.'s divergence from the illustrative degrees in this key respect. *See* Mot. at 33–34. Whatever the reach of the WFTCA's definition,[8] it does not include the N.D. degree.

[7] To be clear, the Department maintains that, even without the use of statutory canons, the N.D. degree fails the unambiguous plain language of the statutory definition's first and third criteria.

[8] The N.D. degree also is not a professional degree based on the contextual requirements included in the Rule. Specifically, the N.D. degree does not include the same four-digit CIP code as the illustrative degrees. *See* Rule at 23882. Plaintiffs admit as much. *See* Mot. at 34 ("Moreover, an N.D. falls under the same *2-digit* CIP Code as over 15 degrees now considered 'professional,' including most of the original 11." (emphasis added)). Contrary to the D.C. court's decision, the Department maintains that the CIP code requirement is a permissible interpretation of the statutory definition, but there is no need to discuss that requirement here. Plaintiffs do not provide any argument in their motion challenging the contextual requirements and, even if they did, Plaintiffs suffer no irreparable harm from those requirements because they have been stayed on a nationwide basis by the D.C. court. *See Hawai'i v. Trump*, 233 F. Supp. 3d 850, 853 (D. Haw. 2017) ("[T]he Western District of Washington's nationwide injunction already provides the State with the comprehensive relief it seeks in this lawsuit. As such, the State will not suffer irreparable damage."); *California v. Trump*, 963 F.3d 926, 949 (9th Cir. 2020) (affirming denial of States' request for a permanent injunction "because the relief sought was duplicative of the relief the district court had already granted in [another] matter").

**4. The Court should adopt the Department's interpretation for other reasons**

For all the reasons above, the Department's exclusion of the N.D. degree is correct as a matter of the plain language of the WFTCA. But even if this Court disagrees, the Department has authority to "prescribe rules to fill up the details" of the statutory schemes under its purview, including the HEA. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (citation omitted); *see* 20 U.S.C. §§ 1082, 1221e-3, 3441, 3474, 3471. Moreover, the undefined and broad terms "profession" and "generally" in § 668.2 are "term[s] or phrase[s] that leave[] agencies with flexibility" in how to regulate the WFTCA's student loan caps. *Loper Bright*, 603 U.S. at 395 (citation omitted); *accord Mosaic Co. v. United States*, 160 F.4th 1340, 1347 (Fed. Cir. 2025) (finding where statute did not define phrase "predominant user," agency had reasonable flexibility to assess who is a "predominant user"); *Texas v. EPA*, 156 F.4th 523, 544 n.13 (5th Cir. 2025) (acknowledging that a term like "'significant' can signal that an agency has been left with flexibility" under *Loper Bright* (cleaned up)); *cf. Rutherford v. United States*, 608 U.S. —, 146 S. Ct. 1320, 1332 (2026) (acknowledging that "the terms 'extraordinary' and 'compelling'" in statute "leave room for judgment"). "When the best reading of a statute is that it delegates discretionary authority to an agency," a court must ensure that "the agency has engaged in reasoned decisionmaking within" the boundaries of that delegation. *Loper Bright*, 603 U.S. at 395 (citation omitted). For all the reasons above, the Department's exclusion of the N.D. degree from the definition of professional degree was a reasonable use of the authority delegated to it by Congress.

And even where Congress has not given an agency the authority to fill gaps, the Court may "seek aid from the interpretations of those responsible for implementing particular statutes," which "'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance' consistent with the APA." *Id.* at 394 (quoting *Skidmore v. Swift &*

*Co.*, 323 U.S. 134, 140 (1944)). The Department of Education has obvious subject matter expertise over the details of various postbaccalaureate degrees, and which meet the WFTCA's definition of "professional degree."

**B. Excluding the N.D. degree was not arbitrary or capricious.**

The Department's conclusion that the N.D. degree is not a professional degree also was not arbitrary and capricious under the APA. Review under the arbitrary and capricious standard is "narrow," *Arrington v. Daniels*, 516 F.3d 1106, 1112–13 (9th Cir. 2008), and "highly deferential," *Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009) (citation omitted). A court must "presum[e] the agency action to be valid and affirm[] . . . if a reasonable basis exists for [the agency's] decision." *Id.* (citation omitted). A reasonable basis exists so long as "the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.* (citation omitted). The agency's decision "need only be a reasonable, not the best or most reasonable, decision." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (citation omitted). A court, moreover, may not "substitute its judgment for that of the agency." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

