**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**ASSOCIATION OF ACCREDITED NATUROPATHIC MEDICAL COLLEGES**; **AMERICAN ASSOCIATION OF NATUROPATHIC PHYSICIANS**; and **NATUROPATHIC MEDICAL STUDENT ASSOCIATION**,

Plaintiffs,

v.

**LINDA MCMAHON**, in her official capacity as U.S. Secretary of Education; and **U.S. DEPARTMENT OF EDUCATION**,

Defendants.

Case No. 3:26-cv-1599-SI

**OPINION AND ORDER**

Ollie A. Cleveland, III, Brandt P. Hill, Lorrie L. Hargrove, and Alexander G. Spanos, THOMPSON COBURN LLP, 2311 Highland Avenue, Suite 330, Birmingham, AL 35205; and Caleb Crahan, THOMPSON COBURN LLP, One US Bank Plaza, St. Louis, MO 63101. Of Attorneys for Plaintiffs.

Christian Dibblee and Kathryn L. Alkire, Trial Attorneys, U.S. DEPARTMENT OF JUSTICE, Civil Division, Federal Programs Branch, 1100 L Street, N.W., Washington, D.C. 20005. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

**INTRODUCTION**

Plaintiffs Association of Accredited Naturopathic Medical Colleges ("AANMC"), American Association of Naturopathic Physicians ("AANP"), and Naturopathic Medical Student

Association ("NMSA") (collectively, "Plaintiffs") bring this lawsuit against Defendants U.S. Secretary of Education Linda McMahon and the U.S. Department of Education ("Department") (collectively, "Defendants"). Plaintiffs challenge a final rule, effective July 1, 2026, that narrows professional degrees eligible to borrow a greater sum in postgraduate federal student loans. *See Reimagining and Improving Student Education*, 91 Fed. Reg. 4254 (Jan. 30, 2026) ("Proposed Rule"); *Reimagining and Improving Student Education—Federal Student Loan Program Final Regulations*, 91 Fed. Reg. 23768 (May 1, 2026) ("Final Rule"). Plaintiffs allege that Defendants implemented the Final Rule in violation of the Administrative Procedure Act ("APA") by exceeding their statutory authority and engaging in arbitrary and capricious conduct in implementing the rule.

The Final Rule excludes the Doctor of Naturopathic Medicine ("N.D.") degree[1] from the regulatory definition of "professional degree" and excludes medical students seeking such a degree from the regulatory definition of "professional student." Plaintiffs are an organization that accredits naturopathic colleges, an association of naturopathic medical doctors, and an association of naturopathic medical students.

Before the Court is Plaintiffs' Motion for Preliminary Injunction. Plaintiffs request an injunction under Rule 65 of the Federal Rules of Civil Procedure. In their motion, Plaintiffs assert that the Final Rule is contrary to law and thus violates the APA for two reasons. First, because the Final Rule adds extra-statutory requirements for what qualifies as a professional degree, and second, because an N.D. degree qualifies under the test established by Congress.

---

[1] Documents cited in the record reference the "Doctor of Naturopathic Medicine" as both N.D. and N.M.D., and also reference the "Doctor of Naturopathy" as N.D. At oral argument, counsel for Plaintiffs clarified that there is no meaningful distinction between an N.M.D. and N.D., and stated that some of Plaintiffs' institutions confer the N.M.D. degree. For purposes of this Opinion and Order, the Court references "N.D." as encompassing both types of degrees.

They also contend that the Final Rule's exclusion of an N.D. degree is arbitrary and capricious because Defendants (1) relied on factors they should not have (namely, the extra-statutory requirements); (2) unevenly applied the rule to an N.D. degree as compared to other similar degrees; (3) unreasonably found that an N.D. degree does not meet the Final Rule's requirements; and (4) departed from past practices in implementing the rule with respect to an N.D. degree. At oral argument, Plaintiffs narrowed their claims in this motion by dropping their arguments and requested relief based on the extra-statutory requirements in the Final Rule. Plaintiffs also narrowed their requested relief to an order requiring Defendants to treat an N.D. degree as a "professional degree" and naturopathic medical students as "professional students" within the regulatory framework. Plaintiffs thus request a mandatory injunction.

Defendants respond that (1) Plaintiffs fail to show standing for the association of students and its members, (2) Plaintiffs are not likely to succeed on the merits, (3) Plaintiffs fail to show irreparable harm, and (4) the balance of equities and public interest tips in Defendants' favor. For the reasons that follow, the Court GRANTS Plaintiffs' motion, as modified at oral argument.

## STANDARDS

### A. General Standard for Injunctive Relief

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must demonstrate that she is likely to succeed on the merits, irreparable harm in the absence of preliminary relief, that the balance of equities tips in her favor, and that an injunction is in the public interest." *Bates v. Pakseresht*, 146 F.4th 772, 783 (9th Cir. 2025) (citing *Winter*, 555 U.S. at 20). "When the government is a party, the last two factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021).

A preliminary injunction also "may issue where 'serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor' if the plaintiff 'also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). The Ninth Circuit has a "'sliding scale' approach, in which 'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'" *Id.* (quoting *All. for the Wild Rockies*, 632 F.3d at 1131). In addition, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

The already high standard for granting a preliminary injunction is further heightened when the type of injunction sought is a "mandatory injunction." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (noting that the burden is "doubly demanding" for a mandatory injunction). To obtain a mandatory injunction, a plaintiff must "establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Id.* (emphasis in original).

**B. Standing**

A plaintiff bears the burden of establishing standing for every claim asserted and every form of relief sought. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). To establish Article III standing, a plaintiff must show: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)

("A plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision"). "The injury must be concrete to ensure that it is real and not abstract, and particularized so that it affects the plaintiff in a personal and individual way as opposed to a generalized grievance." *Kumar v. Koester*, 131 F.4th 746, 751-52 (9th Cir. 2025) (cleaned up).

An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1992)). An injury is "concrete" if it is "'*de facto*'; that is it must actually exist," meaning that it is "'real' and not 'abstract.'" *Id.* at 340. "'Concrete' is not, however, necessarily synonymous with 'tangible.' Although tangible injuries are perhaps easier to recognize, [the Supreme Court has] confirmed in many . . . previous cases that intangible injuries can nevertheless be concrete." *Id.*

"This standing inquiry is the same for individuals and for organizations." *Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 630 (9th Cir. 2026) (en banc); *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy."). In other words, "organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982)). "[A]n organization has suffered an injury-in-fact if the frustration of its mission comes from an action that 'directly affect[s] and interfere[s] with [its] core business activities.'" *Ariz. All.*, 186 F.4th at 633 (alterations in *Ariz. All.*) (quoting *All. Hippocratic Med.*, 602 U.S. at 395). "But just like any individual bringing a case in federal court,

an organization needs a 'direct stake in the outcome' of a case." *Id.* at 630 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972).

Organizations also may assert associational standing. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). To do so, an organization must show "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.*

**C. Administrative Procedure Act**

As relevant here, under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Agency action is

> arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

"[T]he touchstone of 'arbitrary and capricious' review under the APA is 'reasoned decisionmaking.'" *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *State Farm*, 463 U.S. at 52). "[A]n agency's action can only survive arbitrary or capricious review where it has articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *All. for the*

*Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) (cleaned up); *see also Gill v. U.S. Dep't of Just.*, 913 F.3d 1179, 1187 (9th Cir. 2019) ("An agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" (quoting *State Farm*, 463 U.S. at 43). *Post-hoc* rationalizations cannot justify an agency's actions. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

A reviewing court's inquiry into agency action must be "thorough," but "the standard of review is highly deferential; the agency's decision is 'entitled to a presumption of regularity,' and [the court] may not substitute [its] judgment for that of the agency." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quoting *Volpe*, 401 U.S. at 415). A court, however, affords no deference to an agency's determinations of law. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92 (2024). Further, the court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2008); *see also Volpe*, 401 U.S. at 415 (stating that the presumption of regularity "is not to shield . . . action from a thorough, probing, in-depth review"); *Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001) ("The presumption of agency expertise can be rebutted when its decisions, while relying on scientific expertise, are not reasoned."). A court "must not 'rubber-stamp' . . . administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (first alteration in original, remaining alterations

added). A court, however, may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Gill*, 913 F.3d at 1187-88 (quoting *State Farm*, 463 U.S. at 43).

The Supreme Court has often observed that the reasoned decisionmaking requirement includes a duty to explain any "departure from prior norms." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *see also Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 36 (9th Cir. 2025) ("An agency must provide a reasoned explanation for adoption of a new policy . . . ." (cleaned up)); *Valley Hosp. Med. Ctr., Inc. v. NLRB*, 100 F.4th 994, 1002 (9th Cir. 2024) ("When an agency overrules its prior decisions, it must acknowledge the change and provide a reasoned explanation."). "Unexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

When an agency's action represents a policy change, such action requires "a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *State Farm*, 463 U.S. at 42. The Ninth Circuit has explained:

> A policy change complies with the APA if the agency (1) displays awareness that it is changing position, (2) shows that the new policy is permissible under the statute, (3) believes the new policy is better, and (4) provides good reasons for the new policy, which, if the new policy rests upon factual findings that contradict those which underlay its prior policy, must include a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.

*Montana Wildlife Fed'n*, 127 F.4th at 36.

## BACKGROUND

### A. Statutory and Regulatory Background

#### 1. History of Direct Loans for Graduate Education

Congress passed the Higher Education Act of 1965 ("HEA") "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." Pub. L. No. 89-329, 79 Stat. 1219. Title IV of the HEA authorizes student aid programs, including a "Direct Loan Program" by which the Department issues loans directly to students to help pay for "their courses of study." 20 U.S.C. § 1087a(a). "The Department of Education's Direct Loan program, established in 1993, is the single largest source of federal financial assistance for postsecondary education." *Am. Ass'n of Nurse Pracs. v. McMahon* (hereinafter "*Nurse Practitioners*"), 836 F. Supp. 3d 175, 185 (D.D.C. 2026). "Prior to July 4, 2025, the law provided that graduate-level students in any field of study . . . . could obtain Direct Unsubsidized Loans up to $20,500 per year ($138,500 in aggregate)." *Id.* at 186. "Additionally, graduate-level students enrolled in certain approved 'health profession programs' were eligible for Direct Unsubsidized Loans of up to $224,000 in aggregate, on the basis that those students engaged in specialized training requiring exceptionally high costs of education." *Id.* (quotation marks omitted).[2] "Graduate-level students needing further federal financial assistance could then turn to Direct PLUS Loans, also known as Grad

[2] In 2005, the Department specifically added N.D. programs accredited by the Council on Naturopathic Medical Education ("CNME") to the list of "approved health profession" programs for students pursuing an N.D. degree, allowing for the larger loan aggregate cap. Federal Student Aid, *GEN-05-09, Increased Unsubsidized Loan Amounts for Naturopathic Medicine Students* (June 30, 2005), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2005-07-05/gen-05-09-increased-unsubsidized-loan-amounts-naturopathic-medicine-students.

PLUS Loans, which carry a higher interest rate than Direct Unsubsidized Loans and can be used to finance up to the full cost of attendance." *Id.*

In 2007, the Department proposed definitions of "undergraduate student," "graduate or professional student," and "first-professional degree." 72 Fed. Reg. 44620 (Aug. 8, 2007) ("2007 Proposed Rule"). The 2007 Proposed Rule defined a "graduate or professional student" as "a student who is . . . enrolled in a program leading to a first-professional degree." *Id.* at 44644. It proposed the following definition of a "first-professional degree":

> A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

*Id.* at 44643.