*First*, the Department did not "unevenly" apply a "majority of state licensure requirement" when it concluded that certified anesthesiologist assistants (earning a "CAA") meet the three-part operative test. Mot. at 30; *see* Rule at 23805. Professional licensure must be "generally required" for a degree to be considered professional, 34 C.F.R. § 668.2, and, as explained already, an N.D. degree holder can practice naturopathy without a license in many States and even refer to themselves as a naturopathic doctor. *See supra* at §I.A. Not so for a CAA. "The legal ability for CAA practice is created by legislation that is enacted and codified into state law or through

regulation that is adopted by the board of medicine." Am. Soc'y of Anesthesiologists, *Statement on Certified Anesthesiologist Assistants (CAAs): Description and Practice* (Oct. 26, 2022), https://perma.cc/DL2W-C7PF. In other words, one cannot practice as a CAA without a license. Thus, licensure is required "as a rule" to be a CAA. *Generally*, Webster's New World College Dictionary 591 (4th ed. 2008). And no jurisdiction affirmatively bans CAAs, unlike naturopathy. CAAs and N.Ds., therefore, are not "like cases" requiring the same conclusion by the Department. Mot. at 30 (citation omitted).

*Second*, the weight of the evidence shows that the Department did not ignore its previous treatment of N.D. degrees. *Contra* Mot. at 31–33. Plaintiffs do not contest that § 668.2 on the date of the WFTCA's enactment did not include the N.D. degree in the list of illustrative professional degrees. *See* Rule at 23794. Instead, they say that the Department's National Center for Education Statistics had previously reported N.D. degrees as "first-professional degrees" under the precursor to § 668.2. But the actual evidence paints a different picture; the Department has never considered the N.D. degree to be a professional or first-professional degree.

As background, the Department has always given institutions some discretion on how to report their postbaccalaureate degrees, including whether they qualified as first-professional degrees. *See* Integrated Postsecondary Educ. Data Sys. ("IPEDS"), *Mapping Old Post-baccalaureate Award Levels with New Award Levels*, https://perma.cc/R66D-PVC6 (directing new reporting procedures for "Fall 2010-11 Data Collection" and giving institutions discretion "to decide how to recode their post-baccalaureate awards"). The Department accordingly has reported as professional or first-professional degrees whatever degrees the institutions themselves had reported as professional or first-professional. The definition of professional degree before and after § 668.2's promulgation, however, never included the N.D. degree. Plaintiffs cite a table from

the 2001 IPEDS digest that listed the N.D. degree as a "first-professional degree," *see* Mot. at 18 & n.13. But that digest's definition of first-professional degree listed the same ten degrees that ultimately were listed in § 668.2, without the N.D. degree. *See* Nat'l Ctr. for Educ. Stats. ("NCES"), *Digest of Education Statistics 2001* at 542 (Feb. 2002), https://perma.cc/W9WT-CWYK. Indeed, a Technical Review Panel suggested in 2004 that IPEDS add naturopathy to the list of first-professional degrees. *See* Report and Suggestions from IPEDS Technical Review Panel #7, https://perma.cc/8DYW-YVK2; *see also* William J. Kepler, *Why Naturopathic Medicine Deserves First-Professional Degree Designation* (Mar. 2006), https://perma.cc/QE7A-Q3LG. If the N.D. was already treated as a first-professional degree—as Plaintiffs assert, *see* Mot. at 32—there would have been no need to add it to the list. And although the Department indicated with respect to the Panel's suggested change that it wanted "to implement th[at] new definition . . . with the Fall 2005 data collection," IPEDS Technical Review Panel, *supra*, the IPEDS glossary in 2007 did not include the N.D. degree as a first-professional degree, *see* NCES, *Postsecondary Institutions in the United States: Fall 2005 and Degrees and Other Awards Conferred: First Look* at B-2 (Dec. 2006), https://perma.cc/ET8B-9EJ3. Further, when the Department promulgated § 668.2 in 2007, it unquestionably did not include the N.D. in the regulation's illustrative list of professional degrees. *See* 34 C.F.R. § 668.2; *see also* IPEDS, 2012-13 Survey Materials: Glossary, https://perma.cc/45C3-TLYY (defining "first professional" without listing the N.D. degree).

Plaintiffs' best evidence about the Department's historical treatment is a 2004 instructional document to institutions that listed Naturopathic Medicine as a first-professional degree. *See* Mot. at 18 & n.14. That one document is insufficient to establish a historical pattern, particularly since before and after that document the Department did not change the actual definition of first-professional degree to include the N.D. degree. By contrast, the Department *always* included in

the definition of first-professional degree that a degree must require six years of postsecondary work and two years of post-baccalaureate coursework. *See* NCES, *Digest of Education Statistics 2001*, *supra*, at 542; NCES, *Postsecondary Institutions in the United States: Fall 2005 and Degrees and Other Awards Conferred: First Look*, *supra*, at B-2. The Department thus is not "hav[ing] it both ways" by defending the Rule's length-of-coursework requirements on this historical ground. Mot. at 33. The Department published a definition for many years before § 668.2 that included those requirements. The "old soil" therefore includes those requirements. *Sekhar v. United States*, 570 U.S. 729, 733 (2013) (citation omitted). There is no similar historic inclusion of the N.D. degree as a professional degree.