The 2007 Final Rule deleted the word "first" from the definition of "professional degree." 72 Fed. Reg. 62014, 62016 (Nov. 1, 2007) ("2007 Final Rule"). The "professional degree" definition in the 2007 Final Rule otherwise remained the same as the "first-professional degree" from the 2007 Proposed Rule. *Id.* at 62025. The Department also specifically had stated that the proposed definition of "first-professional degree"—and thus the final "professional degree" definition—was "based on the definition currently used by the National Center for Education Statistics" ("NCES"). 2007 Proposed Rule, 72 Fed. Reg. at 44621. The 2007 Final Rule definitions were codified at 34 C.F.R. § 668.2.

NCES is a division in the Department responsible for analyzing data submitted by Title IV institutions. "Under [NCES's] definition a first professional degree would be limited to

degree programs that require a level of professional skill beyond that normally required for a bachelor's degree as well as a professional license." 2007 Proposed Rule, 72 Fed. Reg. at 44621. Thus, only an N.D. would qualify under the "naturopathic medicine" category, and not other naturopathic practitioners such as traditional naturopaths, who have no educational or licensing requirements.

**2. The Department's Treatment of an N.D. Degree**

"Integrated Postsecondary Education Data System" ("IPEDS") is a "system of interrelated surveys" that NCES requires Title IV institutions to complete, which NCES publishes annually. *See* 20 U.S.C. § 1094(a)(17). NCES organized data from these studies, including by degree type and field of study. NCES has a long history of considering N.D. programs as "first professional" and "professional."

Beginning in 2001, for the 1999-2000 school year, NCES charted "[f]irst-professional degrees conferred by degree-granting institutions," and included naturopathic medicine. *See* NCES, *Digest of Education Statistics*, Table 278 First-Professional Degrees Conferred by Degree-Granting Institutions, by Racial/Ethnic group, Major Field of Study, and Sex of Student: 1999-2000 (Aug. 2001), https://nces.ed.gov/programs/digest/d01/dt278.asp (last visited October 6, 2026). NCES continued to chart "naturopathic medicine" as a "first-professional" degree through 2009. *See* ECF 4-3 at 43-47 (Decl. of Dr. Joann Yánez, Executive Director of AANMC ("AANMC Decl."), Ex. A).

In 2004, the Department issued IPEDS Web-Based Data Collection Edit Specifications for Institutional Characteristics. *See* NCES, IPEDS Web-Based Data Collection Fall 2004, https://nces.ed.gov/ipeds/pdf/webbase2004/editspec_ic.pdf (last visited October 6, 2026). This document stated that "the twelve fields listed below . . . are recognized as first-professional programs by the Department of Education" and included "Naturopathic medicine." *Id.*

NCES also treated naturopathic medicine as a "first-professional degree" for purposes of IPEDS even after the 2007 Final Rule. *See, e.g.*, NCES, *Digest of Education Statistics*, Table 295 Degrees Conferred by Degree-Granting Institutions in Selected Professional Fields, by Sex of Student, Control of Institution, and Field of Study: Selected years, 1985-86 through 2009-10 (May 2011). It continued to do so through 2021. *See* AANMC Decl. Ex. A (ECF 4-3 at 48-54).

In later years, NCES switched to focusing on degrees conferred in "professions," and evaluated degrees in the "health profession." *See, e.g.*, NCES, *Digest of Education Statistics*, Table 325.60, Degrees in the Health Professions and Related Programs Conferred by Postsecondary Institutions, by Level of Degree and Sex of Student: 1970-71 through 2013-14 (Sept. 2015). As previously noted, in 2005 the Department expressly placed an N.D. degree within the "health profession" category subject to higher loan limits. *See supra*, fn.3. Additionally, in the modified NCES reporting based on "professions," NCES listed the type of degree—Bachelor's, Master's, and Doctor's—and defined Doctor's degrees to include "medicine (M.D.), dentistry (D.D.S. and D.M.D), and other medical specialty degrees that were formerly classified as first-professional." *Id.* Thus, the N.D. degree would still qualify based on its earlier treatment as "first professional."

Indeed, the NCES in "Health Professions and Related Sciences" has a Classification for Instructional Programs ("CIP") Code for "Naturopathic Medicine/Naturopathy (ND)." NCES, *Detail for CIP Code 51*, https://nces.ed.gov/ipeds/cipcode/cipdetail.aspx?y=55&cipid=88742 (last visited October 6, 2026). It defines this area of study as "[a] program that prepares individuals for the *independent professional practice of naturopathic medicine*," which includes, among other things, instruction in "the basic medical sciences, epidemiology, neuroscience, biostatistics, public and community health, *laboratory and clinical diagnosis*, pharmacognosy."

NCES, *Detail for CIP Code 51.3303*, https://nces.ed.gov/ipeds/cipcode/cipdetail.aspx?y=55&cipid=87829 (last visited October 6, 2026) (emphasis added). A traditional naturopath (one who has not obtained an N.D. degree) may not diagnose patients and does not require any particular education. *See, e.g.*, NIH, *National Center for Complementary and Integrative Health, Naturopathy*, https://www.nccih.nih.gov/health/naturopathy (hereinafter "*NIH Naturopathy*") (describing the difference between "licensed naturopathic physicians" and "traditional naturopaths") (last updated Apr. 2025). Thus, CIP Code 51.3303, the title of which expressly includes the modifier of an N.D. degree, also must only apply to N.D. degrees based on its definition, because a "traditional naturopath" does not meet its requirements.

### 3. Rulemaking Process for Final Rule

#### a. Governing Statute

On July 4, 2025, Congress enacted a reconciliation act titled "Working Families Tax Cuts Act," colloquially known as the "One Big Beautiful Bill." Pub. L. No. 119-21, 139 Stat. 72, 335 (2025) ("the Act"). The Act modified the decades old Direct Loan program. "Among many other things, the Act amended the Direct Loan program (1) to eliminate the Grad PLUS loan, which had permitted uncapped borrowing up to the cost of attendance, and (2) to impose different borrowing limits for graduate and professional students on other Direct Loans." *Nurse Practitioners*, 836 F. Supp. 3d at 186. Thus, "[g]oing forward, prospective students needing additional loan assistance for any graduate degree beyond that provided by the capped Direct Unsubsidized Loans must turn to private loans, which are not always available, often impose more burdensome terms and higher interest rates, and are not eligible for federal public service loan forgiveness programs." *Id.* at 184.

The Act amended the HEA by adding a new subsection (a)(4) to 20 U.S.C. § 1087e, which imposed, effective July 1, 2026, separate student loan caps for "graduate" and

"professional" students, with professional students able to borrow higher annual and aggregate amounts than graduate students. The new annual limit for Direct Unsubsidized loans is $20,500 for a "graduate" student and $50,000 for a "professional" student. 20 U.S.C. § 1087e(a)(4)(A). The new aggregate limit beyond the amount borrowed for undergraduate education is $100,000 for a "graduate" student, and $200,000 for a "professional" student. *Id.* § 1087e(a)(4)(B). Before this change, the direct unsubsidized loan limits for graduate students and professional students were the same. *See* Proposed Rule, 91 Fed. Reg. at 4262; *see also id.* at 4263. Degrees in the designated "health professions," of which an N.D. degree was one, however, could borrow more.

Congress also enacted new statutory definitions for "graduate" and "professional" students. A "professional" student is defined as "a student enrolled in a program of study that awards a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (as in effect on July 4, 2025), upon completion of the program." 20 U.S.C. § 1087e(a)(4)(C)(ii). A "graduate" student is "a student enrolled in a program of study that awards a graduate credential (other than a professional degree) upon completion of the program." *Id.* § 1087e(a)(4)(C)(i).

The statute contained a "grandfathering" provision that exempts from the new loan limits students who, as of June 30, 2026, are "enrolled in a program of study at an institution of higher education" and have already borrowed a federal loan. 20 U.S.C. § 1087e(a)(8). This exemption only applies for the duration of their "expected time to credential," which is "three academic years" or the difference between the remaining time left in the program and the total program length required for the program of study. *Id.*

**b. Rulemaking**

**i. Proposed Rule**

On January 30, 2026, the Department issued a Notice of Proposed Rulemaking amending the preexisting definition of "professional degree" to add more stringent requirements. *See* Proposed Rule, 91 Fed. Reg. at 4332. The Proposed Rule recognized that 34 C.F.R. § 668.2 was a "regulation that had been remarkably consistent over time, as it remained unaltered for nearly 20 years." *Id.* at 4263. Yet the Department stated that "the regulation existed in a different context and served a different role" and thus believed it could add new criteria. *Id.*

The Proposed Rule included the following definition of "professional degree":

> (1) A professional degree is a degree that:
>
> > (i) Signifies both completion of the academic requirements for beginning practice in a given profession, and a level of professional skill beyond that normally required for a bachelor's degree;
> >
> > (ii) Is generally at the doctoral level, and that requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework;
> >
> > (iii) Generally requires professional licensure to begin practice; and
> >
> > (iv) Includes a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (2)(i) of this definition.
>
> (2) A professional degree may be awarded in the following fields:
>
> > (i) Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (DC or DCM.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), Theology (M.Div., or M.H.L.), and Clinical Psychology (Psy.D. or Ph.D.).

*Id.* at 4332.

The Proposed Rule thus changed the illustrative list to an exhaustive list by removing the phrase "examples . . . include but are not limited to." 34 C.F.R. § 668.2. The Department stated that the list incorporated by the Act was "illustrative" and "need not be exhaustive," but interpreted it as only allowing the Department to "add additional degrees to the list of professional degrees through regulation." Proposed Rule, 91 Fed. Reg. at 4263. The Department then proposed adding one more degree to the exhaustive list, a Doctorate in Clinical Psychology. *Id.* at 4264. The Proposed Rule also added the program length, doctoral level, and CIP code requirements. *Id.*; *see also id.* at 4332 (including these new requirements in the proposed definition).

The Department also evaluated whether many other degrees meet the new definition of "professional degree." *Id.* at 4265-67. For Naturopathic Medicine, the Department concluded that it did not meet the definition because "the regulatory landscape surrounding naturopathic medicine is unsettled." *Id.* at 4265. The state of the regulatory landscape, however, is not a criteria in either the statute's three-part test in the definition of "professional" or the revised test in the Proposed Rule. The Department also concluded that because "less than half of states license naturopathic physicians and some states ban the practice of naturopathy entirely . . . an N.D. cannot clearly be said to be required for entrance into a specific profession or lead to licensure at this moment in time." *Id.*

Plaintiffs, among many others, submitted comments on the Proposed Rule's altered definition of "professional degree." The Final Rule, however, adopted the definition without material change, only revising the paragraph numbering and the paragraph citation in the CIP Code subsection.

**ii. Final Rule**

On May 1, 2026, the Department promulgated the Final Rule. 91 Fed. Reg. 23768. "Like the Act, the Rule's effective date is also July 1, 2026, only two months after promulgation of the Final Rule and only a couple short months before the academic year for 2026-2027 begins, as students newly accepted into graduate and professional programs are finalizing how to pay the tuition and associated expenses." *Nurse Practitioners*, 836 F. Supp. 3d. at 184.