*Third*, the list of degrees included in the EA does not require inclusion of N.Ds.[9] *Contra* Mot. at 35. The Department compiled that list based on its "understanding of the [D.C.] Court's ruling," Ex. 2 at 2, which stayed only the select "'contextual' set of factors" that the Court viewed the Department as having "add[ed] to the three-part test" in the text of § 668.3, *AANP*, 2026 WL 1826176, at *16. That ruling expressly did not "change the validity or force of the statutory definition," *id.* at *22, and in the wake of the D.C. court's stay the Department relied only on that statutory definition to determine which degrees it would treat as professional for the duration of the D.C. court's stay. The N.D. degree does not meet that definition, *see supra* § I.A, regardless of its "rigor," which is not an element of the statutory definition, Mot. at 35.

---

[9] The Department does not read Plaintiffs' Motion as separately challenging the EA. *See generally* Proposed Order (not mentioning the EA). *But see* Mot. at 43 (asking the Court to direct the Department to treat N.D. degrees as the degrees in the EA). In any event, the EA is not a final agency action reviewable under the APA. The Department issued the EA "solely to facilitate implementation of the D.C. court's order" and stated clearly that "[t]hese interim designations . . . may change as litigation in the case proceeds." *See* Ex. 2 at 2. Also, to the extent Plaintiffs believe the EA is inconsistent with the D.C. court's order, that challenge belongs in the court that issued that order, not here.

## II. Plaintiffs Have Failed To Establish Irreparable Harm

Preliminary injunctive relief is also improper because Plaintiffs have not "demonstrate[d]" that that they will be "immediate[ly]" and "irreparab[ly]" harmed absent preliminary relief. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). To justify the issuance of preliminary relief, Plaintiffs must show that "unless the [Rule] is enjoined," they are "likely to experience not just some injury, but irreparable harm that cannot be cured by ultimate success on the merits in this case." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009). Plaintiffs advance three theories of irreparable harm to non-member prospective students and current student members, to Member Institutions, and to the Plaintiff Organizations themselves. *See* Mot. at 36–42. None satisfies their burden.

### A. Plaintiffs' Delay Weighs Against Finding Irreparable Harm

As an initial matter, Plaintiffs' own delay in filing for preliminary relief weighs against finding irreparable harm. *See, e.g.*, *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("[D]elay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013) ("[A]n unreasonable delay in filing for injunctive relief . . . weigh[s] against a finding of irreparable harm."); *Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 F. App'x 390, 397 (6th Cir. 2013) (finding district court did not err in considering delay as a factor weighing against injunction); *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (holding that 36-day delay before filing for preliminary injunctive relief was "dilatory action" that failed to clear the high bar needed to show entitlement to relief); *see also Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (finding that 44-day delay before bringing action for injunctive relief was "inexcusable," and "bolstered" the

"conclusion that an injunction should not issue," particularly where the party seeking an injunction had knowledge of the pending alleged irreparable harm).

In the intervening three months since the Department finalized the Rule, not only did the Rule go into effect, but the D.C. court resolved two motions for preliminary relief with implications for the challenged Rule. *See, e.g.*, Ex. 2. The District Court for the District of Massachusetts also resolved a third motion for preliminary relief challenging the same Rule, which was fully briefed and argued before Plaintiffs filed this suit. *See Am. Nurses Ass'n*, 2026 WL 2294606 (denying additional preliminary relief). These other cases demonstrate that, if Plaintiffs here had been concerned about irreparable harm, they could have sought relief more quickly. And Plaintiffs fail to explain their delay in moving for preliminary relief. Such "delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *See Oakland Trib., Inc.*, 762 F.2d at 1377.

**B. Plaintiffs Lack Associational Standing On Behalf Of Prospective Students and Current Student Members**

Standing is an essential aspect of the Article III case-or-controversy requirement that requires a plaintiff to have "a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citation omitted). A "plaintiff 'bears the burden of establishing standing as of the time [it] brought the lawsuit and maintaining it thereafter.'" *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation omitted). "At the preliminary injunction stage," a plaintiff "must make a 'clear showing' that [it] is 'likely' to establish each element of standing," and it "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (citations omitted). When an organization sues on behalf of its members (associational or representational standing), it must show that "(a) its members would otherwise have standing to

sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Arizona All. for Retired Americans v. Mayes*, — F.4th — 2026 WL 2277101, at *4 n.1 (9th Cir. Aug. 7, 2026) (citation omitted).