In the "Analysis Relating to Professional Degrees [and] Professional Student" section of the Final Rule, the Department addressed comments relating to the N.D. degree. Final Rule, 91 Fed. Reg. at 23790. The Department stated that the history of reporting this degree as professional in IPEDS was "not relevant here" because the Department only looked to the Act. *Id.* The Department also noted that naturopathic medicine is banned in some states, and thus professional licensure cannot be "generally required." *Id.* Finally, the Department stated that because all the professions in the illustrative list are legal in every state, and naturopathic medicine is not, it cannot be included as a "professional degree." *Id.*

In the "Enumerated List of Professional Degrees" section of the Final Rule, the Department also addressed comments relating to the N.D. degree. *Id.* at 23794. The Department noted that the Act incorporated the statutory definition from 34 C.F.R. § 668.2 and its three-part test and concluded that the N.D. degree "cannot be included in the list of professional degrees because it does not pass all parts of the operative test." *Id.* The Department recited its previous reasoning from the Proposed Rule that an N.D. does not meet the first and third elements of the test because "less than half of States license NDs and some States ban the practice of naturopathy altogether. As such, the ND is not required to [sic] for entry into the profession and licensure is not 'generally required.'" *Id.* The Department also referenced its earlier reasoning in the Final

Rule, focusing on the fact that three states ban the practice of naturopathic medicine and none of the degrees in the illustrative list are banned in any state. *Id.*

In addressing other comments, the Department stated that the meaning of "naturopathy" is "unsettled" and an N.D. degree cannot be considered a professional degree because it has never expressly been listed in the regulation as a professional degree and is not "substantially similar" to the listed professions. *Id.* The Department also declined to consider as relevant the treatment of the N.D. degree as a professional degree in NCES tables or Federal Student Financial Aid documentation, or the text of CIP code 51.333 relating to an N.D., on the grounds that naturopathic medicine was never a listed profession in the regulatory definition and is not substantially similar to the listed professions. *Id.*

**4. Litigation Challenging the Final Rule**

Four lawsuits, in addition to this case, have challenged the Department's definition of "professional degree."[3] *Nurse Practitioners* consolidated the two pending cases in the U.S. District Court for the District of Columbia. 836 F. Supp. 3d at 185. In a thoughtful and well-reasoned opinion, U.S. District Judge Beryl A. Howell concluded that the Final Rule's "new definition of 'professional degree' is likely inconsistent with the definition of 'professional degree' set forth in the Act, and therefore [the plaintiffs] are likely to succeed on the merits" of their contrary-to-law APA claim. *Id.* at 200-01. The court found that the plaintiffs were likely to succeed on their contrary-to-law APA claim because the Department made five material changes to the definitions of "professional degree" and "professional student." *Id.* at 202-03. These

---

[3] *See Am. Ass'n of Nurse Practitioners v. McMahon*, No. 1:26-cv-01780 (D.D.C.); *PA Educ. Ass'n v. U.S. Dep't of Educ.*, No. 1:26-cv-1941 (D.D.C.) (consolidated as "*Nurse Practitioners*"); *Maryland v. U.S. Dep't of Educ.*, No. 1:26-cv-01957 (D. Md.); *Am. Nurses Ass'n v. U.S. Dep't of Educ.*, No. 1:26-cv-12443 (D. Mass.) ("*Nurses*").

material changes were requiring that a professional degree: (1) "Is generally at the doctoral level. . ."; (2) "requires at least six academic years of postsecondary education coursework for completion, including at least two years of post-baccalaureate level coursework"; (3) "[i]ncludes a four-digit program CIP code, as assigned by the institution or determined by the Secretary, in the same intermediate group as the fields listed in paragraph (2)(i) of this definition"; (4) cannot "lead[ ] to employment that ordinarily must be supervised by a licensed professional in a different occupation and cannot be performed independently"; and (5) must be listed in the regulation, which includes the 10 statutory listed degrees plus "Clinical Psychology (Psy.D. or Ph.D.)." *Id.* at 188-89, 202. Judge Howell explained that "Congress did not direct the Department to evaluate and update the regulatory definition already in 34 C.F.R. § 668.2 with any new eligibility criteria, let alone five material changes to the statutorily adopted regulatory definition. *Id*. at 202. In fact, Congress did the opposite." *Id.*

The court in *Nurse Practitioners* also found irreparable harm and that the public interest and balance of the equities favor the plaintiff. *Id.* at 208-09. Judge Howell then granted a nationwide stay under the APA, staying the Department from implementing the extra-statutory requirements in the Final Rule's preamble and definition of "professional degree." *Id.* at 214-15. Judge Howell also found that the plaintiffs were "likely to show that the Department lacked the authority" to create an exhaustive, instead of illustrative, list of professions (as one of the five material changs). *Id.* at 202. But she declined to enjoin the use of this list "on the understanding that the list of qualifying degrees is not exclusive" because the listed professions were unrelated to the plaintiffs' professions and the plaintiffs could not show irreparable harm from allowing those 11 professions to be included in the definition. *Id.* at 211.

Finally, Judge Howell declined to "make findings in the first instance" regarding whether "certain degrees" were "professional degrees" under the operative three-part test. *Id.* at 212. The court found this to be "a question best reserved for the agency to consider in the first instance, based on application of the proper three-criteria standard set forth in 34 C.F.R. § 668.2 (Jul. 4, 2025)." *Id.* The Department represented that it could perform that assessment "relatively quickly." *Id.* at 211.

Five days after the June 24 stay, the Department issued an Electronic Announcement, listing 18 new degrees that meet the three-part test, which the Department said it would "treat" as "professional degrees" "for the duration of the Court's stay." U.S. Dep't of Educ., *Update to List of Professional Degree Programs Due to Court Order (General 26-42)* (June 29, 2026), https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2026-06-29/update-list-professional-degree-programs-due-court-order-updated-july-10-2026. This announcement also listed degrees that did not qualify as "professional degrees." *Id.* The N.D. degree was not included on either list.

In another case, *Am. Nurses Ass'n v. United States Dep't of Education* (hereinafter "*Nurses*"), --- F. Supp. 3d ----, 2026 WL 2294606 (D. Mass. Aug. 10, 2026), U.S. District Judge Patti B. Saris agreed with the analysis and conclusion in *Nurse Practitioners* that the Final Rule's definition of "professional degree" likely violated the APA. *Id.* at *11. Judge Saris declined to enter a preliminary injunction or a stay under the APA because the Electronic Announcement was issued after Judge Howell stayed the extra-statutory test, and the Department added the plaintiffs' professions as qualifying under "professional degree." *Id*. at *13-14. The plaintiffs, therefore, could not show irreparable harm. *Id.* at *13.

**B. Factual Background**

**1. Naturopathic Medicine Generally**

Naturopathic medicine "combines the understanding and knowledge of nature with the exactitudes of modern science." Decl. of Laura Farr, Executive Director of AANP ("AANP Decl."), ¶ 16 (ECF 4-5). Naturopathy focuses on the root cause of disease and "takes a holistic approach to healing, incorporating practices like physical activity, a well-balanced diet, and stress management." *NIH Naturopathy*. Naturopathy includes licensed naturopathic doctors, "traditional naturopaths," and other health care providers that follow the naturopathic approach.

Traditional naturopaths generally receive various types of nonaccredited training (e.g., an online program), but have no required studies and are not eligible for a license. *NIH Naturopathy*; Prairie Naturopathic Doctors, *Traditional Naturopath vs. Licensed Naturopath* (hereinafter "*Prairie Naturopathic*") (Jan. 1, 2024), https://perma.cc/MJ3P-QYPY. The parties do not dispute that unlicensed traditional naturopaths cannot diagnose and treat patients, but instead "offer their services as 'a wellness coach or a health consultant.'" ECF 33 at 23 (Defs' Resp Br.) (quoting *Prairie Naturopathic*); *see also* AANP Decl. ¶ 24. In states that do not license and regulate naturopathic medical doctors, a person with an N.D. degree, like a "traditional naturopath," may not diagnose and treat patients, prescribe medication, or order prescription-level laboratory panels or tests such as a CT scan or x-ray. *Id.* ¶ 24.

Naturopathic medical doctors (persons with an N.D. degree), on the other hand, "are trained to be primary care providers who diagnose, treat, and manage care for patients suffering from acute and chronic conditions." AANP Decl. ¶ 16; *see also id.* ¶ 22; *NIH Naturopathy*. They also may prescribe medication, in some states. AANP Decl. ¶ 22. To become a licensed naturopathic doctor requires rigorous three-to-five year post-baccalaureate medical training, with a minimum of 4,100 hours of didactic instruction, including 1,200 hours of supervised clinical

training. *Id.* ¶ 22; AANMC Decl. ¶¶ 18, 50 (ECF 4-3). Graduates with an N.D. degree are eligible to sit for the national board examination, the Naturopathic Physicians Licensing Examination ("NPLEX"). AANP Decl. ¶ 19; Decl. of Randy C. Frish, President of Bastyr University ("Bastyr Decl."), ¶ 11 (ECF 4-6).

There are 26 domestic (United States) jurisdictions that license naturopathic medical doctors—23 states, Puerto Rico, the District of Columbia, and the U.S. Virgin Islands. AANMC Decl. ¶ 30. In all these jurisdictions, graduating from a CNME-accredited naturopathic medical school and passing the NPLEX are required for licensure. AANP Decl. ¶ 23; Bastyr Decl. ¶¶ 11-12. Annual tuition at accredited medical schools generally is $26,000 to $60,000, and students can expect to incur living and other expenses of approximately $120,000 over the course of their degree. AANMC ¶ 36. Demand for naturopathic medical doctors has increased significantly since 2000, with a commensurate growth in jurisdictions that have accepted and begun regulating the profession. *Id.* ¶ 10-11, 13.

**2. Plaintiffs**

"AANMC is a national, nonprofit membership association that supports accredited and recognized schools of naturopathic medicine." AANMC Decl. ¶ 4. "AANMC's members are nonprofit institutions of higher education in the United States and in Canada that offer accredited, post-baccalaureate programs of study leading to [an N.D.] degree." *Id.* ¶ 5. AANMC works to aid the development, growth, and preservation of the naturopathic medical profession; improve the quality of education, operations, research, and patient care at member schools; enhance each school's visibility; and foster collaboration between member schools and compatible organizations. *Id.* ¶ 4.

NMSA is a "national organization representing approximately 2,000 naturopathic medical students enrolled at all five accredited naturopathic medical schools in the United

States" and Puerto Rico. Decl. of Dr. Desta Golden, Executive Director of NMSA ("NMSA Decl."), ¶ 3 (ECF 4-4). NMSA was founded in 2007 and established to support these medical students, who pay dues to NMSA. *Id.* ¶ 6. NMSA's mission includes "advocat[ing] for naturopathic doctors in-training, and inspir[ing] educational and community-building initiatives that prepare naturopathic medical students with tools, experiences, and connections necessary to become successful doctors." *Id.* ¶ 8. "NMSA organizes national conferences and educational events, provides leadership training and mentorship for student leaders, facilitates collaboration among students enrolled at the five accredited naturopathic medical schools in the United States, and works closely with academic institutions, accrediting organizations, and professional associations to address issues affecting naturopathic medical education." *Id.* ¶ 9. It also monitors relevant legislative and regulatory developments and communicates those to its members, "and evaluates their impact on students' educational opportunities, professional training, and access to financial aid." *Id.*

AANP is a national organization representing "licensed naturopathic doctors, naturopathic medicine students, 35 affiliated state naturopathic associations, 10 affiliated specialty naturopathic associations, three accredited naturopathic medicine schools, and other healthcare professionals allied with the naturopathic profession." AANP Decl. ¶ 4 (footnote omitted). Practicing naturopathic doctors who are members of AANP pay annual dues. *Id.* ¶ 6. AANP currently represents approximately 1,400 practicing members and "more than 400 members who are naturopathic medicine students at accredited naturopathic medical schools." *Id.* ¶¶ 6-7. The association also represents and receives annual contributions from three accredited naturopathic medical schools: Bastyr University ("Bastyr"), National University of Natural Medicine ("NUNM"), and Sonoran University of Health Medicine ("Sonoran"). *Id.* ¶ 8.