To the extent Plaintiffs allege irreparable harm based on non-member, prospective students, Plaintiffs lack standing (and, by extension, have not shown irreparable harm). Associational standing requires Plaintiffs to "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Plaintiffs filed two declarations in support of their theory of associational standing on behalf of prospective students. *See* Decl. of Tara Topper, ECF No. 4-10 ("Topper Decl,"); Decl. of Gerardo A. Melendez Teran, ECF No. 4-11 ("Teran Decl."). But neither student is a member of a Plaintiff Organization. Plaintiffs thus cannot establish standing to sue on behalf of these prospective students, nor can they establish irreparable harm on behalf of these individuals or any other unidentified prospective students.

Plaintiffs also fail to establish standing on behalf of their current student members. Plaintiffs filed six declarations in support of their theory of associational standing and irreparable harm as to current students who are members of the Plaintiff Organizations. *See* ECF Nos. 4-12–4-17. These students, however, cannot support Plaintiffs' Article III standing because their alleged injuries are not "fairly traceable" to the challenged Rule. *Murthy*, 603 U.S. at 57–58. As Plaintiffs identify in their Motion and the accompanying declarations, these current students' alleged injuries resulted from their own voluntary decisions to remain enrolled in programs whose expected time to credential extends beyond the new statutory grandfathering period in the WFTCA. *See, e.g.*, Mot. at 37–38. As discussed, when Congress enacted the WFTCA, it established an interim exception, or grandfathering provision, where certain current students could continue to receive

the prior borrowing limits during the "expected time to credential." 20 U.S.C. § 1087e(a)(8)(A). The WFTCA defines the "expected time to credential" as the lesser of three academic years or the difference between the program's length and the period of the program that the student completed as of June 30, 2026. 20 U.S.C. § 1087e(a)(8)(B).

The alleged impacts on Plaintiffs' current students from the grandfathering provision were not unforeseen consequences of the WFTCA. Indeed, Congress enacted the grandfathering provision nearly a year before it, and the new loan limits, took effect on July 1, 2026. *See* Pub. L. No. 119-21, 139 Stat. 72 (enacted on July 4, 2025). Current students, including the identified current student members of the Plaintiff associations, ECF Nos. 4-12–4-17, had ample notice of the WFTCA's statutory framework governing their future borrowing eligibility and could have taken steps in the ensuing year to structure their enrollment to ensure that they could complete their programs within the expected time to credential period for which Congress preserved the prior loan limits. Having knowingly chosen not to do so, Plaintiffs cannot transform the consequences of those voluntary decisions into an Article III injury caused by the Department's Rule, nor can they claim it as irreparable harm. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("No [plaintiff] can be heard to complain about damage inflicted by its own hand."); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves."); *Nat'l Fam. Plan. & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("[S]elf-inflicted harm doesn't satisfy the basic requirements for standing. Such harm does not amount to an 'injury' cognizable under Article III."); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) ("Self-inflicted wounds are not irreparable injury." (citation omitted)); *Familias Unidas por la Justicia, AFL-CIO v. United States Dep't of Lab.*, 795 F. Supp. 3d 1325, 1332 (W.D. Wash. 2025) ("A largely self-inflicted

harm severely undermines a party's claim for equitable relief." (citation modified)). Plaintiffs fail to establish Article III standing on behalf of prospective or current students, and they accordingly cannot establish irreparable harm.

**C. Plaintiffs Fail to Establish Irreparable Harm To The Plaintiff Organizations And Their Institutional Members**

Plaintiffs next advance theories of irreparable harm to their member Institutions and the Plaintiff Organizations themselves. These theories fail to satisfy the high standard for the extraordinary remedy of a preliminary injunction. *Winter*, 555 U.S. at 24.

Plaintiffs first allege harm to the member Institutions and Plaintiff Organizations stemming from lost revenue in the form of tuition and membership dues. *See* Mot. at 39–41. But "[i]t is well established" that "monetary injury is not normally considered irreparable." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). "'[E]conomic loss does not, in and of itself' satisfy the irreparable harm requirement; rather the monetary loss must 'threaten[] the very existence of the movant's business.'" *Cal. Pharmacists Ass'n v. Kent*, No. 19-cv-2999-JSW, 2020 WL 4460547, at *4–5 (N.D. Cal. Feb. 21, 2020) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Although Plaintiffs claim that reduced dues and tuition have caused Plaintiffs to change their operations, *see, e.g.*, Mot. at 40–41, they have not met their burden of showing that the alleged economic losses threaten the existence of the Plaintiff Organizations or member Institutions. This is especially true here where Plaintiffs' delay in bringing this action has foreclosed the possibility of preliminary relief to prevent the claimed economic losses, which Plaintiffs allege have already occurred. *See, e.g.*, *id.* at 41 (alleging Plaintiff "AANMC already lost $20,128 in 2026 dues"); *see Oakland Trib., Inc.*, 762 F.2d at 1377 ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm"). *But see California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (finding that

states' prompt filing of an action following issuance of an IFR weighed in their favor to overcome the burden of economic harm not constituting irreparable harm).