"AANP executes a broad array of operational and strategic activities, including: producing continuing medical education programs and its annual national convention to support advanced clinical expertise; providing operational and business tools to support viable medical practices, and serving as the national clearinghouse for accurate information regarding naturopathic medicine." *Id.* ¶ 12. AANP also directs federal and state legislative efforts, working with partners "to expand state licensure and recognition in federal programs, protect professional scope of practice, and improve insurance reimbursement." *Id.*

**3. Plaintiffs' Alleged Harm**

**a. AANMC**

AANMC describes that most of the students of its member institutions use federal direct loans to pay for naturopathic medical school. *Id.* ¶ 71. These students face an immediate shortfall if the N.D. degree is not eligible for the "professional degree" loan level of $50,000 per year, because that generally is the cost of obtaining an N.D. *Id.* ¶¶ 73-74. These students will be required to try to take out "private student loans, which have stricter approval requirements, unfavorable interest rates, and limited repayment plan options." *Id.* ¶ 75. Without access to higher federal loans, some students simply will not enroll. *Id.* at 75-76.

AANMC explains that its responsibilities are almost exclusively paid by annual dues, which generally range from $40,000 to $60,000 per institution annually. AANMC Decl. ¶ 24. Annual dues are tied to N.D. enrollment; thus, as that goes down, so does AANMC's funding. *Id.* Loss of revenue from schools paying reduced dues because of reduced enrollment directly affects AANMC's ability to perform its mission. *Id.* ¶¶ 78, 81. Similarly, less enrollment causes reduced income from AANMC's alternative income sources such as centralized application services and centralized residency application and match fees. *Id.* ¶ 24.

"Some AANMC member institutions have already had prospective students decide not to enroll." *Id.* ¶ 76. With reduced enrollment, member schools will see a greater strain on their resources. *Id.* ¶ 77. It also results in the member schools paying less in dues to AANMC. *Id.* ¶ 78. This reduction in enrollment negatively affects the mission of AANMC's member schools. *Id.* ¶ 79. For example, the change in student loan rules was a factor in the decision of one school, University of Western States in Portland, Oregon, to drop its plan to create an accredited school and cancel its membership with AANMC. *Id.* ¶ 77. This also led AANMC to lose $20,361 in dues revenue for the second half of the year. *Id.* As previously noted, this reduction in dues revenue to AANMC diminishes its "ability to carry out its core mission." *Id.* ¶ 78.

The Final Rule affects more than 80 percent of students seeking an N.D. *Id.* ¶ 79. This creates "a risk that programs will be financially insolvent, students will be unable to complete their programs, and career pathways will close for students and prospective students." *Id.* It also negatively affects the health industry as a whole, reducing the healthcare professionals available to meet patients' needs. *Id.* ¶ 80.

**b. NMSA**

Most students in accredited naturopathic medicine schools are members of NMSA. NMSA Decl. ¶ 12. Each member pays $60 in annual dues, and approximately 70% of the NMSA budget comes from member dues. *Id.* "The remainder of NMSA's funding comes primarily from corporate and community partnerships, charitable donations, and registration fees associated with its educational conferences and programs." *Id.*

The ability of NMSA to perform its mission "depends on maintaining a robust and engaged student membership." *Id.* ¶ 13. Already "some admitted prospective N.D. students have withdrawn from enrollment at naturopathic medicine schools as a result of the lower loan limits associated with a graduate degree and their inability to locate alternative sources of funding.

Some schools are reporting declining applications and/or admissions, which signal declining enrollment." *Id.* ¶ 14. Additionally, some current students are not eligible for grandfathering "because they had a gap in enrollment, have not previously had a federal student loan, or surpass the stated program duration." *Id.* ¶ 15. They may be forced to take out private student loans, with the concomitant more onerous terms, or to abandon their educational pursuit if that is not a viable option. *Id.*

Reduced enrollment means less revenue for NMSA, and less ability to perform its core mission. *Id.* ¶¶ 16-17. In light of the anticipated revenue loss, "NMSA has already been required to make significant operational reductions. These actions include canceling its in-person Leadership Summit and strategic planning meeting, pausing longstanding travel and educational grant programs for student members, reducing conference programming, and deferring planned staff compensation adjustments." *Id.* ¶ 17.

**c. AANP**

AANP receives annual revenue from member dues and providing continuing medical education to licensed N.D.s. AANP Decl. ¶ 26. Approximately 30 percent of its revenue is from dues. *Id.* As a result of the Final Rule, some prospective N.D. students have withdrawn from or deferred their studies and some current students "have reported struggling to finance and complete the remainder of their academic program." *Id.* ¶ 27. This reduces AANP's revenue and its ability to perform its core mission. *Id.* ¶¶ 27-29.

**d. Naturopathic Medical Schools**

Several accredited naturopathic schools submitted declarations describing the effect of the Final Rule. This includes Bastyr, NUNM, Sonoran, and National University of Health Sciences ("NUHS").

Bastyr stated that its Fall 2026 applications declined more than 20 percent from Fall 2025. Bastyr Decl. ¶ 26. Bastyr explained that the loss in revenue from reduced enrollment means that faculty and staff may need to be let go and, ultimately, it may need to discontinue the N.D. program. *Id.* ¶ 29. It further described that its other programs also may be adversely affected, because lower enrollment causes institution costs to be spread among fewer students, raising their costs. *Id.* ¶ 30.

Bastyr also explained that it is a member of AANMC, pays annual dues, and its dues are based in part on enrollment levels. *Id.* ¶¶ 31-32. It also is a member of AANP, and declining enrollment will result in Bastyr paying less to AANP. *Id.* ¶ 33.

The other universities provided similar statements as Bastyr. *See* ECF 4-7, 4-8, and 4-9. NUNM added that its deposits for first-time, first-year students declined by approximately 40 percent. Decl. of Melanie Henriksen, President/CEO of NUNM ¶ 24 (ECF 4-7). In addition to experiencing similar harms as Bastyr from reduced enrollment, Sonoran explained that it already has taken actions to counter the revenue shortfall, including limiting new hires that are needed for its core mission and "develop[ing] a contingency budget that sequences staffing and operational cuts," but it still faces the possibility of institutional closure. Decl. of Lise Alschuler, President/CEO of Sonoran University ("Sonoran Decl.") ¶ 36 (ECF 4-8). NUHS detailed that one-third of its prospective Fall 2026 students who cannot proceed cited the financial aid changes from the Final Rule. Decl. of Randy Swenson, VP for Academic Services at NUHS ("NUHS Decl."), ¶¶ 28-29. Additionally, some current students have dropped their program completely or transitioned to other areas of study. *Id.* ¶ 33. NUHS further explained that cuts to the overall budget will be required based on the reduction in enrollment, affecting all of its programs. *Id.*

**e. Individuals**

Plaintiffs submitted the declarations of two prospective students and six current students. *See* ECF 4-10, 4-11, 4-12, 4-13, 4-14, 4-15, 4-16, 4-17. These declarations explain the effect of the Final Rule on their plans to pursue an N.D. degree.

**i. Prospective Students**

Tara Topper, who has Bachelor's and Master's degrees, has worked as a healthcare provider for marginalized people for 18 years. Topper Decl. ¶¶ 2, 4 (ECF 4-10). She decided to pursue a career as a naturopathic medicine doctor, and was accepted to Bastyr for Fall 2026. *Id.* ¶¶ 5-6. Because of the federal student loan changes, however, she has deferred her studies. *Id.* ¶ 6, 8, 11. She researched private loans but they do not provide reasonable terms. *Id.* ¶¶ 9-10. She had planned to join AANP and the Naturopathic Medical Student Association ("NMSA"). *Id.* ¶ 13. She also states that "[i]f circumstances later change" and she can "obtain student loans at the 'professional degree' higher loan limits to finance the cost of the N.D. program," she "would be able to afford the N.D. program and immediately plan to enroll in the N.D. program at Bastyr," as well as join the NMSA and AANP. *Id.* ¶ 14. Gerardo A. Melendez Teran made similar statements explaining why he withdrew from commencing studies for an N.D. degree at Ana G. Mendez University, and his plans if the Final Rule changes. ECF 4-11.

**ii. Current Students**

Ariana Sorci explained that she currently is pursuing an N.D. degree and that she has primarily financed her degree through federal Direct Unsubsidized Loans. Sorci Decl. ¶¶ 6-8 (ECF 4-13). Ms. Scorci, however, has decelerated her studies, and so she expects to complete her studies in 12 trimesters, instead of the 10 trimesters stated by NUHS as the expected duration of study. *Id.* ¶¶ 7, 11. Thus, she is not eligible under the grandfathering provision of the Act for at least the final two trimesters of study. *Id.* ¶¶ 11, 12. She cannot obtain other funding, and thus

will have to withdraw from the program before graduating. *Id.* ¶¶ 15-16. That would leave her with $117,000 in debt for a program she was unable to finish. *Id.* ¶ 16. She has been a member of AANP and NMSA throughout her six trimesters of study, but she would not renew her memberships if she is forced to quit her studies. *Id.* ¶¶ 17-18.

Keaton Scanlon described how after receiving his Bachelor's degree, he worked for seven years with vulnerable populations in Senegal. Scanlon Decl. ¶ 4 (ECF 4-14). He researched options to provide healthcare to rural populations, including by obtaining an M.D. or D.O., but chose to pursue an N.D. degree. *Id.* ¶ 4. He completed one semester at NUNM and then took a leave of absence for personal reasons. *Id.* ¶ 5. His plan was to return for the January 2027 term. *Id.* He believes that he is ineligible for the grandfathering provision of the Act because he is on a leave of absence. *Id.* ¶ 9. He researched private loans but they do not offer reasonable terms. *Id.* ¶ 11. Unless the Final Rule changes, he will not be able to complete his studies and will have to give up his education and career goals. *Id.* ¶ 12-13. This leaves him with loans he already has taken that he will owe for a degree he could not finish. *Id.* ¶ 14. He will immediately reenroll if the Final Rule changes and he can again afford to pursue the N.D. degree. *Id.* ¶ 16. He has been a member of AANP and NMSA. *Id.* ¶ 15.

Alawna Thompson made similar statements as Ms. Scorci and Mr. Scanlon. Thompson Decl., ECF 4-14. She added that she is ineligible for grandfathering because she decelerated her studies at NUMN due to health issues. *Id.* ¶ 10.

Alyssa Abraham made similar statements to the others. Abraham Decl., ECF 4-15. She also explained that she is ineligible for grandfathering because she reduced her workload for health reasons and to better manage her course load, extending by one trimester. *Id.* ¶¶ 11-12.

Kailee Keiser made similar statements to the others. Keiser Decl., ECF 4-16. She also explained that she is ineligible for grandfathering because she has not taken any federal student loans yet for her N.D. degree. *Id.* ¶ 11. She had used her personal savings, which are now depleted. *Id.* ¶¶ 11-12.

Cozetta Yvonne Case made similar statements to the others. Case Decl., ECF 4-17. She explained that she is pursuing a dual degree at NUHS, which extends the duration of her N.D. studies by four trimesters, plus requires an additional four trimesters to complete the dual degree. *Id.* ¶¶ 7-9. She also further extended her studies at the advice of her doctor to accommodate her disabilities, as she is a fully disabled veteran. *Id.* ¶¶ 5, 13. Based on the timeline of her studies, she requires alternative funding under the Final Rule as of the Spring 2027 term, because she is ineligible for grandfathering. *Id.* ¶ 16.