Plaintiffs also claim irreparable harm from reduced enrollment for the fall 2026 academic year, Mot. at 39, but these alleged harms, which also have already occurred, cannot support preliminary relief. Plaintiffs allege that the Rule has already caused students "not to enroll this year," and that applicants have "cancelled their applications" and withdrawn deposits. *Id.* (citations omitted). Plaintiffs rely on their declarations, which state that institutions have already experienced a 40% decline in deposits and a 20% decline in applications for the fall 2026 semester. Mot. at 39; *see also* Decl. of Randy C. Frisch ¶ 26, ECF No. 4-6 ("Frisch Decl."); Decl. of Melanie Henriksen ¶ 24, ECF No. 4-7 ("Henriksen Decl."). But these figures also only identify alleged harm that has already occurred. However, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "A preliminary injunction will do nothing to repair alleged past harms." *Wolfe v. Logan*, No. 2:22-cv-6463-JLS-PD, 2023 WL 2347133, at *3 (C.D. Cal. Jan. 2, 2023); *Phillips v. Cnty. of Riverside*, No. 5:19-cv-1518-VAP-MAAx, 2024 WL 650182, at *2 (C.D. Cal. Jan. 26, 2024) (same); *Matthews v. Ryan*, No. 18-03740-PHX-MTL (MHB), 2020 WL 3050571, at *2 (D. Ariz. June 8, 2020) ("To obtain preliminary injunctive relief, a plaintiff must demonstrate ongoing harm or the present threat of irreparable injury, not a past injury."); *see also Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931) (an injunction is only appropriate "to prevent existing or presently threatened injuries"); *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) ("The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance."); *O'Brien v. Town of Caledonia*, 748 F.2d 403, 406 (7th Cir. 1984). Plaintiffs do not

explain how the requested preliminary relief would prevent any of these past harms.

Plaintiffs submitted declarations from two prospective students, but those declarations do not change this conclusion. Plaintiffs' declarations say that those two students have already decided not to enroll in an N.D. degree program this year, but that they would enroll "[i]f circumstances later change" and the higher loan limits for professional students applied to their desired N.D. degree. Topper Decl. ¶¶ 12, 14; Teran Decl. ¶¶ 10, 13. But Plaintiffs do not allege that a preliminary injunction entered this late in the enrollment cycle would allow either student to enroll in the upcoming academic semester. Nor do Plaintiffs explain how an injunction entered at this preliminary stage would restore the broader alleged enrollment losses they attribute to the challenged Rule. *See Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) ("A preliminary injunction should be used only to maintain the status quo. Therefore, an injunction must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs."); *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011) ("[Plaintiff] has not established that the requested injunction would forestall that [irreparable harm]."). [10]

Plaintiffs also allege injury from the loss of current and prospective members to the Plaintiff Organizations, and their ability to recruit future members, Mot. at 40–41, but such allegations fall short of irreparable harm. Plaintiffs allege that "AANMC has already lost one institutional member," *id.* at 40, but they otherwise fail to explain how such injuries amount to irreparable harm that would be prevented by the Court's entry of preliminary injunctive relief.

[10] Plaintiffs' reduced enrollment theory of injury entirely fails to account for Congress's elimination of Direct PLUS loans. In the WFTCA, Congress eliminated Direct PLUS loans, which did not impose borrowing caps on graduate or professional students and instead permitted them to borrow up to the full cost of attendance. *See* § 81001, 139 Stat. at 334. Plaintiffs fail to allege what portion of their enrollment shortfalls are traceable to the Rule rather than Congress's elimination of uncapped Direct PLUS loans, which separately limits available federal funds to students regardless of the Rule.

Similarly, Plaintiffs allege irreparable harm to the Plaintiff Organizations' missions and core business activities because they have made "operational reductions" and "devoted substantial organizational resources, staff time, and programing to address the Final Rule." *Id.* at 42. But Plaintiffs fail to show how preliminary relief is necessary to prevent those expenditures, let alone how the alleged expenditures amount to "'operational costs beyond those normally expended' to carry out [their] advocacy mission." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)); *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395–96 (2024) (rejecting diversion of resources theory based on plaintiffs' self-directed expenditures for research, member education, public outreach, petitions, and advocacy in response to agency action).