## DISCUSSION

### A. Standing

Defendants challenge the standing of NMSA. NMSA asserts standing in its own right and associational standing. Defendants do not raise any arguments in response to NMSA's assertion of standing in its own right. The Court finds that NMSA adequately has shown organizational Article III standing. *See, e.g.*, *Nurse Practitioners*, 836 F. Supp. 3d at 199 (finding organizational standing to challenge the Final Rule based on alleged loss of membership and concomitant membership dues and the effect on the mission of the organizations); *see also Havens Realty*, 455 U.S. at 379 (concluding that where the defendant's conduct "perceptibly impaired" the main services of the organization, "with the consequent drain on the organization's resources," "there can be no question that the organization has suffered injury in fact"); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 767 (9th Cir. 2018) (holding that the plaintiffs established organizational standing based on declarations describing that the plaintiffs would

"lose a significant amount of business and suffer a concomitant loss of funding"); *Fair Hous. Council of San Fernando Valley v. Roommate.com*, 666 F.3d 1216, 1225 (9th Cir. 2012) (Ikuta, J., concurring in part) ("An action that invades an organization's interest in recruiting members, obtaining funding, or collecting dues clearly hinders that organization's ability to function, and is an injury for purposes of standing." (citing, *inter alia*, *Am. Fed'n. of Gov't Emps. Local 1 v. Stone*, 502 F.3d 1027, 1033 (9th Cir. 2007) ("[A]n increased difficulty in recruiting union members qualifies as a 'concrete and demonstrable' injury"); and *Constr. Indus. Ass'n of Sonoma Cnty. v. City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975) (holding that a restrictive building plan injured an association of builders "in a very real sense" by decreasing construction and consequently, membership dues for the association))), *overruled in part on other grounds by Ariz. All.*, 186 F.4th at 633-34 (overruling the Ninth Circuit's analysis of organizational standing that concluded that "an organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose" because advocacy alone is insufficient and a court must "ask whether the challenged conduct directly affected and interfered with the plaintiff organizations' core activities" (quotation marks omitted)).

The Court next considers whether NMSA also has alleged representational standing. Defendants challenge NMSA's standing with respect to its current student members, and all Plaintiffs with respect to prospective student members.

**1. Representational Standing based on NMSA Current Student Members**

Defendants contend that NMSA cannot assert associational standing because the grandfathering provision of the WFTCA was announced one year before the Final Rule went into effect, and Defendants argue that students could have arranged their studies to qualify for

grandfathering and thus their harm is not "fairly traceable" to the Final Rule. *Spokeo*, 578 U.S. at 338. This argument fails for two reasons.

First, although the grandfathering provision may have been passed in July 2025, without the rule stripping the N.D. degree from professional status, N.D. students would not have had reason to believe the grandfathering provision would apply to them. For the reasons discussed below in analyzing whether Defendants changed course from previous action, until the Final Rule, it was reasonable for an N.D. student to believe that the grandfathering provision would not apply to them.

Second, even if N.D. students could believe that the grandfathering provision might apply to them in July 2025 when the statute was passed, or in January 2026 when the proposed rule was published, it would still be the Final Rule that is the "fairly traceable" cause of the alleged harm. *See id.* Plaintiffs provide declarations from six students, who explain the various circumstances under which their N.D. studies likely will not be subject to grandfathering.

Keaton Scanlon explains that he took a leave of absence on December 31, 2025, due to a pregnancy, a family illness, and a physical relocation, and planned to return the January 2027 semester. Scanlon Decl. ¶¶ 5, 9. Ariana Sorci decelerated her studies so she could work while obtaining her N.D., extending her estimated time of study beyond the grandfathering eligibility. Sorci Decl. ¶ 11. Alawna Thompson took a leave of absence in January 2025 (*before* the Act even passed) for health reasons and had planned to return fall 2026. Thompson Decl. ¶ 10. Alyssa Abraham decelerated her studies to allow for better learning and accommodate her health, extending her studies by one semester. Abraham Decl. ¶ 11. Kailee Keiser has not yet borrowed federal unsubsidized loans for her N.D. studies, financing the first two years through her savings. Keiser Decl. ¶ 11. She has now depleted those savings and requires a loan for her third year. *Id.*

¶ 12. Finally, Cosetta Yvonne Case is a disabled Veteran who extended her studies because she was studying a dual degree and because of her disabilities. Case Decl. ¶¶ 13, 16.

Most of these students slowed their studies or took a leave of absence before the bill was passed or its implications with respect to loans for students pursuing an N.D. degree were even known. There was no harm to them at that time in extending their studies. Only *because* of the Final Rule do these actions result in financial difficulty and likely withdrawal from the N.D. program.

Additionally, it is unreasonable to expect these students to have altered their plans at the last minute in an attempt to qualify for grandfathering that may or may not apply to them. These plans generally were longstanding and required for serious reasons. The Court rejects Defendants' contention that these students, some of whom were already out on leave, should have returned and figured out how to qualify for grandfathering after the bill was passed.

The Court independently has considered the other elements of standing. The student declarations submitted support that Plaintiffs have at least one member who likely would have standing to sue on her own. These declarations describe the harm to the individuals that the Final Rule's cap on "graduate" student loans will cause if the N.D. is not considered a "professional" degree and the resulting harm to the universities. The remaining elements are sufficiently shown by the Associations' employee declarations. Thus, Plaintiffs sufficiently allege representational standing for their members. *See, e.g.*, *Nurses*, 2026 WL 2294606, at *8-9 (concluding that the associations sufficiently alleged representational standing to challenge the Final Rule through student declarations describing harm to their educational plans and association declarations describing their mission and anticipated effects).

### 2. Representational Standing based on Prospective Students

Defendants also challenge the standing of all Plaintiffs to the extent they rely on "non-member, prospective students." ECF 33 at 38. Defendants argue that the two students put forward by Plaintiffs are not members of any Plaintiff organization and thus cannot support standing for any organization, as organizations are required to "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Plaintiffs respond that these students are not put forward to support *standing*, but to show *harm to Plaintiffs*, because absent the Final Rule, these students *would* become members. Thus, argue Plaintiffs, Defendants' standing argument with respect to these students is misguided. The Court accepts Plaintiffs' explanation of the purpose of these students' declarations, and thus this argument by Defendants is moot.

Moreover, "once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) (citing *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682 (1977)). Because the Court has found that NMSA has organizational standing and representational standing through current student members, and because the other Plaintiffs have standing unchallenged by Defendants, even if the prospective students were offered to support standing, the Court would not need to consider them for that purpose.

## B. Showing of Success

### 1. APA—Contrary to Law

Courts must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). Plaintiffs assert that that the Final Rule is contrary to law because it adds criteria not in the statute and because the N.D. degree meets the three-part statutory definition.

The Court concludes that Plaintiffs clearly have shown a likelihood of success on their first argument and therefore the Court declines to reach Plaintiffs' second argument.

The Act for the first time established separate federal unsubsidized loan amounts for "graduate" and "professional" students. 20 U.S.C. § 1087e(a)(4). The Act defined a "professional" student as "a student enrolled in a program of study that awards a professional degree, as defined under section 668.2 of title 34, Code of Federal Regulations (as in effect on July 4, 2025), upon completion of the program." 20 U.S.C. § 1087e(a)(4)(C)(ii). The Act defined a "graduate" student as any student in a graduate program that "awards a graduate credential" other than a professional degree. *Id.* § 1087e(a)(4)(C)(i).

The definition of "professional degree" as of July 4, 2024, was:

> Professional degree: A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. Professional licensure is also generally required. Examples of a professional degree include but are not limited to Pharmacy (Pharm.D.), Dentistry (D.D.S. or D.M.D.), Veterinary Medicine (D.V.M.), Chiropractic (D.C. or D.C.M.), Law (L.L.B. or J.D.), Medicine (M.D.), Optometry (O.D.), Osteopathic Medicine (D.O.), Podiatry (D.P.M., D.P., or Pod.D.), and Theology (M.Div., or M.H.L.).

34 C.F.R. § 668.2(b) (2025).

The statutory requirement under the Act for a "professional" student is, therefore, a student enrolled in a degree program where: "(1) the degree signifies . . . completion of the academic requirements for beginning practice in a given profession, (2) [the degree] requires a level of professional skill beyond that is normally required for a bachelor's degree, and (3) professional licensure is generally required." Final Rule, 91 Fed. Reg. at 23783.

The Final Rule "imposed new requirements absent from the preexisting definition adopted by Congress and turned an illustrative list of qualifying degrees into an exhaustive one."

*Nurse Practitioners*, 836 F. Supp. 3d at 188. With respect to an N.D. degree, however, the Final Rule concluded that it could not qualify as a "professional degree" based on the three-part statutory text, not the new factors added in the Final Rule. 91 Fed. Reg. at 23790, 23794. The Department determined that an N.D. degree failed the first and third elements. *Id.* Plaintiffs contend that the Final Rule is contrary to law because the N.D. degree meets the three-part statutory test and the Department improperly concluded that it does not.

Under the APA, an agency acts "contrary to law" if its actions are not "authorized by the statutory text," *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006), as an agency "may not act contrary to the will of Congress when exercised within the bounds of the Constitution," *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 233 (1986). It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). The Court considers whether the Department acted contrary to the statute in determining that an N.D. degree fails the three-part test.

In the Final Rule, the Department assessed whether the N.D. degree could qualify as a "professional degree" as follows:

> Naturopathic medicine is illegal in several States. See Fla. Stat. § 458.305, S.C. Code Ann. § 40-31-10, and Tenn. Code Ann. § 63-6-205. The definition requires, among other things, that the degree signifies the beginning of practice in a profession where "[p]rofessional licensure is also generally required." Here, professional licensure is not "generally required" because the practice is altogether prohibited in certain States. In contrast, every degree on the illustrative list leads to professions that are legally permissible in every State. Naturopathic Medicine cannot legally operate in any capacity in certain States and therefore they do not meet the definition of professional degree for purposes of higher loan limits. As we state throughout this final rule, the Department does not make a normative judgment regarding the practice of

> professions that it does not classify as professional for loan limit purposes, including Naturopathic Medicine.

Final Rule, 91 Fed. Reg. at 23790.

The Department later referenced its reasoning from the Proposed Rule, "that an ND would not satisfy the first and third part of the professional degree definition because less than half of States license NDs and some States ban the practice of naturopathy altogether. As such, the ND is not required . . . for entry into the profession and licensure is not 'generally required.'" *Id.* at 23794. The Department repeatedly stated that the N.D. degree failed the test because the N.D. degree was not specifically listed in the definition and was not "substantially similar" to those professions that were listed. *Id.* at 23794, 23795

**a. The Practice Ban in Three States**

The first reason given by the Department, that an N.D. degree fails because the practice of naturopathic medicine is banned in some states, is contrary to law because it adds a factor to the three-part test that was not included by Congress. There is no requirement in the statute that the profession must be available in every state. "Congress explicitly directed the Department to apply the preexisting regulatory definition set forth in 34 C.F.R. § 668.2 as the relevant test, and the Department has no power to revise the definition Congress codified or to add additional substantive criteria." *See Nurse Practitioners*, 836 F. Supp. 3d at 203. Congress could have included a requirement that the profession be legal in every state, but did not.

This reasoning also is contrary to law because it is not authorized by the statute's text. The profession of a person with an N.D. degree is practicing as a naturopathic *doctor;* in other words, practicing medicine. Persons pursuing this degree must obtain doctorate-level education. They then expect to sit for the NPLEX and practice primary care or general medicine. *See, e.g.*, AANMC Decl. ¶¶ 18, 27, 49; AANP Decl. ¶¶ 18-21; Sonoran Decl. ¶ 14. As Defendants

concede, one cannot perform medical services such as treating and diagnosing patients without a license, in any state. *See, e.g.,* ECF 33 at 23-24. Indeed, as Defendants state in their brief, a "naturopath" who practices without a license can merely "offer their services as 'a wellness coach or a health consultant.'" *Id.* at 23 (quoting *Prairie Naturopathic*). But a wellness coach is not the *profession* that a graduate with an N.D. degree is pursuing or qualified for. Defendants too broadly define the profession at issue, when the profession of a person practicing naturopathy *with* a doctorate degree is not the same as the profession of a person practicing naturopathy *without* that degree. Obtaining an N.D. degree "signifies completion of . . . the academic requirements for beginning practice" as a naturopathic medical doctor, not as a wellness coach. *See* 34 C.F.R. § 668.2(b).