The ultimate preliminary injunction inquiry asks whether an injunction is necessary to prevent irreparable harm that will occur before the Court can resolve the merits. *See Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" (citation omitted). To the extent Plaintiffs' alleged irreparable harm stems from the enrollment and membership they allege they otherwise would have had this school year in the absence of the Rule, those injuries are ultimately a direct consequence of Plaintiffs' decision to delay seeking preliminary relief. Plaintiffs do not allege, and there is no reason to assume, that the merits of this case will remain unresolved by the next enrollment period. Indeed, three courts considering challenges to the same Rule have already set summary judgment briefing schedules, which all conclude by the first week of December. Scheduling Order, *Maryland v. U.S. Dep't of Educ.*, No. 26-cv-1957, ECF No. 90 (D. Md. July 28, 2026); July 20, 2026, Minute Order, *Am. Ass'n of Nurse Practitioners v.*

*McMahon*, No. 26-cv-1780 (D.D.C.); Electronic Order, *Am. Nurses Ass'n v. U.S. Dep't of Educ.*, No. 26-cv-12443, ECF No. 60 (D. Mass. Aug. 17, 2026). Plaintiffs have not met their burden of showing that their alleged irreparable harms are the type that preliminary relief would prevent before the Court can adjudicate the merits of their claims.

### III. The Balance Of Equities And The Public Interest Weigh Against A Stay

Not only is the Rule consistent with the law, *see supra* § I, the Rule is also consistent with the motivation behind the relevant sections of the WFTCA, which is "to lower the cost of postsecondary education for taxpayers, students, and families." H.R. Rep. No. 119-106, pt. 1, at 203 (2025), *as reprinted in* 2025 U.S.C.C.A.N. 10; *see also* Rule at 23811–12 ("Congress intended for these limits to put pressure on institutions to lower tuition."). As the House Report accompanying an early version of the WFTCA explains, Americans' expenditures towards higher education "nearly doubl[ed]" in the two decades before 2020. H.R. Rep. No. 119-106, pt. 1, at 207. Easing this burden on American families and students is in the public interest, and setting loan limits is one way to reduce borrowers' overall expenditures and also "provide an incentive to institutions to limit tuition increases." NPRM at 4299; *see also* H.R. Rep. No. 119-106, pt. 1, at 207 ("[A] 2017 study by the New York Federal Reserve found that colleges raise tuition by 60 cents for each $1 increase in federal loan subsidies.").

Moreover, an injunction would be especially inequitable here where it could force the Government to make specific payments that may not be fully recoverable. As Plaintiffs concede, N.D. programs are expensive, and they require a substantial financial investment that often well exceeds even the WFTCA's new higher aggregate cap. *See, e.g.*, Decl. of Randy Swenson ¶ 17, ECF No. 4-9 ("Swenson Decl.") (stating total cost of attendance for NUHS's N.D. program "often exceeds a median amount of $315,000"); Decl. of Lise Alschuler ¶ 17, ECF No. 4-8 ("Alschuler

Decl.") (Sonoran's program "is, at minimum, $273,000"). And an overwhelming majority of N.D. students rely on federal loans to fund their education. *See* Frisch Decl. ¶ 17 (stating approximately 93 percent of Bastyr's current N.D. students rely on federal loans); Swenson Decl. ¶ 19 (NUHS's program at 85 percent); Alschuler Decl. ¶ 19 (Sonoran's program at 83 percent); Henriksen Decl. ¶ 18 (NUNM's program at 70 percent).

Plaintiffs contend that "this lawsuit is about student loans that will be repaid," Mot. at 44, but data suggests that federal loans made to students in N.D. programs pose a high risk of non-repayment or are more likely to be only partially repaid through income-driven repayment plans that impose costs on the Government. Information collected by the Department on borrowers earning these types of degrees shows that graduates' national median earnings are only $45,167. U.S. Dep't of Educ., College Scorecard, https://perma.cc/22FH-5KK2 (last visited Aug. 24, 2026). The disparity between borrowers' debt and expected income creates a significant risk that borrowers will be unable to repay the full amount of the loans they incur or will ultimately only repay a portion of the loans through income-driven repayment programs. *See* Fed. Student Aid, Income-Driven Repayment Plans, https://studentaid.gov/manage-loans/repayment/plans/income-driven (last visited Aug. 24, 2026) ("An income-driven repayment (IDR) plan bases your monthly student loan payment amount on your income and family size or number of dependents. For some people, payments on an IDR plan can be as low as $0 per month."). If the Court temporarily requires the Department to make higher loan limits available to N.D. students, the Government will assume additional exposure to the risk of non-repayment that cannot necessarily be undone if Plaintiffs ultimately fail on the merits. Notably, however, Plaintiffs have not represented that they or their members would return any monies loaned above the WFTCA's cap if the Department's Rule is enjoined and later reinstated. *See Dep't of Educ. v. California*, 604 U.S. 650, 652 (2025).