Defendants also rely on the fact that persons who *do not* obtain an N.D. degree can work as a "traditional naturopath" performing as a wellness coach or health consultant and perhaps even call themselves a "naturopathic doctor" (in Idaho).[4] But that says nothing about the profession of a person who *does* obtain an N.D. degree. That there are "traditional naturopaths" who can work at the level of a wellness coach does not detract from the generally expected licensure after an N.D. degree. Many of Defendants' "professional degrees" have other related professions that require less training and education but perform somewhat similar work in the same overall field. For example, a person with a Clinical Psychologist degree pursues a

[4] Idaho, however, allows only naturopaths with a license to call themselves a "licensed naturopathic physician," "physician of naturopathic medicine," "naturopathic medical doctor," or "NMD." *See* Idaho Code § 54-5110. To attain this license, one must have obtained a degree from one of Plaintiffs' naturopathic medical schools. Thus, Idaho recognizes the distinction and scope of practice of a naturopath who completed medical school and obtained a license and those that do not. *Cf.* Idaho Code § 54-5102 (establishing the scope of practice for a naturopathic medical doctor); Idaho Code §§ 54-1803(1), 54-1804 (defining the practice of medicine and prohibiting unlicensed practice).

profession different from a person with a Licensed Clinical Social Work or Master's in Marriage and Family Therapy degree, because the latter cannot perform the same duties, including prescribing medication, without the doctorate level of education. But they both may work in the field of psychotherapy. A similar concept applies to attorneys and paralegals—a person with a J.D. performs more advanced legal work than a paralegal. What is key is the *profession* that a student generally expects, pursues, and is qualified for after obtaining a doctorate-level degree. That simply is not the same profession as someone who works in the field but does not have a doctorate.

This is true with naturopathic practitioners with an N.D. degree versus without. Those with an N.D. degree expect to be licensed so they can practice what they spent a "4100 minimum credit" program preparing for—work as a naturopathic doctor, treating patients in a more holistic manner. *See, e.g.*, Sonoran Decl. ¶ 10 (explaining that its "ND program provides 4290 hours of total instruction, including over 1221 hours of hands-on clinical training"); ¶ 12 ("4100 minimum credit" and NPLEX required for licensure); AANMC Decl. ¶ 9 ("Naturopathic doctors are trained to be primary care providers who diagnose, treat, and manage care for patients suffering from acute and chronic conditions holistically . . . ."). At oral argument, Defendants relied heavily on the fact that a person, with or without an N.D. degree, can "call" themselves something similar to a naturopathic doctor in some states that do not allow for a licensed N.D., but Defendants conceded that such a person cannot practice as a naturopathic doctor, diagnosing and treating patients, and in some jurisdictions, prescribing medication. It is the *practice* that matters, not the *title* a person uses, when evaluating whether "the degree signifies . . . completion of the academic requirements for beginning *practice* in a given profession." 34 C.F.R. § 668.2(b) (emphasis added).

Defendants also contend that because a person *with* an N.D. can go to a state in which licensing of naturopathic doctors is not allowed and practice, even calling themselves a "naturopathic doctor,"[5] that means that obtaining the N.D. must not prepare one for the practice of naturopathic medicine at the doctorate level. The Court rejects this proposition. If some number of persons[6] choose to forego practicing in the profession for which they were trained, that does not detract from the fact that the N.D. *degree* signifies that a person has completed the necessary academic requirements and can work in the profession of naturopathic medicine. This is no different than a person graduating law school but choosing not to get licensed and instead using their law degree in a different manner. That does not detract from the J.D. *degree* signifying completion of academic requirements to work as a licensed attorney.

**b. Failure of Majority of Jurisdictions to License N.D.s**

Defendants next argue that the N.D. degree does not prepare a student for a profession in which licensure is "generally required," because a slim majority of states do not allow for such licensing and states that do allow licensing are inconsistent in the titles they allow licensed (and sometimes unlicensed) naturopathic practitioners to use. There are 23 states and three other jurisdictions that license naturopathic doctors. Florida has a statute requiring a license to work as a naturopath, but no longer issues licenses. The remaining 26 states do not license naturopathic doctors.[7]

---

[5] This argument relies on Idaho's flexibility in how non-licensed naturopaths can refer to themselves.

[6] Defendants offer no evidence of the number of persons with N.D. degrees choosing to work in states where they cannot perform the duties for which they spent thousands of hours in class and clinical settings (not to mention potentially more than two hundred thousand dollars)—diagnosing and treating patients, prescribing medication, and so forth.

[7] Notably, the Department added after Judge Howell's stay the degree of "Certified Anesthesiologist Assistant" ("CAA") to the list of "professional degrees," even though fewer

Defendants' argument misapplies the unambiguous term of the definition—that licensure generally is required for the *profession*. In the Final Rule, the Department described the requirement as such. The Final Rule states: "The definition requires, among other things, that the degree signifies the beginning of practice *in a profession where* '[p]rofessional licensure is also generally required.'" 91 Fed. Reg. at 23790 (emphasis added). As discussed above, the profession at issue is that of a naturopathic doctor, practicing medicine. There is no dispute that a license is required for that profession, regardless of the titles naturopaths with or without a license may use from state-to-state. It is undisputed that all states that do not currently license naturopaths regulate the practice of medicine and require a license to practice medicine.[8] Thus, in those states, a naturopath could not diagnose and treat patients, prescribe pharmaceuticals, or issue laboratory orders without some medical license.

Defendants' argument also disregards the inconsistency in the Department relying on the varying state laws. In addressing comments about whether the level of supervision should be a factor in determining a "professional degree," the Department stated that it "does not agree that variation in State supervision and practice-authority is relevant to determining whether a program may be considered a professional degree." *Id.* at 23787. The Department went on to emphasize that the criteria must be based on § 668.2, and concluded that it "decline[s] to amend

---

states certify CAAs than license N.D.s. Defendants argue that the CAA profession is different because no state bans it, but as discussed above, there is no statutory requirement that a profession not be banned by any state. Additionally, the practical effect of not licensing an N.D. is the same as banning it—a naturopath cannot engage in the practice of a naturopathic doctor in all of those jurisdictions. Same with a CAA—as argued by Defendants, a CAA can only practice "general" anesthesiology assistance in states that do not certify a CAA. The "ban" therefore does not make a material difference.

[8] *See, e.g.*, ECF 34 at 19 n.4 (listing the codes that regulate medicine for the states that do not license N.D.s).

the regulations to create a dynamic classification keyed to a certain numerical court of State laws, as this would undermine clarity, predictability, and nationally uniform administration." *Id.* Indeed, before the court in *Nurses*, Defendants asserted that it "cannot achieve a clear, nationally uniform framework . . . if that framework depends on the idiosyncrasies of a few State laws." *Nurses*, Case No. 1:26-cv-12443, Opp. to Mot. to Stay, ECF 42 at 24 (quotation mark omitted).

**c. "Substantial Similarity" of N.D. to Listed Professions**

The Department concluded that an N.D. is not "substantially similar" to the listed professions. The only difference stated was that the listed professions lead to professions that are legal in every state. This single difference, however, does not mean that an N.D. is not *substantially* similar to the listed professions. Substantially similar does not mean identical.

Plaintiffs have shown that the facts and law clearly favor their argument that the N.D. degree is substantially similar to the listed professions, even under the criteria Judge Howell stayed. The N.D. degree requires more than "six academic years of postsecondary education coursework for completion" and a professional licensure. Final Rule, 91 Fed. Reg. at 3882. As discussed above, it also signifies completion of the academic requirements for the profession of a naturopathic doctor, and a level of professional skill beyond a Bachelor's degree. *Id.* It falls under the same two-digit CIP code (51) as most of the listed 11 and many of the newly-named "professional degrees," and is further defined with text similar to listed degrees. *See* 91 Fed. Reg. at 23795. The Department noted that "[c]omparable language between two NCES CIP code definitions does not *alone* make the two programs substantially similar." *Id.* (emphasis added). But the similarities do not end with the CIP codes, but include several others, as described herein.

**d. Canons of Construction**

Defendants also argue that the statutory construction canons of *noscitur a sociis* and *ejusdem generis* support the Department's conclusion that the N.D. degree does not meet the three-part test based on its lack of similarity to the other listed professions.[9] The Court agrees with and adopts the reasoning of the court in *Nurse Practitioners* in rejecting this argument (in the context of adding the extra-statutory requirements).[10] 836 F. Supp. 3d at 203-05. Judge Howell concluded that the Department's application of these canons was "misguided" because the statute is unambiguous and because "nothing suggests that the 'examples' provided in the list are meant to run the gamut of all possible types of professional degrees such that they would delineate the outermost bounds of the definition" but instead "the most natural reading of the clause, '*[e]xamples* of a professional degree include *but are not limited to*,' is that the succeeding list of ten fields of study comprises only a subset of the total universe of professional degrees." *Id.* at 204 (alteration and emphases in original).

The court in *Nurse Practitioners* also concluded that those canons, even if appropriate to consider, were not properly applied by the Department. *Id.* at 205-06. For *noscitur a sociis*, the court explained: "The purpose of the *noscitur a sociis* canon is 'to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words.' *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). In this case, there is no 'one word' that requires interpretation in order to glean the meaning of that word." *Id.* at 205.

---

[9] In their briefing, this argument is directed at Plaintiffs' challenge to the extra-statutory requirements in the Final Rule, which Plaintiffs abandoned. At oral argument, however, Defendants applied this argument in discussing Plaintiffs' remaining contrary-to-law claim and thus the Court reaches this issue.

[10] The court in *Nurses* also agreed with the court's reasoning in *Nurse Practitioners* on this issue. *Nurses*, 2026 WL 2294606, at *11.

For *ejusdem generis*, the *Nurse Practitioners* court explained that this canon "teaches that 'a general or collective term at the end of a list of specific items' is typically 'controlled and defined by reference to the specific classes . . . that precede it.'" *Id.* (alteration in *Nurse Practitioners*) (quoting *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022)). In the statutory definition of "professional degree," however, "the list of examples is not a list of specifics followed by a generic catchall term needing further definition—the list does not read, for instance, 'doctors, lawyers and *other professionals*,' such that the meaning of 'other professionals' would be defined by reference to the two specific terms, 'doctors' and 'lawyers.' Rather, the list of 'examples' is just that: simple examples." *Id.* (emphasis in original).

The court in *Nurse Practitioners* was analyzing whether these canons of construction support the Department's inclusion in the Final Rule of additional requirements beyond the three-part test. The court's reasoning, however, is equally applicable to the use of the canons in the Department's consideration here, of whether an N.D. degree meets the statutory three-part test.

Plaintiffs have shown that the law and facts clearly support that the Department's conclusion that an N.D. degree does not meet the statute's three-part test is contrary to law. The test is unambiguous, as is its application to the N.D. degree.[11]

[11] The court in *Nurse Practitioners* declined to consider *in the first instance* whether the affected degrees met the three-part test, wanting the agency to have the first opportunity to apply the test. 836 F. Supp. 3d at 212. Here, the Department *already* made its determination whether the N.D. degree met the three-part test, in the Final Rule. That likely is why the N.D. degree is not mentioned in the Electronic Announcement issued after Judge Howell's stay, because the Department already had considered the application of the three-part test and thus did not need to do so again.

**2. APA—Arbitrary and Capricious**

Plaintiffs argue four separate bases for why promulgation and adoption of the Final Rule was arbitrary and capricious. Because the Court finds that Plaintiffs meet their burden in arguing that Defendants treated the N.D. degree inconsistently with other similarly situated degrees and improperly departed from agency practice, the Court declines to reach Plaintiffs' remaining arguments.