The relevant measure of the Government's risk is not simply the percentage of borrowers who enter default status. *But see, e.g.*, Henriksen Decl. ¶ 19 (detailing default rates for FYs 2013–2022). Default is a status, not a measure of whether the Government ultimately recovers the amount it has advanced. For example, a borrower may remain outside default status while in deferment or forbearance, or while making payments under an income-driven repayment plan that are insufficient to fully amortize the outstanding balance. Where borrowers have exceptionally high debt relative to their incomes, the Government may ultimately recover substantially less than the amount disbursed even where borrowers never enter default status. The Government therefore faces a risk of permanent financial loss from preliminary relief here, and the balance of equities accordingly favors the Department.[11]

Plaintiffs' requested remedy also has potential to harm students who, if the Rule is preliminarily enjoined but upheld at final judgment, will start programs with a higher loan limit that may later be lowered. The higher amount of debt would count toward their aggregate limits, leaving less available for future academic semesters. At the very least, Plaintiffs' requested relief would infringe on Congress's "broad discretion" under Article I of the Constitution to determine how federal taxpayer dollars—and these loans constitute federal taxpayer dollars—are spent. *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). Such an intrusion into the workings of a coordinate branch of the Government inflicts irreparable harm on the

[11] The potential for borrower defense claims also poses risks to the Government. For example, at least two student loan borrowers recently testified in a March 2026 Department advisory committee meeting that they had approved borrower defense claims related to loans for N.D. programs. *See* National Advisory Committee on Institutional Quality and Integrity Transcript March 24–25, 2026 (Day 2 March 25, 2026) at 195 (comment of Shannon Hirst) and 199 (comment of Traci Pantuso), https://perma.cc/S7RT-D4TM. An approved borrower defense claim means the Department has or will discharge some or all of a borrower's outstanding balance and, in some cases, refund repayments already made. The Department will thus recover only a portion or none of the original loan.

Government.

## IV. Any Relief Should Be Appropriately Limited

### A. Plaintiffs' Requested Vacatur and Declaratory Relief Are Final Merits Remedies, Not Proper Preliminary Relief

Plaintiffs improperly seek final merits relief at the preliminary stage in the form of vacatur and declaratory relief. *See* Proposed Order "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," and the Supreme Court has cautioned that "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." *Univ. of Tex.*, 451 U.S. at 395; *see also Lackey v. Stinnie*, 604 U.S. 192, 201 (2025) (reaffirming distinction between preliminary relief and a final decision on the merits). But Plaintiffs' requested relief would resolve the ultimate merits of Plaintiffs' APA claims and provide precisely the relief Plaintiffs seek at the conclusion of this litigation. Such relief is improper. At most, if the Court finds that Plaintiffs have otherwise satisfied the demanding requirements for a preliminary injunction—which they have not—the Court may consider appropriately tailored interim relief necessary to prevent a demonstrated irreparable harm while preserving the Court's ability to resolve the APA claims on a full merits record. *See* 5 U.S.C. § 705. The Court should accordingly deny Plaintiffs' request for vacatur and declaratory judgment at this preliminary stage.

### B. Any Injunctive Relief Should Be Limited To The Relevant Portions Of The Rule

For the reasons explained above, no relief is warranted here. But if the Court were to award any relief, it should be limited to enjoining the Department from relying on the relevant portions of the Rule to exclude N.D. degrees from the higher loan limits. The Department indicated in the preamble that it intended all provisions of the Rule to be severable from each other. *See* Rule at 23771 ("No part herein will be affected if another part is found to be unlawful."); *id*. ("[I]f a court

disagrees with the Department's classification of a particular degree or degrees, the Department intends for its classification of all other degrees to survive and remain in effect."); *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 384 (D.C. Cir. 2021) ("Severability 'depends on the issuing agency's intent.'" (quoting *North Carolina v. FERC*, 730 F.2d 790, 796 (D.C. Cir. 1984))); *cf. Members of Jamestown Sch. Comm. v. Schmidt*, 699 F.2d 1 (1st Cir. 1983). "[R]egulations—like statutes—are presumptively severable[.]" *Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023).[12] If the Court grants any preliminary injunctive relief, it should thus be limited to the portions of the Rule that the Court determines are likely unlawful as applied to N.D. degrees.

**C. Any Injunctive Relief Should Be Limited To Plaintiffs And Their Members Who Have Demonstrated Standing**

Separately, any relief should be limited to the Plaintiffs and their members who have demonstrated standing. To be clear, the Court has jurisdiction over a claim so long as "at least one of its members would have standing." *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, 100 F.4th 1039, 1054 (9th Cir. 2024). But as the U.S. Supreme Court explained in *CASA*, at the remedy stage the question is "whether an injunction will offer complete relief *to the plaintiffs before the court*," "not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025). Injunctions therefore must be no "broader than necessary to provide complete relief to *each* plaintiff with standing to sue." *Id.* at 861(emphasis added); *see also Gill v. Whitford*, 585 U.S. 48, 73 (2018) (Any remedy must "be tailored to redress the plaintiff's particular injury."); *Price*, 390 F.3d at

[12] To the extent Plaintiffs ask the Court to set aside the same "extra-statutory requirements in the Final Rule" that the D.C. court set aside, *see* Mot. at 25, such request is also improper. As discussed *supra* §II. n.9, Plaintiffs do not make any arguments in support of this request and, in any event, Plaintiffs cannot establish irreparable harm from these stayed portions of the Rule.