**a. Inconsistent Treatment**

Plaintiffs argue that Defendants treated the N.D. degree inconsistently with other similar degrees when designating "professional degrees." Under "longstanding principles of arbitrary and capricious review . . . agencies must reasonably explain disparate treatment of similarly situated parties." *Balt. Gas & Elec. Co. v. FERC*, 954 F.3d 279, 285-86 (D.C. Cir. 2020); *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) ("It is textbook administrative law that an agency must provide a reasoned explanation for departing from precedent *or* treating similar situations differently." (emphasis added) (cleaned up)); *cf. Monsalvo v. Bondi*, 604 U.S. 712, 749 (2025) (Kavanaugh, J., dissenting) (explaining that he rejects the majority's conclusion because it would provide "a windfall that is not enjoyed by most other similarly situated aliens" and "there is no good reason for that disparate treatment").

Although discussing several degrees, Plaintiffs focus on the CAA degree as treated differently. This degree was designated as a "professional degree" after Judge Howell's stay and order requiring the agency to evaluate degrees based on the three statutory factors. Plaintiffs point out that fewer states license CAAs than N.D.s,[12] and that a CAA cannot practice in that profession without a license. The Department responds that the difference was that no state has

[12] Only 24 jurisdictions license CAAs, compared to 26 for N.D.s.

affirmatively banned CAAs, unlike N.D.s. This, however, is a distinction without a difference, because if a license is required to practice and the state does not offer that license, then the profession is effectively banned. Counsel for Defendants essentially conceded as much at oral argument, stating that "a CAA is entirely a creature of state law. If a state does not recognize a CAA, you cannot practice as a CAA." Tr. 42:6-7.

Defendants also argue that a key difference is that traditional naturopaths can "refer to themselves" as a naturopathic doctors (in Idaho) when an anesthesiologist assistant cannot represent themselves as a CAA in any state without obtaining the necessary license. But what matters is the *profession*—what practitioners can *do*, not what they call themselves. That traditional naturopaths might be able to call themselves "N.D.s" in Idaho does not mean that they are in the *profession* of practicing as a naturopathic medical doctor. Indeed, Idaho has a separate title for that profession. *See* fn.4, *supra*.

Plaintiffs also point out that a CAA degree is *not* a doctorate level degree, unlike the N.D. degree, and unlike all but one of the listed professions. Thus, argue Plaintiffs, the N.D. degree is more similar to the listed professions than a CAA degree. Plaintiffs contend that the Department did not adequately explain treating the CAA degree more favorably than the N.D. degree, and the Court agrees.

The Department's focus on the "ban" of the practice of naturopathic medicine in three states and that a traditional naturopathic practitioner may call themselves something akin to a naturopathic doctor are unavailing. Because the reasons given to discount the N.D. degree stem from its failure to be licensed in all states, and the CAA degree is similarly not licensed in all states, the two degrees are similarly situated for purposes of the Department's evaluation. The

Department failed to provide a reasoned explanation of its inconsistent treatment of these similarly situated degrees. Thus, its decision is arbitrary and capricious.

**b. Departure from Prior Agency Practice**

Plaintiffs argue that the Final Rule departs from the Department's decades of categorizing N.D.s as qualifying for professional status. As discussed above, N.D.s were categorized as "first-professionals" for several years, even after the 2007 Final Rule, and when the Department began focusing on "health profession" degrees, N.D.s still qualified. These definitions, however, required someone with an N.D. degree or qualifications only applicable to an N.D. versus a traditional naturopath, including receiving a required education and diagnosing patients. Therefore, the Court is unpersuaded by Defendants' general arguments that traditional naturopathy was part of the Department's analysis in whether to allow "naturopathic medicine" as a professional degree.

In specifically disputing that the Department changed course in refusing to define an N.D. degree as a "professional degree," Defendants first argue that it is undisputed that naturopathic medicine was not included in the definitional list of § 668.2 as of July 4, 2005. That list, however, was non-exhaustive, and thus this exclusion is not legally dispositive.

Defendants next argue that the IPEDS tables are not persuasive authority because the Department has given institutions "some discretion" on how to code their survey responses. Even if the Court accepts that the Department gave so much discretion that an institution could essentially make up its own category of "first-professional" degrees, if the Department did not consider an N.D. degree to qualify as a "first-professional" degree then it should not have accepted years of survey responses categorizing the degree as such. At a minimum, the

Department acquiesced to or ratified this categorization in not only accepting surveys stating as much, but *reporting* statistics in that manner.[13]

Defendants also argue that because an IPEDS Technical Review Panel in 2004 proposed adding "naturopathic medicine" to the specific definition list contained in "first-level professional" (along with many other fields, including those that require no doctorate-level education, such as physical therapists, engineers, social workers, and financial planners), it shows that IPEDS did not consider an N.D. a "first-profession." Of course, one panel's request to add many more degrees to the express list within the NCES's "first-professional" definition does not detract from the argument that the Department *treated* an N.D. degree as a professional degree. There is no dispute that neither the NCES nor the Department ever expressly included the N.D. degree in any of the relevant definitions. But, as discussed above, that is not dispositive, particularly not after 2007 when the listed professions in the Department's definition were clearly non-exhaustive.

At oral argument, Defendants asserted that the categorization of an N.D. degree as a "health profession" beginning in 2005 (along with most of the listed degrees) is irrelevant because that designation was for loan purposes and 34 C.F.R. § 668.2 was used for recordkeeping purposes. The Court rejects this distinction. What matters is that for two decades

---

[13] The N.D. degree undoubtedly met the elements of the definition of "first-professional" degree at the time, which required: "A degree that signifies both completion of the academic requirements for beginning practice in a given profession and a level of professional skill beyond that normally required for a bachelor's degree. This degree usually is based on a program requiring at least 2 academic years of work prior to entrance and a total of at least 6 academic years of work to complete the degree program, including both prior-required college work and the professional program itself." *See* Digest of Education Statistics 2001, at 542 (2002), https://www.govinfo.gov/content/pkg/ERIC-ED467580/pdf/ERIC-ED467580.pdf. The N.D. degree, however, was not listed in the specific professions identified as qualifying "[b]y NCES definition." *Id.*

the Department treated the N.D. degree as a professional degree, and the Department is now treating the degree differently. Further, the current implementation of the definition is for loan purposes, and thus how the Department historically treated the N.D. degree for loan purposes is relevant.

Defendants acknowledge that the 2004 document cited by Plaintiffs lists the N.D. degree as a “first-professional” degree, but argues that this “one document is insufficient to establish a historical pattern.” ECF 33 at 34. Because the Court finds that there are many other documents showing that the Department accepted the N.D. degree as professional, the Court rejects this argument.

The bottom line is that Plaintiffs clearly have shown that they are likely to succeed in their contention that for more than two decades, the Department has treated the N.D. degree as a “professional” degree, under the 2007 definition or a substantially similar earlier definition that the N.D. degree also met. Defendants may not now change course unless they “provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests.” *Food & Drug Admin. v. Wages & White Lion Invs.*, 604 U.S. 542, 568 (2025) (cleaned up). The Department failed to recognize its change in course, did not provide any reasoned explanation, and failed to consider the serious reliance interests of students and Plaintiffs. Indeed, in addressing in the Final Rule comments raising concerns about these issues, the Department essentially disregarded the concerns of students and institutions and simply accepted that fewer students would be able to study the excluded professional degrees. *See, e.g.*, *Nurse Practitioners*, 836 F. Supp. 3d at 190 (explaining that “[i]n addition, the Department acknowledged but purposely did not address the downside adverse effects on the workforce repeatedly raised by commentators to the narrow definition of ‘professional degree’

adopted in the Final Rule" and describing this and other harms ignored by the Department). Plaintiffs thus are likely to succeed on their claim under the APA that Defendants' conduct was arbitrary and capricious because the Department changed course without adequate explanation or evaluation of the affected reliance interests.

**C. Irreparable Harm**

To meet their burden for preliminary equitable relief, Plaintiffs must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). Such harm "is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Claimed irreparable injury also must not be speculative. "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (quoting *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)) (emphasis in *Caribbean Marine*). "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Id.* at 1023 (quoting *Winter*, 555 U.S. at 22). An organizational plaintiff's showing of serious "ongoing harms to their organizational missions," however, establishes a likelihood of irreparable harm. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (stating that an increased difficulty for a plaintiff to accomplish its "primary mission" is adequate to show irreparable harm).

The court in *Nurse Practitioners* concluded that the plaintiffs had demonstrated irreparable harm because they established that prospective students would be subjected to lower

loan caps, might have to forego their educational and professional goals, and may have to accept more burdensome private loans. 836 F. Supp. 3d at 207 (citing cases). The *Nurse Practitioners* court also found that the organizations would suffer irreparable harm by decreased membership and concomitant decreased revenue, and that the loss in membership revenue will require them "to cut educational programing, conferences, research, student engagement initiatives, and workforce development initiatives." *Id.* (citing cases). Similarly, the court in *Nurses* found: "There is no question that the types of harms Plaintiffs argue some of their members will suffer—lost educational and professional opportunities and borrowing private loans with less favorable terms—may be irreparable." 2026 WL 2294606, at *12.[14]

The same type of harms have been shown here in the 15 declarations, *see* ECF 4, whose contents are summarized above in Section B.3. The current students describe the financial effect of having to take out private loans and the loss to their educational opportunities. The prospective students explain that because of the Final Rule they cannot attend school or join Plaintiffs' organizations, when otherwise they would attend and would join the organizations. The universities explain that they pay dues to the associations based on attendance, meaning the fewer students, the less revenue to Plaintiffs, and that the Final Rule may require them to stop

[14] The court in *Nurses* ultimately concluded that most of the plaintiffs could not show irreparable harm because after the *Nurse Practitioners*' injunction was issued, the Department issued new guidance on the Final Rule that included programs for Registered Nursing, Nursing Administration, Nursing Research, and Clinical Nursing as eligible "professional degrees." 2026 WL 2294606, at *13-14. Thus, although the voluntary cessation of conduct did not moot the plaintiffs' claims, it did preclude the irreparable harm needed for preliminary injunctive relief. *Id.* That left only the PhD in Nursing degree as affected by the Final Rule, but the plaintiffs failed to show any such individual plaintiff that would suffer irreparable harm from the Final Rule. *Id.* Accordingly, the *Nurses* court declined to enter a preliminary injunction. *Id.* at 14.

The Department did not add the N.D. degree to its approved list after the *Nurse Practitioners* injunction. Thus, the reasoning in *Nurses* ultimately not to find irreparable harm, despite the actual harms being irreparable, does not exist here.

offering the N.D. degree, which will significantly harm Plaintiffs. The associations describe the loss of funding, members, and their ability to perform their missions and core business activities. The Court agrees with *Nurse Practitioners* and *Nurses* that the type of harms established here are irreparable.[15] They also are imminent, as some students explain that they would begin or return to their studies in the Spring 2027 term if direct federal loans are available. The universities and associations describe current harm from a loss of funding and greater harm in the immediate future if students are not able to obtain federal loans and begin or return to their studies.

Defendants first argue that Plaintiffs delayed in filing this action and that counters against a finding of irreparable harm. The Ninth Circuit has noted that "[d]elay by itself is not a determinative factor in whether the grant of interim relief is just and proper." *Aguayo ex rel. NLRB v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988). The Ninth Circuit also has noted that delay is most relevant when it "suggests that 'the harm has occurred and the parties cannot be returned to the status quo.'" *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993), *vacated on reh'g en banc on other grounds*, 19 F.3d 449 (9th Cir. 1994) (quoting *Tomco*, 853 F.2d at 750). Additionally, the court has emphasized that a "long delay" before seeking injunctive relief "implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

Plaintiffs first waited to see if a universal injunction, which was requested in one of the cases before Judge Howell, would be issued in that consolidated lawsuit. If so, the Final Rule would not go into effect and Plaintiffs would not suffer imminent harm. When the *Nurse*

---

[15] Defendants assert in a footnote that Plaintiffs cannot establish irreparable harm because the *Nurse Practitioners* court already enjoined the extra-statutory elements. This is unavailing because the Department's decision here did not rely on the extra-statutory factors. Plaintiffs also state that if the *Nurse Practitioners* stay is lifted and Defendants apply the extra-statutory factors to deny professional status to the N.D. degree, Plaintiffs can file a new motion before this Court.