1117 (noting a preliminary "injunction must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs, rather than 'to enjoin all possible breaches of the law'" (quoting *Zepeda v. INS*, 753 F.2d 719, 728 n.1 (9th Cir. 1983))). These principles mean that under Plaintiffs' theory of associational standing, Plaintiffs are entitled to relief, if at all, only on behalf of those among their current members who establish standing. *See CASA*, 606 U.S. at 861 (staying injunctions that are "broader than necessary to provide complete relief to each plaintiff with standing to sue").

Basic principles of equity require that an enjoined defendant must know against whom it must refrain from acting, *see* Fed. R. Civ. P. 65(d), and those same principles do not allow Plaintiffs to (1) forgo pleading or joining specific claims or available class-action procedures for litigating those claims; (2) assert that they have large or dispersed memberships; (3) claim only an unidentified fraction have standing; and (4) still demand injunctive relief for all members. That exceeds the traditional bounds of equity and the Court's authority to provide equitable relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross," and "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not." (citation omitted)). Rather, "[w]hen an organization establishes Article III standing on its members' behalf, the remedy 'inure[s] to the benefit of those members of the association actually injured.'" *N.H. Indonesian Cmty. Support v. Trump*, 157 F.4th 29, 35 (1st Cir. 2025) (quoting *Warth*, 422 U.S. at 515), *cert denied sub nom., Trump v. Doe*, 2026 WL 1871309 (U.S. June 30, 2026). Thus, any relief here should be appropriately limited to the Plaintiff Organizations that have established a concrete injury to the Organization itself, and the identified members of the Plaintiff Organizations who have demonstrated standing. *See, e.g.*, *Dickinson v. Trump*, 174 F.4th 634, 645–46 (9th Cir. 2026) (vacating preliminary injunction because it was not

limited to relief for the named plaintiffs); *L.A. Press Club v. Noem*, 171 F.4th 1179, 1191 (9th Cir. 2026) (similar).

### V. If The Court Grants Preliminary Relief, It Should Require Plaintiffs To Post Security and Issue a Stay Pending Appeal

For the reasons stated above, Defendants submit that the Court should deny Plaintiffs' Motion. If the Court enters injunctive relief, however, it should require Plaintiffs to post an appropriate bond commensurate with the amount of funding affected by Plaintiffs' requested relief—that is, the costs and damages that would be sustained by the Government, because an injunction may require the Government to make specific payments it is not legally obligated to make, and which may not be fully recoverable. *See Dep't of Educ.*, 604 U.S. at 652 (staying district court injunction requiring payment of federal funds in part because the district court "declined to impose bond"); *see also* Rule at 23769 (estimating taxpayer savings of the professional student definition at $51–52 million). Under Federal Rule of Civil Procedure 65(c), the Court may issue preliminary injunctive relief "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." "The requirement of security is rooted in the belief that a defendant deserves protection against a court order granted without the full deliberation a trial offers." *Univ. of Tex.*, 451 U.S. at 397 (citation omitted). Without such a protective measure here, there may be no way to recover the funds lost to United States taxpayers if this Court or appellate courts were later to find that the Department was "wrongfully enjoined." Fed. R. Civ. P. 65(c); *cf. Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 606 U.S. —, 145 S. Ct. 2658, 2660 (2025) (staying district court injunction because plaintiffs did not say they would "repay grant money if the Government ultimately prevail[ed]" during appellate process).

A bond is particularly warranted in this case because, as discussed, the Government's

potential loss cannot be reliably estimated by reference to historical default rates alone. Plaintiffs' evidence does not justify dispensing with security or setting it at a nominal amount. If preliminary relief requires the Government to make loans at the higher limits, Plaintiffs should provide security against the possibility that those higher disbursements will not ultimately be repaid.

Lastly, the Court should also stay any injunction pending appeal. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay"). For the reasons explained above, Plaintiffs are not likely to succeed on the merits and Defendants will be irreparably injured absent a stay. *See id.* The public interest strongly favors giving effect to a provision enacted by the American people's democratically elected representatives. *See id.* Those factors outweigh any injury Plaintiffs might suffer. A stay pending appeal is warranted if the Court issues injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: August 24, 2026.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHELLE BENNETT
Assistant Branch Director
Federal Programs Branch

/s/ *Christian Dibblee*
CHRISTIAN DIBBLEE (D.C. Bar No. 90002557)
KATHRYN L. ALKIRE (FL Bar No. 1050146)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 353-5980
Email: Christian.R.Dibblee@usdoj.gov

*Counsel for Defendants*