*Practitioners* court did not issue a complete universal injunction, Plaintiffs attempted to convince Defendants voluntarily to change its categorization of an N.D. degree, like it did after the *Nurse Practitioners* decision for 18 other degrees, before filing for Court intervention. This conduct was reasonable. Nor did Plaintiffs significantly delay in filing this action regardless of those efforts, by filing within one month of the Final Rule going into effect. Additionally, the harms claimed by Plaintiffs are not only in the past, but are ongoing. The Court does not find that delay detracts from the irreparable harm shown by Plaintiffs.

Defendants next argue that Plaintiffs cannot show irreparable harm because the harm to the institutions is merely economic and not severe enough because it does not "threaten the existence" of the institutions. But the latter is *sufficient* but not *required* to show irreparable harm. *Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 977 (9th Cir. 2026) (stating that the threat of going out of business is sufficient to show irreparable harm even if money losses are recoverable, but that "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm independent of a threat of being put out of business because they are often not quantifiable and cannot be fully remedied with a financial award" (quotation marks omitted)). Additionally, Plaintiffs assert economic harm that is non-recoverable through money damages, and assert more than simply economic harm.

Defendants also argue that Plaintiffs only show "past" harm. Plaintiffs, however, have shown irreparable harm by detailing the effects on their missions and core activities, and the loss of membership and associated revenue. As explained by the court in *Nurse Practitioners*, these harms likely will last for at least a year, 836 F. Supp. 3d at 207, which means the Spring 2027 and Fall 2027 semesters (or Winter 2026, Spring 2027, and Fall 2027 quarters, if applicable), will be affected. Thus, the harm is not simply for the Fall 2026 term, which Defendants contend

is "past" harm. Plaintiffs' quantification of the harm *already* suffered only supports that Defendants' ongoing violation will continue to cause this same level of harm, if not more, in the future terms. *See Porter v. Jones*, 319 F.3d 483, 491 (9th Cir. 2003) ("Although Plaintiff's allegations are rooted in events that occurred in the past, the injunctive and declaratory relief they seek would prevent future and ongoing illegality.").

This same point applies to AANMC's attestation that it already has lost one institutional member. That "past" harm demonstrates the likelihood that future institutional members will have to leave the organization absent an injunction. Defendants argue that Plaintiffs do not explain how or show that an injunction will avoid *future* harm, but the Court disagrees. Plaintiffs have submitted declarations from students and prospective students that if the Final Rule changes, they will enroll in school and stay or remain members of Plaintiffs, but if it does not, they will not. Plaintiffs also submit declarations from the universities that they pay dues based on student attendance. Same with AANMC's declaration about the loss of the institutional member. The impact on future membership and revenue is self-evident.[16]

Plaintiffs' loss of revenue also is irreparable, as unrecoverable in this APA case. *See Nurse Practitioners*, 836 F. Supp. 3d at 207 ("[T]hreat of unrecoverable economic loss does amount to irreparable harm."); *see also California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) ("Economic harm is not normally considered irreparable. However, such harm is irreparable here

---

[16] Defendants argue that Plaintiffs cannot show that the Final Rule is the cause of the claimed reduced enrollment of students because the Act also eliminated the Grad PLUS Loans, and that may be the cause of lower enrollment by students. The Court agrees with the *Nurse Practitioners* court in rejecting this same argument, which explained that "[a]lthough the elimination of the Grad PLUS programs are likely affecting enrollment as well, those harms do not replace, but rather compound, the harms caused by the Department's likely unlawful regulatory definition of 'professional degree' for loan eligibility purposes." 836 F. Supp. 3d at 200.

because the states will not be able to recover monetary damages connected to the [final rules]. *See* 5 U.S.C. § 702 (permitting relief 'other than money damages') . . . ." (citation omitted)).

In sum, Plaintiffs have demonstrated significant and varied irreparable injury. The Court rejects Defendants' arguments to the contrary.[17]

**D. Balance of Equities and Public Interest**

The Court turns to the final two *Winter* factors, the balance of the equities and the public interest. These two factors "merge" into one when "the Government is the party opposing the injunction." *Galvez v. Jaddou*, 52 F.4th 821, 831 (9th Cir. 2022) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009) (applying merged factors in stay context)). These factors merge because "the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original) (applying merged factors in preliminary injunction context).

Defendants argue that the government may be harmed by the grant of relief because it may have to provide unsubsidized loans to persons who ultimately will be determined ineligible, and may not be able to recover those amounts. The Court finds this purported harm speculative. For it to occur a student must borrow above the graduate level cap and not repay despite contractual obligations requiring repayment and the fact that these loans generally are not dischargeable in bankruptcy. The general statistics provided by Defendants are unpersuasive. Further, Defendants' argument is based on an assumption that *Defendants* are likely to succeed on the merits, when the Court has found that *Plaintiffs* are likely to succeed on the merits.

---

[17] The Court has considered, and rejected, any argument not specifically addressed herein.

Moreover, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

"There is generally no public interest in the perpetuation of unlawful agency action." *See Newby*, 838 F.3d at 12. "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *see also Nurse Practitioners*, 836 F. Supp. 3d at 208 (same).

Moreover, in addition to a substantial public interest in ensuring that the government obeys the law, "[t]he loss of educational and vocational opportunities for . . . professional students is also detrimental to the public, particularly in underserved communities that may face a shortage of healthcare and other critical professional services." *Nurse Practitioners*, 836 F. Supp. 3d at 208-09. Considering all relevant interests, Plaintiffs clearly have shown that the balance of the equities tips in their favor.

**E. Scope of Relief**

Defendants argue that if Plaintiffs are successful, their requested preliminary injunction should be limited in scope, because it requests relief that resolves the final merits of Plaintiffs' claims and is not simply to place the parties in the status quo ante. This includes requesting vacatur of the agency action and the declaratory relief. This argument is moot in light of Plaintiffs narrowing their requested scope of relief at oral argument.

Defendants also argue against relief directed at any person other than Plaintiffs and their members. Again, Plaintiffs limited their requested relief at oral argument to an injunction only for Plaintiffs and their members.

**F. Defendants' Request for a Bond**

Rule 65(c) of the Federal Rules of Civil Procedure states that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Federal courts, however, have discretion as to the amount of the security and whether to even require a security in the first place. *See Couturier*, 572 F.3d at1086 ("Rule 65(c) invests the district court with discretion as to the amount of the security required, *if any*." (emphasis in original) (cleaned up)); *see also People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985) ("The court has discretion to dispense with the security requirement . . . where requiring security would effectively deny access to judicial review."), *amended*, 775 F.2d 998 (9th Cir. 1985).

Defendants request a bond, but do not propose any specific amount. They request that the Court estimate the damages of loans provided if the injunction is error. Several factors weigh against requiring Plaintiffs to post a bond.

First, as previously discussed, whether Defendants will suffer damages is speculative. Even if Defendants could show a possibility of damages, the Court has considered the relative hardships and the likelihood of success on the merits and concludes that to require any security in this case would be unjust.

Second, the balance of equities weighs overwhelmingly in favor of Plaintiffs. *See Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996) ("Where the balance of these equities weighs overwhelmingly in favor of the party seeking the injunction, a district court has the discretion to waive the Rule 65(c) bond requirement."). As a result of Defendants' conduct, Plaintiffs face irreparable harm to their ability to fund their missions, universities face significant reductions

and possible closure, and current students face the irreparable loss of their educational opportunities. Defendants, at most, face only some monetary loss.

Third, for all the reasons discussed above, Plaintiffs have shown a strong likelihood of success on the merits. This also supports the Court waiving the bond requirement. *See Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972) (holding that a "strong likelihood of success on the merits" supports the exercise of a district court's discretion not to require the posting of a bond).

And fourth, requiring a bond would constrain Plaintiffs' ability to enforce their rights. *See Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 780 F. Supp. 3d 897, 926 (N.D. Cal. 2025) ("Because this litigation is brought by nonprofit organizations to protect the public interest and ensure compliance with federal law, the Court declines the Government's request [for a bond]."); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 454 (D. Md. 2025) (rejecting argument that potential unrecoverable expenditures by the government supports a bond and explaining that "[b]ecause the Court has found that Plaintiffs are likely to succeed on their claim that the withholding of the funds at issue in this case is unconstitutional, the Court again declines to require a bond").[18] "Because this litigation is brought to protect the public interest and ensure compliance with federal law, the Court concludes that requiring Plaintiffs to post a bond is not needed." *See Or. Council for Humans. v. United States DOGE Serv.*, 794 F. Supp. 3d 840, 900 (D. Or. 2025).

[18] The Court acknowledges that other courts, including courts in this circuit, have chosen to impose *nominal* bonds instead of no bond at all. *See, e.g.*, *S.F. A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1234 (N.D. Cal. 2025) (imposing bond of $1,000); *S. Educ. Found. v. United States Dep't of Educ.*, 784 F. Supp. 3d 50, 76 (D.D.C. 2025); *Thakur v. Trump*, 787 F. Supp. 3d 955, 1005 (N.D. Cal. 2025) (imposing bond of $100), *aff'd in part, rev'd in part on other grounds and remanded*, 176 F.4th 1187 (9th Cir. 2026); *New York v. Kennedy*, 789 F. Supp. 3d 174, 214 (D.R.I. 2025) (imposing bond of $100). Here, Defendants did not request, nor does the Court see the value in imposing, a nominal or symbolic bond. Indeed, as noted, Defendants did not propose any specific amount for the bond.

### G. Stay Pending Appeal

Defendants request a stay pending appeal. The Supreme Court has explained the four traditional factors to be weighed when considering a request to stay a lower court's decision pending resolution of an appeal. Those factors are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Alabama Ass'n of Realtors v. Dep't of Health & Hum., Servs.*, 594 U.S. 758, 762 (2021) (per curiam).

As discussed above, it is Plaintiffs, not Defendants, who have clearly shown a likelihood of success on the merits. Further, the Court has rejected Defendants' argument that the government faces irreparable harm from a preliminary injunction, whereas Plaintiffs do face irreparable harm if this preliminary injunction is not granted. The public interest also supports Plaintiffs. Finally, a stay pending appeal will substantially injure Plaintiffs, who face significant loss to their core business activities and funding, and an appeal may well bleed into the Spring 2027 term, the Summer 2027 term, and possibly the Fall 2027 term, compounding these harms if the injunction is stayed. The Court denies Defendants' request for a stay pending appeal.

## PRELIMINARY INJUNCTION

**IT IS HEREBY ORDERED** that the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction, as modified at oral argument, and until this Court orders otherwise and except as otherwise expressly permitted by this Preliminary Injunction, or until such time as the parties agree in writing to amend, supersede, or terminate this Preliminary Injunction:

1. With respect to Plaintiffs and their members, Defendants shall treat the N.D. degree as a "professional degree" under 34 C.F.R. § 685.102 (2026), and shall treat students pursuing an N.D. degree as "professional students" under the regulation; and

2. Defendants' attorneys shall provide written notice of this Order to Defendants within 7 calendar days of this Preliminary Injunction and shall file a detailed written report on the docket in this case within 14 calendar days of this Preliminary Injunction advising the Court of the steps Defendants have taken to comply with this Preliminary Injunction.

**CONCLUSION**

The Court GRANTS Plaintiffs' Motion for Preliminary Injunction (ECF 4), as modified at oral argument and as stated above.

**IT IS SO ORDERED**.

DATED this 16th day of October, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge